## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## HUNTINGTON DIVISION

**LANCE R. BELVILLE, DONALD C. CARR, MINDI STEWART, STANLEY STEWART, DEAN RICHARDSON, CHRISTINE SALAMONE, CHARLES JOHNSON, JILL DURANT, BEVERLY GORTON, JOSH LEGATO, MICHAEL ANTRAMGARZA, ROOFWERKS, INC., QUINTIN WILLIAMS, ACA LEGAL INVESTIGATIONS, INC., JOHN MCGEE, MILLS ALLISON, DAVID H. PATTON, INEZ A. PATTON, LAURA ELSINGER, and GABRIEL KLETSCHKA, individually and on behalf of all others similarly situated,**

        **Plaintiffs,**

**v.**

        **CIVIL ACTION NO.:** `3:13-cv-6529`

**FORD MOTOR COMPANY,**

        **Defendant.**

### CLASS ACTION COMPLAINT

Plaintiffs Lance R. Belville, Donald C. Carr, Mindi Stewart, Stanley Stewart, Dean Richardson, Christine Salamone, Charles Johnson, Jill Durant, Beverly Gorton, Josh Legato, Michael Antramgarza, Roofwerks, Inc., Quintin Williams, ACA Legal Investigations, Inc., John McGee, Mills Allison, David H. Patton, Inez A. Patton, Laura Elsinger, and Gabriel Kletschka (collectively, "Plaintiffs"), individually and on behalf of the other members of the below-defined nationwide and statewide classes they respectively seek to represent (collectively the "Class," unless otherwise identified herein), for their Class Action Complaint (the "Complaint") allege against Defendant Ford Motor Company ("Ford" or "Defendant"), upon personal knowledge as

to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## I.    NATURE OF THE CASE

1.    This class action lawsuit is brought by Plaintiffs seeking damages and equitable relief on their own behalf and on behalf of the other Class members, each of whom purchased or leased one or more Ford vehicles manufactured between 2002 and 2010 equipped with an electronic throttle control system but not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration (the "Ford Vehicles").  This Complaint does not assert, and is not intended to assert, wrongful death or personal injury claims, or any damages therefrom.

2.    Ford Vehicles are vulnerable to sudden unintended acceleration events.

3.    Ford has admitted that its Ford Vehicles are prone to sudden unintended acceleration and that sudden unintended acceleration has numerous causes.

4.    In addition, and most significantly, regardless of the cause of these admittedly foreseeable events, the Ford Vehicles share a common design defect in that they lack adequate fail-safe systems, including a reliable Brake Over Accelerator ("BOA") system (also sometimes referred to as a "Brake Override System") that would allow a driver to mitigate sudden unintended acceleration by depressing the brake.

5.    A BOA system is a system designed to allow a driver to intervene to overcome unintended throttle opening by returning the throttle to idle when certain conditions are met.

6.    Ford could have and should have prevented the dangers presented by these foreseeable incidents by including a BOA or other fail-safe systems in its Ford Vehicles.

7.     The common design defect in all of the Ford Vehicles manufactured between 2002 and 2010 is that they are fitted with an electronic throttle control and do not include a fail-safe system such as a BOA.

8.     Each person who has owned or leased a Ford Vehicle vulnerable to sudden unintended acceleration during the time period relevant to this action paid more for the Ford Vehicle than they would have paid, or would not have purchased or leased the Ford Vehicle altogether, because of the defective nature of the Ford Vehicles resulting from the absence of a fail-safe such as a BOA to prevent sudden unintended acceleration events in each of them.

9.     Ford has received hundreds, if not thousands, of reports from owners of Ford Vehicles with these electronics, including police departments, showing that its "drive-by-wire" electronics are not fault tolerant for problems affecting ETC.  These reports showed that the complex electronic interactions inherent to "drive-by-wire" electronics were bypassing design features in this system that were supposed to provide owners with fail-safe protection against a potential catastrophic loss of throttle control.

10.     As Ford sold and/or leased more Ford Vehicles with drive-by-wire electronics after 2002, it became clear that in hundreds of instances, sudden unintended acceleration events occurred without generating a diagnostic trouble code ("DTC") to immediately put the Ford Vehicle in the "limp-home mode."  As a result, there was no fail-safe protection in the Ford Vehicles against a potentially catastrophic unintended acceleration event.

11.     Beginning in 2010, recognizing its deadly failure to implement adequate fail-safe systems on its earlier Ford Vehicles, Ford began installing a BOA system on some of its North American vehicles.  Ford, however, has failed to remedy, or even warn owners and/or lessees about, the lack of a BOA or other fail-safe system on its earlier Ford Vehicles.

3

## II.   JURISDICTION AND VENUE

12.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant, there are more than 100 class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of costs and interest.

13.    The Court has personal jurisdiction over Ford because Ford has purposefully availed itself of the privilege of conducting business activities in the State of West Virginia by advertising and selling its manufactured vehicles (including the Ford Vehicles at issue) within the State of West Virginia.   Additionally, Ford has maintained systematic and continuous business contacts with the State of West Virginia, and is registered to conduct business in this State.

14.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because many of the transactions forming the basis for this action occurred within this District, including the purchases of Ford Vehicles by several Plaintiffs who also reside in this District.

## III.   PARTIES

**A.   Plaintiffs**

**1.   West Virginia**

15.    Lance R. Belville is a resident of Huntington, West Virginia and owns a 2005 Lincoln Town Car (VIN 1LNHM81W55Y665862), which he purchased as a used vehicle from Turnpike Ford, an authorized Ford dealership located in Huntington, West Virginia.  Unknown to Plaintiff Belville at the time of the purchase, but known to Ford, his Town Car was, and is, subject to sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it. Ford did not disclose this defect to Plaintiff Belville, and Plaintiff Belville therefore purchased

his Town Car with the incorrect understanding that his Town Car would be a safe and reliable vehicle.

16.     Plaintiff Belville saw advertisements for and representations about Lincoln vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before he purchased his Town Car in or about January 2008.  Although Plaintiff Belville does not recall the specifics of the many Lincoln advertisements he saw before he purchased his Town Car, he does recall that safety and reliability were very frequent themes across the advertisements he saw.  Those advertisements about safety and reliability influenced his decision to purchase his Town Car.  Had those advertisements and any other materials Plaintiff Belville saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, he would not have purchased his Town Car, or certainly would not have paid as much for it as he did.

17.     Plaintiff Belville thus suffered injury because he paid more for his vehicle than he should have.  A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.  At the time Plaintiff Belville purchased his vehicle, he paid a price based on the value of such a vehicle free of such defects.

18.     Donald C. Carr is a resident of Charleston, West Virginia and owns a 2009 Ford F-150 (VIN 1FTPX14V79FA99268), which he purchased as a new vehicle from Moses Ford, an authorized Ford dealership located in Charleston, West Virginia.  Unknown to Plaintiff Carr at the time of the purchase, but known to Ford, his F-150 was, and is, subject to sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it.  Ford did not disclose this

5

defect to Plaintiff Carr, and Plaintiff Carr therefore purchased his F-150 with the incorrect understanding that his F-150 would be a safe and reliable vehicle.

19.     Plaintiff Carr saw advertisements for and representations about Ford vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before he purchased his F-150 on or about July 31, 2009. Although Plaintiff Carr does not recall the specifics of the many Ford advertisements he saw before he purchased his F-150, he does recall that safety and reliability were very frequent themes across the advertisements he saw.  Those advertisements about safety and reliability influenced his decision to purchase his F-150.  Had those advertisements and any other materials Plaintiff Carr saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, he would not have purchased his F-150, or certainly would not have paid as much for it as he did.

20.     Plaintiff Carr thus suffered injury because he paid more for his vehicle than he should have.  A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.  At the time Plaintiff Carr purchased his vehicle, he paid a price based on the value of such a vehicle free of such defects.

21.     Mindi Stewart is a resident of Orgas, West Virginia and owns a 2008 Ford Focus (VIN 1FAHP35N78W220013), which she purchased as a new vehicle from Bert Wolfe, an authorized Ford dealership located in Charleston, West Virginia.  Unknown to Plaintiff Mindi Stewart at the time of the purchase, but known to Ford, her Focus was, and is, subject to sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it.  Ford did not

disclose this defect to Plaintiff Mindi Stewart, and Plaintiff Mindi Stewart therefore purchased her Focus with the incorrect understanding that her Focus would be a safe and reliable vehicle.

22.     Plaintiff Mindi Stewart saw advertisements for and representations about Ford vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before she purchased her Focus in or about November 2008.  Although Plaintiff Mindi Stewart does not recall the specifics of the many Ford advertisements she saw before she purchased her Focus, she does recall that safety and reliability were very frequent themes across the advertisements she saw.   Those advertisements about safety and reliability influenced her decision to purchase her Focus.  Had those advertisements and any other materials Plaintiff Mindi Stewart saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, she would not have purchased her Focus, or certainly would not have paid as much for it as she did.

23.     Plaintiff Mindi Stewart thus suffered injury because she paid more for her vehicle than she should have.  A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.  At the time Plaintiff Mindi Stewart purchased her vehicle, she paid a price based on the value of such a vehicle free of such defects.

24.     Stanley Stewart is a resident of Orgas, West Virginia and owns a 2008 Ford F-150 (VIN 1FTRF14W38KD17961), which he purchased as a new vehicle from Turnpike Ford, an authorized Ford dealership located in Marmet, West Virginia.  Unknown to Plaintiff Stanley Stewart at the time of the purchase, but known to Ford, his F-150 was, and is, subject to sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it.  Ford did not

disclose this defect to Plaintiff Stanley Stewart, and Plaintiff Stanley Stewart therefore purchased his F-150 with the incorrect understanding that his F-150 would be a safe and reliable vehicle.

25.     Plaintiff Stanley Stewart saw advertisements for and representations about Ford vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before he purchased his F-150 in or about May 2008.  Although Plaintiff Stanley Stewart does not recall the specifics of the many Ford advertisements he saw before he purchased his F-150, he does recall that safety and reliability were very frequent themes across the advertisements he saw.  Those advertisements about safety and reliability influenced his decision to purchase his F-150.  Had those advertisements and any other materials Plaintiff Stanley Stewart saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, he would not have purchased his F-150, or certainly would not have paid as much for it as he did.

26.     Plaintiff Stanley Stewart thus suffered injury because he paid more for his vehicle than he should have.  A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.  At the time Plaintiff Stanley Stewart purchased his vehicle, he paid a price based on the value of such a vehicle free of such defects.

**2.     Florida**

27.     Dean Richardson is a resident of Cape Canaveral, Florida and owns a 2005 Ford Explorer (VIN 1FMDU65W65ZA30849), which he purchased as a new vehicle from an authorized Ford dealership located in Melbourne, Florida.  Unknown to Plaintiff Richardson at the time of the purchase, but known to Ford, his Explorer was, and is, subject to sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it.  Ford did not

disclose this defect to Plaintiff Richardson, and Plaintiff Richardson therefore purchased his Explorer with the incorrect understanding that his Explorer would be a safe and reliable vehicle.

28.     Plaintiff Richardson saw advertisements for and representations about Ford vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before he purchased his Explorer in or about 2005.   Although Plaintiff Richardson does not recall the specifics of the many Ford advertisements he saw before he purchased his Explorer, he does recall that safety and reliability were very frequent themes across the advertisements he saw.  Those advertisements about safety and reliability influenced his decision to purchase his Explorer.  Had those advertisements and any other materials Plaintiff Richardson saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, he would not have purchased his Explorer, or certainly would not have paid as much for it as he did.

29.     Plaintiff Richardson thus suffered injury because he paid more for his vehicle than he should have.   A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.  At the time Plaintiff Richardson purchased his vehicle, he paid a price based on the value of such a vehicle free of such defects.

**3.     Illinois**

30.     Christine Salamone is a resident of Chicago, Illinois and leased a 2008 Ford Edge, which she leased as a new vehicle from Joe Rizza Ford North Riverside, an authorized Ford dealership located in North Riverside, Illinois.  Unknown to Plaintiff Salamone at the time of the lease, but known to Ford, her Edge was subject to sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it.  Ford did not disclose this defect to Plaintiff Salamone,

and Plaintiff Salamone therefore leased her Edge with the incorrect understanding that her Edge would be a safe and reliable vehicle.

31.     Plaintiff Salamone saw advertisements for and representations about Ford vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before she leased her Edge beginning in or about March 2008.  Although Plaintiff Salamone does not recall the specifics of the many Ford advertisements she saw before she leased her Edge, she does recall that safety and reliability were very frequent themes across the advertisements she saw.  Those advertisements about safety and reliability influenced her decision to lease her Edge.  Had those advertisements and any other materials Plaintiff Salamone saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, she would not have leased her Edge, or certainly would not have paid as much for it as she did.

32.     Plaintiff Salamone thus suffered injury because she paid more for her vehicle than she should have.  A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.  At the time Plaintiff Salamone leased her vehicle, she paid a price based on the value of such a vehicle free of such defects.

**4.     Maryland**

33.     Charles Johnson is a resident of Valencia, California and owns a 2004 Mercury Mountaineer (VIN 4M2DU86WO4ZJ04841), which he purchased as a new vehicle from Safford Mercury Lincoln, an authorized Mercury dealership located in Silver Springs, Maryland. Unknown to Plaintiff Johnson at the time of the purchase, but known to Ford, his Mountaineer was, and is, subject to sudden unintended acceleration and lacking in adequate fail-safe systems

10

to prevent it.  Ford did not disclose this defect to Plaintiff Johnson, and Plaintiff Johnson therefore purchased his Mountaineer with the incorrect understanding that his Mountaineer would be a safe and reliable vehicle.

34.     Plaintiff Johnson saw advertisements for and representations about Mercury vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before he purchased his Mountaineer on or about November 15, 2003.  Although Plaintiff Johnson does not recall the specifics of the many Mercury advertisements he saw before he purchased his Mountaineer, he does recall that safety and reliability were very frequent themes across the advertisements he saw.   Those advertisements about safety and reliability influenced his decision to purchase his Mountaineer. Had those advertisements and any other materials Plaintiff Johnson saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, he would not have purchased his Mountaineer, or certainly would not have paid as much for it as he did.

35.     Plaintiff Johnson thus suffered injury because he paid more for his vehicle than he should have.  A vehicle containing the defects described herein – that is the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.  At the time Plaintiff Johnson purchased his vehicle, he paid a price based on the value of such a vehicle free of such defects.

### 5.     Massachusetts

36.     Jill Durant is a resident of West Peabody, Massachusetts and owns a 2007 Ford Explorer (VIN 1FMEU74EX7UA93939), which she purchased as a used vehicle from Michaud Mitsubishi located in Danvers, Massachusetts.  Unknown to Plaintiff Durant at the time of the lease, but known to Ford, her Explorer was subject to sudden unintended acceleration and

lacking in adequate fail-safe systems to prevent it.  Ford did not disclose this defect to Plaintiff Durant, and Plaintiff Durant therefore purchased her Explorer with the incorrect understanding that her Explorer would be a safe and reliable vehicle.

37.     Plaintiff Durant saw advertisements for and representations about Ford vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before she purchased her Explorer in or about May 2010.  Although Plaintiff Durant does not recall the specifics of the many Ford advertisements she saw before she purchased her Explorer, she does recall that safety and reliability were very frequent themes across the advertisements she saw.  Those advertisements about safety and reliability influenced her decision to purchase her Explorer.  Had those advertisements and any other materials Plaintiff Durant saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, she would not have purchased her Explorer, or certainly would not have paid as much for it as she did.

38.     Plaintiff Durant thus suffered injury because she paid more for her vehicle than she should have.  A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.  At the time Plaintiff Durant purchased her vehicle, she paid a price based on the value of such a vehicle free of such defects.

**6.     Michigan**

39.     Beverly Gorton is a resident of Dearborn Heights, Michigan and owns a 2010 Ford Escape (VIN 1FMCU0C75AKC14705), which she purchased as a new vehicle from Brighton Ford, an authorized Ford dealership located in Brighton, Michigan.  Unknown to Plaintiff Gorton at the time of the purchase, but known to Ford, her Escape was, and is, subject to

sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it.  Ford did not disclose this defect to Plaintiff Gorton, and Plaintiff Gorton therefore purchased her Escape with the incorrect understanding that her Escape would be a safe and reliable vehicle.

40.    Plaintiff Gorton saw advertisements for and representations about Ford vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before she purchased her Escape on or about March 1, 2010.  Although Plaintiff Gorton does not recall the specifics of the many Ford advertisements she saw before she purchased her Escape, she does recall that safety and reliability were very frequent themes across the advertisements she saw.  Those advertisements about safety and reliability influenced her decision to purchase her Escape.  Had those advertisements and any other materials Plaintiff Gorton saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, she would not have purchased her Escape, or certainly would not have paid as much for it as she did.

41.    Plaintiff Gorton thus suffered injury because she paid more for her vehicle than she should have.  A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.  At the time Plaintiff Gorton purchased her vehicle, she paid a price based on the value of such a vehicle free of such defects.

**7.    Missouri**

42.    Josh Legato is a resident of Overland Park, Kansas and owns a 2008 Ford Explorer (VIN 1FMEU75878UA01244), which he purchased as a new vehicle from an authorized Ford dealership located in Kansas City, Missouri.  Unknown to Plaintiff Legato at the time of the purchase, but known to Ford, his Explorer was, and is, subject to sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it.  Ford did not disclose this

defect to Plaintiff Legato, and Plaintiff Legato therefore purchased his Explorer with the incorrect understanding that his Explorer would be a safe and reliable vehicle.

43.    Plaintiff Legato saw advertisements for and representations about Ford vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before he purchased his Explorer in or about March 2009.  Although Plaintiff Legato does not recall the specifics of the many Ford advertisements he saw before he purchased his Explorer, he does recall that safety and reliability were very frequent themes across the advertisements he saw.   Those advertisements about safety and reliability influenced his decision to purchase his Explorer.  Had those advertisements and any other materials Plaintiff Legato saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, he would not have purchased his Explorer, or certainly would not have paid as much for it as he did.

44.    Plaintiff Legato thus suffered injury because he paid more for his vehicle than he should have.  A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.  At the time Plaintiff Legato purchased his vehicle, he paid a price based on the value of such a vehicle free of such defects.

   **8.    New York**

45.    Michael Antramgarza is a resident of Rochester, New York and owns a 2004 Mercury Mountaineer (VIN 4M2ZU86W14ZJ24781), which he purchased as a new vehicle from an authorized Mercury dealership that is no longer in business located in Greece, New York. Unknown to Plaintiff Antramgarza at the time of the purchase, but known to Ford, his Mountaineer was, and is, subject to sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it.  Ford did not disclose this defect to Plaintiff Antramgarza, and

Plaintiff Antramgarza therefore purchased his Mountaineer with the incorrect understanding that his Mountaineer would be a safe and reliable vehicle.

46.    Plaintiff Antramgarza saw advertisements for and representations about Mercury vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before he purchased his Mountaineer in or about July 2004.  Although Plaintiff Antramgarza does not recall the specifics of the many Mercury advertisements he saw before he purchased his Mountaineer, he does recall that safety and reliability were very frequent themes across the advertisements he saw.  Those advertisements about safety and reliability influenced his decision to purchase his Mountaineer. Had those advertisements and any other materials Plaintiff Antramgarza saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, he would not have purchased his Mountaineer, or certainly would not have paid as much for it as he did.

47.    Plaintiff Antramgarza thus suffered injury because he paid more for his vehicle than he should have.  A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.  At the time Plaintiff Antramgarza purchased his vehicle, he paid a price based on the value of such a vehicle free of such defects.

**9.    North Carolina**

48.    Roofwerks, Inc. is a North Carolina corporation located in Wake County, North Carolina.  William Hayes, acting on behalf of Roofwerks, Inc., purchased new Ford vehicles, including the following:

  a. 2006 Ford F-250 (VIN 1FTSW21P16ED74272) purchased on or about July 6, 2006 as a new vehicle from Capital Ford, an authorized Ford dealership, located in Raleigh, North Carolina.

  b. 2008 Ford F-150 (VIN 1FTRX12W38FC32465) purchased on or about December 31, 2011 from Crossroads Ford, an authorized Ford dealership located in Cary, North Carolina.

  c. 2008 Ford F-150 (VIN 1FTRX12W08FC05725) purchased from Crossroads Ford, an authorized Ford dealership located in Cary, North Carolina.

49. Unknown to Mr. Hayes at the time of the purchase, but known to Ford, the Ford Vehicles were, and are, subject to sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it.  Ford did not disclose this defect to Mr. Hayes, and Mr. Hayes therefore purchased the Ford Vehicles with the incorrect understanding that the Ford Vehicles would be safe and reliable.

50. William Hayes, acting on behalf of Plaintiff Roofwerks, saw advertisements for and representations about Ford vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before he purchased the Ford Vehicles.  Although Mr. Hayes does not recall the specifics of the many Ford advertisements he saw before he purchased the Ford Vehicles, he does recall that safety and reliability were very frequent themes across the advertisements he saw.  Those advertisements about safety and reliability influenced his decision to purchase the Ford Vehicles.  Had those advertisements and any other materials Mr. Hayes saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe

systems to prevent this, he would not have purchased the Ford Vehicles, or certainly would not have paid as much for them as he did.

51.     Roofwerks, Inc. has suffered injury because it paid more for the vehicles than it should have.  A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.  At the time Plaintiff Roofwerks purchased the vehicles, it paid a price based on the value of such vehicles free of such defects.

52.     One or more of Roofwerks, Inc.'s drivers has experienced unintended acceleration events in the F-250, specifically when using the cruise control or after pressing the accelerator to speed up.  Upon releasing the accelerator the truck would continue to accelerate once the pedal was released.

53.     Quintin Williams is a resident of Winston-Salem, North Carolina and owns a 2006 Ford Fusion (VIN 3FAFP07196R237069), which he purchased as a used vehicle from Parkway Ford, an authorized Ford dealership located in Winston-Salem, North Carolina. Unknown to Plaintiff Williams at the time of the purchase, but known to Ford, his Fusion was, and is, subject to sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it.  Ford did not disclose this defect to Plaintiff Williams, and Plaintiff Williams therefore purchased his Fusion with the incorrect understanding that his Fusion would be a safe and reliable vehicle.

54.     Plaintiff Williams saw advertisements for and representations about Ford vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before he purchased his Fusion in or about October 2012.  Although Plaintiff Williams does not recall the specifics of the many Ford advertisements

he saw before he purchased his Fusion, he does recall that safety and reliability were very frequent themes across the advertisements he saw.  Those advertisements about safety and reliability influenced his decision to purchase his Fusion.  Had those advertisements and any other materials Plaintiff Williams saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, he would not have purchased his Fusion, or certainly would not have paid as much for it as he did.

55.    Plaintiff Williams thus suffered injury because he paid more for his vehicle than he should have.  A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.  At the time Plaintiff Williams purchased his vehicle, he paid a price based on the value of such a vehicle free of such defects.

**10.    Oklahoma**

56.    ACA Legal Investigations, Inc. is an Oklahoma corporation located in Tulsa, Oklahoma.  A. Cord Adams, acting on behalf of ACA Legal Investigations, Inc., purchased a 2007 Ford Edge (VIN 2FMDK39C77BA78533) as a used vehicle in Collinsville, Oklahoma. Unknown to Mr. Adams at the time of the purchase, but known to Ford, the Edge was, and is, subject to sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it. Ford did not disclose this defect to Mr. Adams, and Mr. Adams therefore purchased the Edge with the incorrect understanding that the Edge would be a safe and reliable vehicle.

57.    A. Cord Adams, acting on behalf of Plaintiff ACA Legal Investigations, saw advertisements for and representations about Ford vehicles on television, in magazines, on billboards, and on the Internet during the several years before he purchased the Edge on or about March 18, 2008.  Although Mr. Adams does not recall the specifics of the many Ford

18

advertisements he saw before he purchased the Ford Vehicles, he does recall that safety and reliability were very frequent themes across the advertisements he saw.  Those advertisements about safety and reliability influenced his decision to purchase the Edge.   Had those advertisements and any other materials Mr. Adams saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, he would not have purchased the Edge, or certainly would not have paid as much for it as he did.

58.     ACA Legal Investigations, Inc. has suffered injury because it paid more for the vehicles than it should have.  A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.   At the time Plaintiff ACA Legal Investigations purchased the vehicles, it paid a price based on the value of such vehicles free of such defects.

**11.     Pennsylvania**

59.     John McGee is a resident of Drums, Pennsylvania and owns a 2006 Ford Mustang (VIN 1ZVFT80NX65127973), which he purchased as a new vehicle from Barber Ford, an authorized Ford dealership located in Hazleton, Pennsylvania.  Unknown to Plaintiff McGee at the time of the purchase, but known to Ford, his Mustang was, and is, subject to sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it.  Ford did not disclose this defect to Plaintiff McGee, and Plaintiff McGee therefore purchased his Mustang with the incorrect understanding that his Mustang would be a safe and reliable vehicle.

60.     Plaintiff McGee saw advertisements for and representations about Ford vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before he purchased his Mustang on or about June

19, 2006.   Although Plaintiff McGee does not recall the specifics of the many Ford advertisements he saw before he purchased his Mustang, he does recall that safety and reliability were very frequent themes across the advertisements he saw.   Those advertisements about safety and reliability influenced his decision to purchase his Mustang.   Had those advertisements and any other materials Plaintiff McGee saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, he would not have purchased his Mustang, or certainly would not have paid as much for it as he did.

61.     Plaintiff McGee thus suffered injury because he paid more for his vehicle than he should have.   A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.   At the time Plaintiff McGee purchased his vehicle, he paid a price based on the value of such a vehicle free of such defects.

### 12.     South Carolina

62.     Mills Allison is a resident of Studio City, California and owns a 2004 Ford Explorer (VIN 1FMZU62K54UC18586), which he purchased as a used vehicle from a private party located in Greenville, South Carolina.   Unknown to Plaintiff Allison at the time of the purchase, but known to Ford, his Explorer was, and is, subject to sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it.   Ford did not disclose this defect to Plaintiff Allison, and Plaintiff Allison therefore purchased his Explorer with the incorrect understanding that his Explorer would be a safe and reliable vehicle.

63.     Plaintiff Allison saw advertisements for and representations about Ford vehicles on television, in magazines, on billboards, and on the Internet during the several years before he purchased his Explorer on or about December 1, 2005.   Although Plaintiff Allison does not recall

the specifics of the many Ford advertisements he saw before he purchased his Explorer, he does recall that safety and reliability were very frequent themes across the advertisements he saw. Those advertisements about safety and reliability influenced his decision to purchase his Explorer. Had those advertisements and any other materials Plaintiff Allison saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, he would not have purchased his Explorer, or certainly would not have paid as much for it as he did.

64. Plaintiff Allison thus suffered injury because he paid more for his vehicle than he should have. A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects. At the time Plaintiff Allison purchased his vehicle, he paid a price based on the value of such a vehicle free of such defects.

**13. Virginia**

65. David H. Patton and Inez A. Patton are residents of Clarksville, Virginia and own a 2006 Lincoln Town Car (VIN 1LNHM81W16Y648171), which they purchased as a used vehicle from Greenbrier Dodge, a dealership located in Chesapeake, Virginia. Unknown to Plaintiffs Patton at the time of the purchase, but known to Ford, their Town Car was, and is, subject to sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it. Ford did not disclose this defect to Plaintiffs Patton, and Plaintiffs Patton therefore purchased their Town Car with the incorrect understanding that their Town Car would be safe and reliable.

66. Plaintiffs Patton saw advertisements for and representations about Lincoln vehicles on television, in magazines, on billboards, in brochures at dealerships, on window stickers, and on the Internet during the several years before they purchased their Town Car on or about July 18, 2009. Although Plaintiffs Patton do not recall the specifics of the many Lincoln

advertisements they saw before they purchased their Town Car, they do recall that safety and reliability were very frequent themes across the advertisements they saw.  Those advertisements about safety and reliability influenced their decision to purchase their Lincoln Town Car.  Had those advertisements and any other materials Plaintiffs Patton saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, they would not have purchased their Lincoln Town Car, or certainly would not have paid as much for it as they did.

67.     Plaintiffs Patton thus suffered injury because they paid more for their vehicle than they should have.  A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.  At the time Plaintiffs Patton purchased their vehicle, they paid a price based on the value of such a vehicle free of such defects.

68.     During their ownership of this Lincoln Town Car, Plaintiffs Patton have experienced instances where the vehicle suddenly accelerated.  These incidents typically have occurred at fairly low speeds and when other vehicles were very close.  To prevent accidents, it has been necessary to press extremely hard on the brake pedal and in a couple of instances to also shift into neutral.

**14.     Wisconsin**

69.     Laura Elsinger is a resident of Milwaukee, Wisconsin and owns a 2008 Ford Escape (VIN 1FMCU93118KC46058), which she purchased as a new vehicle from Creger Ford, an authorized Ford dealership located in Milwaukee, Wisconsin.  Unknown to Plaintiff Elsinger at the time of the purchase, but known to Ford, her Escape was, and is, subject to sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it.  Ford did not

disclose this defect to Plaintiff Elsinger, and Plaintiff Elsinger therefore purchased her Escape with the incorrect understanding that her Escape would be a safe and reliable vehicle.

70.     Plaintiff Elsinger saw advertisements for and representations about Ford vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before she purchased her Escape in or about April 2008.  Although Plaintiff Elsinger does not recall the specifics of the many Ford advertisements she saw before she purchased her Escape, she does recall that safety and reliability were very frequent themes across the advertisements she saw.  Those advertisements about safety and reliability influenced her decision to purchase her Escape.  Had those advertisements and any other materials Plaintiff Allison saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, she would not have purchased her Escape, or certainly would not have paid as much for it as she did.

71.     Plaintiff Elsinger thus suffered injury because she paid more for her vehicle than she should have.  A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.  At the time Plaintiff Elsinger purchased her vehicle, she paid a price based on the value of such a vehicle free of such defects.

72.     Gabriel Kletschka is a resident of Neenah, Wisconsin and owns a 2005 Ford F-150 (VIN IFTPW14555KE43698), which he purchased as a used vehicle from Van Dyn Hoven Ford, an authorized Ford dealership located in Kaukauna, Wisconsin.  Unknown to Plaintiff Kletschka at the time of the purchase, but known to Ford, his F-150 was, and is, subject to sudden unintended acceleration and lacking in adequate fail-safe systems to prevent it.  Ford did

not disclose this defect to Plaintiff Kletschka, and Plaintiff Kletschka therefore purchased his F-150 with the incorrect understanding that his F-150 would be a safe and reliable vehicle.

73.     Plaintiff Kletschka saw advertisements for and representations about Ford vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before he purchased his F-150 in or about December 2007.  Although Plaintiff Kletschka does not recall the specifics of the many Ford advertisements he saw before he purchased his F-150, he does recall that safety and reliability were very frequent themes across the advertisements he saw.  Those advertisements about safety and reliability influenced his decision to purchase his F-150.  Had those advertisements and any other materials Plaintiff Kletschka saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, he would not have purchased his F-150, or certainly would not have paid as much for it as he did.

74.     Plaintiff Kletschka thus suffered injury because he paid more for his vehicle than he should have.  A vehicle containing the defects described herein – that is, the sudden unintended acceleration defects and the absence of adequate fail-safe systems to prevent it – is worth less than a vehicle free of such defects.  At the time Plaintiff Kletschka purchased his vehicle, he paid a price based on the value of such a vehicle free of such defects.

**B.     Defendant**

75.     Ford Motor Company ("Ford") is a corporation doing business in all fifty states (including the District of Columbia) and is organized under the laws of the State of Delaware, with its principal place of business in Dearborn, Michigan.  At all times relevant to this action, Ford manufactured, sold, and purportedly warranted, under the Ford, Lincoln, and Mercury brand names, the Ford Vehicles at issue throughout the United States.

24

## IV.   TOLLING OF THE STATUTE OF LIMITATIONS

**A.   Discovery Rule Tolling**

76.    Plaintiffs could not have discovered through the exercise of reasonable diligence that their Ford Vehicles were defective within the time period of any applicable statutes of limitation.

77.    Among other things, Plaintiffs did not know and could not have known that the Ford Vehicles were vulnerable to sudden unintended acceleration and that they lacked adequate fail-safe systems, such as a BOA, to allow the driver to mitigate it.

**B.   Fraudulent Concealment Tolling**

78.    Throughout the time period relevant to this action, Ford affirmatively concealed from Plaintiffs and the other Class members the defect described herein.  Indeed, Ford kept Plaintiffs and the other Class members ignorant of vital information essential to the pursuit of their claims, and as a result, neither Plaintiffs nor the other Class members could have discovered the defect, even upon reasonable exercise of diligence.

79.    Specifically, and as discussed in greater detail below, Ford was aware of the defect as early as 2002.  Despite its knowledge of the defect, Ford continued to manufacture, advertise, sell, lease, and purportedly warrant the Ford Vehicles without disclosing the defect.

80.    Ford has repeatedly and expressly denied the existence of the defect to Plaintiffs and the other Class members.  Ford's affirmative statements of denial concealed Ford's knowledge of the underlying problem from Plaintiffs and the other Class members.

81.    Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiffs and the other Class members have sustained as a result of the defect by virtue of the fraudulent concealment doctrine.

**C.      Estoppel**

82.      Ford was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Ford Vehicles.

83.      Ford knowingly, affirmatively, and actively concealed the true nature, quality, and character of the Ford Vehicles from consumers.

84.      Based on the foregoing, Ford is estopped from relying on any statutes of limitations in defense of this action.

## V.      COMMON FACTUAL ALLEGATIONS

**A.      The Ford Vehicles.**

85.      Beginning in 2002, Ford started manufacturing and selling the Ford Vehicles that included electronic throttle control systems that were subject to sudden unintended acceleration, but did not include an adequate fail-safe, such as a BOA, to mitigate sudden unintended acceleration.

86.      The Ford Vehicles include the following models:

**Ford vehicles:**  2005-2009 Crown Victoria, 2005-2010 E-Series, 2007-2010 Edge, 2009-2010 Escape, 2005-2010 Escape HEV, 2005-2010 Expedition, 2004-2010 Explorer, 2007-2010 Explorer Sport Trac, 2004-2010 F-Series, 2005-2007 Five Hundred, 2009-2010 Flex, 2008-2010 Focus, 2005-2007 Freestyle, 2006-2010 Fusion, 2005-2010 Mustang, 2008-2010 Taurus, 2008-2009 Taurus X, 2002-2005 Thunderbird, and 2010 Transit Connect

**Lincoln vehicles:**  2003-2006 LS, 2006-2008 Mark LT, 2009-2010 MKS, 2010 MKT, 2007-2010 MKX, 2006-2010 MKZ, 2005-2009 Town Car, and 2006-2010 Zephyr

**Mercury vehicles:** 2002-2005 Cougar (XR7), 2005-2009 Grand Marquis, 2009-2010 Mariner, 2005-2010 Mariner HEV, 2006-2010 Milan, 2005-2007 Montego, 2004-2010 Mountaineer, and 2008-2010 Sable

**B.    It Was Technologically Feasible for Ford to Mitigate Sudden Acceleration Events.**

87.    Sudden unintended acceleration can result from multiple potential causes, including, by way of example, a malfunction in the Ford Vehicle's electronic throttle control system (as discussed further below).

88.    Regardless of the "root cause" of sudden unintended acceleration, Ford has had the ability to mitigate sudden acceleration events in the Ford Vehicles, yet failed to do so.

89.    Indeed, Ford could have equipped the Ford Vehicles with a fail-safe that would provide a driver with the ability to mitigate sudden unintended acceleration events from occurring regardless of the cause, but it chose not to.

90.    For example, Ford began installing the BOA, one type of driver-controlled fail-safe, in certain Ford vehicles that it manufactured for the European market as far back as 2005. Other manufacturers were already equipping their vehicles with BOA systems before 2002.

91.    Yet, despite its knowledge of the problem and the availability of this remedy, Ford failed to take any steps to resolve this problem in North America, thus placing Plaintiffs and the other Class members at serious risk in their Ford Vehicles and causing them material financial harm resulting therefrom.

92.    A properly designed BOA system consists of vehicle braking technology that provides the driver with the ability to cancel unwanted torque commands, regardless of the origin, and limit the amount of engine torque by depressing the brake pedal, thereby permitting the brakes to slow the vehicle.

27

93.     Ford now describes its BOA system in recently manufactured automobile owner manuals as follows:

> This vehicle is equipped with a brake over accelerator feature.  In the event the accelerator pedal becomes stuck or entrapped, applying steady and firm pressure to the brake pedal will both slow the vehicle and reduce engine power.  If you experience this condition, apply the brakes and bring your vehicle to a safe stop.  Turn the engine off, shift to P (Park) and apply the parking brake and then inspect the accelerator pedal for any interference.  If none are found and the condition persists, have your vehicle towed to the nearest authorized dealer.

94.     Ford, however, chose not to equip its vehicles for sale and/or lease in North America with the BOA until 2010.

95.     Ford's failure to install a BOA or other fail-safe system in its Ford Vehicles, despite its ability to do so, has resulted in the economic damages described herein.

**C.      Electronic Throttle Control.**

96.     An ETC is a form of automotive technology that electronically, rather than mechanically, connects the accelerator pedal to the throttle.  The ETC takes away the driver's ability to directly control the throttle solely by depressing and releasing the accelerator pedal.  Instead, when the driver depresses the accelerator pedal, a voltage signal is sent to a computer that interprets the signal against other inputs and signals and then determines the throttle position.  Ford has used the same general architecture for its ETC since first introducing this feature on its gasoline-powered vehicles in 2002, including the Ford Vehicles at issue here.

97.     Sometimes referred to as "drive-by-wire," the ETC is a complex system comprised of sensors, integrated circuits, microprocessors, electronic components, and computers designed to electronically control the operation of the vehicle's throttle, including the Ford Vehicles at issue here.

98.     The ETC has sensors at the pedal and throttle body, wiring, and additional electronic circuitry and software that determines necessary throttle opening using various inputs and then positions the throttle according to driver input.

99.     On the Ford Vehicles, the ETC operates via a powertrain control module ("PCM").  The PCM manages engine systems including the throttle valve, fuel injection, ignition, emissions, and other vehicle functions.  The PCM determines the required throttle position by making computerized calculations measured by sensors in the automobile that gather data including accelerator pedal position, engine speed, and vehicle speed.

100.    The computer processor in the PCM runs programs that consist of hundreds of thousands of lines of code.  Potential problems may go undetected and result in unwanted outcomes, such as sudden unintended acceleration.  For this reason, a well-designed ETC should be backed up by a fail-safe system, such as a BOA, that returns throttle control to the driver when the driver depresses the brake.

101.    The throttle valve is the primary control for engine speed and power.  It functions by regulating the amount of air entering the engine.  The electronic fuel injection system within the PCM maintains the proper air-to-fuel ratio based on the mass airflow and other sensor signals.  The Ford Vehicle's engine is then adjusted to the required position via a closed-loop control algorithm within the PCM.

102.    The ETC is purportedly designed to benefit the driver by improving the ease with which the driver can change gears and accommodate engine torque changes associated with accelerating and decelerating the Ford Vehicle.  Other purported benefits of the ETC include improvements to fuel efficiency and reduced emissions.

103.    The ETC is supposed to facilitate the integration of other automotive features such as cruise control, traction control, and stability control because the throttle can be moved irrespective of the position of the accelerator pedal.

104.    By model year 2009, Ford had installed ETC systems in approximately 96% of its vehicle fleet, including in the Ford Vehicles at issue here.

105.    Sudden unintended acceleration may result from a malfunction in the ETC.  Such a malfunction may be attributed to electromagnetic interference, or EMI, between or among electronic systems in those Ford Vehicles, resistive shorts, and other voltage and resistance fluctuations.

106.    As a result of the problems caused by the interrelationship between these electronic components, set forth in greater detail below, Ford Vehicles manufactured between 2002 and 2010 with an ETC system, and without adequate fail-safe systems, such as a BOA, are not fault tolerant and are unreasonably dangerous and defective.

107.    The failure to install a BOA or otherwise implement a fault tolerant fail-safe system in these Ford Vehicles renders each of the Ford Vehicles dangerous, unsafe, and worth far less than what each Class member paid for their Ford Vehicles had the truth been known about the lack of a BOA or other system to prevent sudden unintended acceleration events.

**D.    Ford Represented That Its ETC System Was Safe for Its Intended Use.**

108.    Since 2002, when Ford first began manufacturing vehicles with an ETC system, Ford has failed to inform customers who purchased and/or leased the Ford Vehicles that they were unsafe for operation or that they were susceptible to sudden unintended acceleration events.

109.    Ford has failed to inform its customers that the ETC system, in particular, was more vulnerable to sudden unintended acceleration events.

110.    Ford has similarly failed to inform its customers that adequate fail-safe systems, such as a BOA, have not been installed on its Ford Vehicles to keep its occupants safe should an unintended sudden acceleration event occur.

111.    Indeed, to the contrary, from 2002 to 2010, Ford has consistently marketed its vehicles as "safe," that Ford is a "safety leader," and that vehicles introduced from 2002 to 2010 build on Ford's "legacy" of safety.

112.    For example, in its 2004 Annual Report, Ford stated:  "We conduct engineering, research and development primarily to improve the performance (including fuel efficiency), safety and customer satisfaction of our products, and to develop new products."

113.    In a 2004 Ford press release, Ford stated it was "underscoring its commitment to safety leadership."

114.    And in 2005, Ford boasted of its efforts to "share safety technology to advance vehicle safety."   In its 2005 Annual Report, Ford stated: "Our strategy is to differentiate ourselves in the marketplace through design innovation, safety innovation, and new environmentally-friendly technologies."

115.    Ford stated in a 2005 press release that the Ford Escape included "one of the industry's most comprehensive suite of safety technologies."

116.    In a 2006 press release, Sue Cischke, Ford's vice president of Environment and Safety Engineering, stated: "We believe our electronic stability control systems are further improving vehicle safety by helping prevent many accidents from occurring in the first place. . . . Making families safer is a key part of our pledge to drive safety innovation."

117.    Cischke also stated: "The 2006 Ford Explorer's suite of available safety features is unmatched in its class. . . . The new Explorer builds on a legacy of introducing industry-first

safety technologies, with a comprehensive approach to help drivers avoid dangerous situations and help provide increased protection in accidents."

118.   Along those same lines, in its 2006 Annual Report, Ford stated:  "We spend substantial resources ensuring compliance with governmental safety and other standards."

119.   In 2006 press releases, Ford stated that "Safety is paramount with the 2006 Escape" and that the "E-Series also offers a full suite of conventional safety features."

120.   Ford stated of its 2006 Fusion:  "Ford again raises the bar in vehicle safety. . . . Fusion benefits from some of the latest safety technologies available. . . . Inside, Fusion has a long list of advanced safety technologies to protect occupants."   And of the 2006 Mustang:  "With power comes responsibility.  The 2006 Mustang helps occupants stay safe."

121.   Ford separately claimed in a press release that the 2007 Five Hundred vehicle "is already the segment leader in safety."

122.   In 2007, Ford stated that its 2007 Sport Trac "offers a comprehensive active safety package to help prevent accidents from occurring" and "an exclusive active safety system not offered by any other manufacturer."

123.   In a 2008 press release, Ford stated: "Also new this year is a new standard safety feature – AdvanceTrac® with RSC®.  Already standard on gas-powered models, this patented Ford Motor Company stability control system includes roll stability control.  Escape Hybrid and Mariner Hybrid are the only small hybrids to offer such an advanced safety technology."

124.   In a 2008 commercial for the Ford Taurus, Ford claimed the vehicle was the "safest large car in America."

125.   In its 2009 Annual Report, Ford stated:

Our improvement in overall market share primarily is the result of several factors, including favorable acceptance of our redesigned products, product focus on

32

industry growth segments, and customers' increasing awareness and acceptance of our commitment to leadership in quality, fuel efficiency, safety, smart technologies and value.

\*         \*         \*

In 2010, globally we will deliver substantially more new or freshened product by volume than 2009, bringing to market an unprecedented volume of new products – with class-leading fuel economy, quality, safety and technology.

\*         \*         \*

With bold, emotive design, high levels of quality, fuel economy leadership, top safety ratings, innovative technology, greater feature content than competitive models and higher attractive series, we are able to reduce brand discount and increase revenue.

126.   And in advertisements for the 2009 Ford F-150, Ford claimed the vehicle was the "safest truck in America."

127.   In press releases discussing the 2010 Ford Edge, Ford claimed that the "Edge also delivers on safety."

128.   But despite these repeated and consistent boasts about safety, Ford has failed to deliver to its customers a Ford Vehicle that is reliably safe in the event of a sudden acceleration event, such as one caused by interference with its ETC system.

129.   According to Ford, the safety benefits of its ETC system include:

(a)     Independent, non-parallel voltage slope signals from the accelerator pedal sensors;

(b)     Inverse polarity voltage signals from the throttle plate position sensors;

(c)     "Safe modes" of operation that, in the event of signal mismatch or "out of range" signal, utilize the smallest pedal angle signal and the largest throttle plate angle signal;

(d)  Dual independent processors to monitor the system and ensure safe operation; and

(e)  Double stored memory to ensure avoidance of corrupted stored data being used for comparison (RAM Double Store).

130.  The safety of the ETC system in the Ford Vehicles, however, depends on the ability of a central computer to detect a failure or fault that induces a sudden, unintended activation of the throttle.  The signals from the accelerator pedal sensors are supposed to monitor each other for possible faults and the central processing unit is supposed to detect a fault and immediately reduce the vehicle speed to a level controllable by the brakes, also known as "limp-home mode."

131.  Ford, despite knowing of an available and feasible fail-safe, such as the BOA, failed to install adequate fail-safe systems in its Ford Vehicles for instances when there is interference with the ETC system and sudden unintended acceleration events occur.

132.  Ford has been on notice of the need for an adequate fail-safe system, such as a BOA, in its Ford Vehicles to prevent the unintended acceleration events described herein due to the multitude of reports of these events.

133.  Ford has been on notice of the problems with its Ford Vehicles, such as the problems with the ETC system described herein, that require an adequate fail-safe system, such as a BOA, and has failed to install the fail-safe system that would prevent the sudden unintended acceleration events that result from problems in the ETC system.

134.  Due to Ford's failure to implement adequate fail-safe systems, such as a BOA, in its Ford Vehicles to prevent these events, numerous unwanted throttle activations have occurred in these Ford Vehicles, ending in crashes resulting in serious safety risks, injuries, and/or death.

135.   Ford has received hundreds, if not thousands, of reports from owners of Ford Vehicles, including police departments, showing that its "drive-by-wire" electronics are not fault tolerant for problems affecting ETC.   These reports showed that the complex electronic interactions inherent to "drive-by-wire" electronics were bypassing design features in this system that were supposed to provide owners with "fail-safe" protection against a potential catastrophic loss of throttle control.

136.   As Ford sold and/or leased more Ford Vehicles with "drive-by-wire" electronics after 2002, it became clear that in hundreds of instances, sudden unintended acceleration events occurred without generating a diagnostic trouble code ("DTC") to immediately put the Ford Vehicle in the "limp-home mode."   As a result, there was no fail-safe protection in the Ford Vehicles against a potentially catastrophic unintended acceleration event.

137.   The lack of adequate fail-safe systems, such as a BOA, in these Ford Vehicles is common to all Ford Vehicles owned or leased by Class members, and all of the Ford Vehicles are inherently dangerous as a result of their absence of such fail-safe systems.

**E.**   **The Ford Vehicles' ETC Systems Are Unreasonably Dangerous When Put to Their Intended Use.**

138.   Ford's ETC system is comprised of integrated circuits, microprocessors, electronic components, and computers designed to electronically control the operation of the vehicle's throttle.

139.   In order for the Ford Vehicles to operate safely, fail-safe systems must be integrated into the Ford Vehicles to mitigate instances of sudden unintended acceleration resulting from ETC malfunctions.

140.    ETC systems contain several components that operate in conjunction with other independent systems in Ford's engines.  The ETC components are inherently interactive and, therefore, cannot be adequately and safely isolated from other electronic systems.

141.    ETC systems contain components that "continuously monitor the performance of various sensors and operating conditions" to "determine how much to change the throttle value position" to control acceleration.

142.    Ford's ETC system relinquishes driver control of vehicle acceleration to vehicle electronics that can negatively interact with other electronic systems in the same vehicle.  In cases of failure, the ETC can take control of the throttle away from the driver and produce unintended acceleration of the vehicle.

143.    The Ford Vehicles are defective and unreasonably dangerous because the ETC in those vehicles is vulnerable to, among other things, EMI, resistive shorts, and other voltage and resistance fluctuations, and the system does not include a fail-safe system, such as a BOA, to safely address these incidents of sudden unintended acceleration.

144.    Despite its knowledge of the problem and the availability of technology to substantially reduce or eliminate this problem, Ford failed to incorporate a fail-safe system into the Ford Vehicles that would have substantially reduced or eliminated the possibility of electronic failures seizing control of the Ford Vehicle from the driver resulting in sudden unintended acceleration of the Ford Vehicles.

**F.    Ford Models Equipped with Electronically Controlled Throttles Have a History of Sudden Unintended Acceleration.**

145.    Ford has been aware of the need for a fail-safe, such as a BOA, for decades.

146.    As early as 1973, Ford knew that electromechanical components in its vehicles required fail-safe systems to prevent unintended catastrophic outcomes relating to electronic interference and failures.

147.    The first reports of Ford models experiencing "unexpected vehicle acceleration that compromised vehicle controllability" surfaced in the early 1980s when Ford introduced vehicles equipped with electronic throttle and cruise control systems.

148.    Beginning in 1984, Ford introduced "advanced" versions of its engine electronics and roughly quadrupled the amount of electronics in its vehicles' engine systems that required thousands of additional lines of potentially error prone code.  Thereafter, reports of sudden acceleration events rose dramatically.

149.    Over the next two decades, Ford gained significant knowledge about how the electronic systems in its vehicles interfered with each other, placing its vehicles at substantial risk of sudden unintended acceleration events.

150.    On September 30, 1985, the National Highway Traffic Safety Administration ("NHTSA") opened the first of several investigations involving sudden acceleration events in Ford vehicles.  Ford was aware of and purported to participate in the NHTSA's investigations.

151.    Pursuant to NHTSA's investigation, Ford's Automotive Safety Office ("ASO") began systematically studying its Service Investigation Reports ("SIRs") submitted by field engineers who were already investigating sudden accelerations reported to Ford dealers throughout the United States.

152.    Ford's internal study revealed five principal findings:

(a)    Sudden accelerations from a standstill invariably began at gear engagement;

(b)     Drivers frequently reported that braking during the event was ineffective;

(c)     Field engineers usually identified the cruise control electronics as the cause of the sudden acceleration event;

(d)     Field engineers frequently recommended replacing the cruise control servo or disconnecting the system; and

(e)     Not a single field report identified "driver error" as the cause of a sudden acceleration event.

153.    Ford never disclosed the findings of its internal study to NHTSA or to the public. In fact, in May 1986, Ford informed NHTSA that it had concluded that its automobile systems were not defective.  As a result, on August 5, 1986, NHTSA closed its initial investigation of Ford without finding a safety defect.

154.    On October 21, 1986, Ford's Electrical and Electronics Division ("EED") submitted a report to Ford senior management officials analyzing the reasons behind the rapid rise in undiagnosed failures in Ford's electronic components (the "EED Report").  The EED Report identified six components whose undiagnosed failure rate had experienced the greatest increases.

155.    The EED Report specifically identified "electromagnetic influences in the vehicle environment" due to "the increasing complexity of electrical systems" as the primary cause of the dramatic increase in undiagnosed electronic malfunctions.

156.    Ford's additional testing confirmed that "electromagnetic influences" were also the cause of unintended acceleration events identified in the SIRs that Ford's ASO was concurrently reviewing.

157.   On December 31, 1986, NHTSA notified Ford that it was opening a second investigation into reports of sudden unintended acceleration involving Ford models and specifically requested copies of all SIRs.

158.   Shortly thereafter, Ford's Office of General Counsel ("OGC") issued a directive that all SIRs related to sudden acceleration were to be purged in the year they were generated and all SIRs dating back to 1982 were eligible for immediate destruction.

159.   On January 29, 1987, Ford instructed its managers to discontinue use of existing field report forms when investigating sudden unintended acceleration events.  Notably, Ford management instructed investigators to use an investigative format that did not permit the investigator to indicate what caused the sudden unintended acceleration event.

160.   On March 13, 1987, Ford's ASO responded to NHTSA's specific request for field reports, studies, and investigations pertaining to sudden unintended acceleration events.  In so doing, Ford withheld numerous investigative reports finding that Ford's ETC system was defective and lacked fail-safe measures to prevent electronic override of throttle control by the vehicle operator.

161.   Ford also informed NHTSA that an electronic malfunction that caused a sudden acceleration would be expected to leave "physical evidence" of a defect, a claim it knew from the EED report, the ASO's study of SIRs, and other internal sources, was false.

162.   In October 1987, NHTSA announced that it commissioned the Transportation System Center of Cambridge, Massachusetts, to conduct an industry-wide study of sudden unintended acceleration events.

163.   Shortly after NHTSA's announcement, a report prepared by Ford's Electronics Reliability Study Team identified for senior management the reasons behind the company's

continuing problems with its electronics. The report specifically identified "electrical transients," or EMI, as an ongoing problem, a conclusion that confirmed the results of the EED study.

164.    Ford's Electronics Reliability Study Team analyzed the causes of Ford's continuing electronics problems and concluded the following:

(a)     Electronics were not being designed for changing conditions that could cause or contribute to an electronic malfunction;

(b)     Electronic problems were being detected late in the design cycle due to late commitment of resources, problems with the company's testing procedures, and a willingness to accept low statistical verification that testing procedures were identifying potential failure problems;

(c)     System engineering was too fragmented to address system level electronic issues;

(d)     There was no uniform procedure for circuit analysis;

(e)     The reason that malfunctioning components like the cruise control servo were testing normal was that the company did not understand the cause of said components' failures; and

(f)     Malfunctions caused by "electrical transients," or EMI, continued to plague the company's electronics.

165.    In February 1988, Ford's ASO circulated a memorandum that concluded that the integration of a vehicle's speed control function into the electronic engine control system, which Ford first introduced in its 1984 vehicle platforms, resulted in the exponential increase in sudden unintended acceleration incidents.

40

166.    Despite all of the information Ford had gathered internally evidencing that sudden unintended acceleration in its vehicles was caused by EMI, Ford told NHTSA that its internal investigations supported the conclusion that "pedal misapplication is the most plausible cause."

167.    Over the next two decades, Ford gained significant knowledge about how the electronic systems in its vehicles interfered with each other and placed its vehicles at substantial risk of sudden unintended acceleration events, unless a proper fail-safe was installed.  Ford, however, never installed proper fail-safes in the Ford Vehicles.

168.    Indeed, Ford did nothing to ensure that its customers and the general public were protected from the substantial risk it knew the Ford Vehicles created and failed to communicate or otherwise disclose to its customers or the general public the absence of proper fail-safes in the Ford Vehicles.

**G.      Ford Concealed from Consumers, the General Public, and the Government the Problems with Its Electronic Throttle Control System.**

169.    Ford knew, or should have known, of the need for additional fail-safe systems in its Ford Vehicles due to the problems associated with its ETC system and its propensity to cause or contribute to sudden unintended acceleration events as early as 2002.

170.    In 2002, Ford introduced the ETC, yet another complex series of electronic circuitry, into certain Ford Vehicles.

171.    Ford knew that vehicles with ETC required fail-safe systems that provide the driver with the ability to mitigate sudden unintended acceleration at all times, regardless of the origin of an uncommanded torque input.

172.    Ford knew that its ETC system can only detect a "single-point failure," but not protect against other failures that do not trigger a fault code to put the car into a safe operating or

"limp-home mode", resulting in Ford's selling and/or leasing to Plaintiffs and the other Class members Ford Vehicles known by Ford to be defective.

173.   Ford's ETC system frequently fails to go into the "limp-home mode" or respond to normal braking when electronic failures capable of causing sudden unintended acceleration events occur.

174.   Further, Ford knew that its ETC system failed to go into the "limp-home mode" or respond to normal braking when sudden unintended acceleration events occurred.

175.   In 2002, when Ford began installing advanced engine control systems that relinquished accelerator and throttle control to yet additional electronics in the Ford Vehicles, it again did nothing to change the design of its electronics to protect its customers and the general public from the substantial risk it knew the Ford Vehicles created.

176.   At that time, Ford knew or should have known that the increased incidence of sudden unintended acceleration events was related to the lack of a proper fail-safe to override the interaction of electronically controlled engine components, including the ETC, by allowing the driver to retake control of the throttle by depressing the brake.

177.   Despite Ford's knowledge of the defective and unreasonably dangerous nature of its ETC system and the risk it posed – and continues to pose – to Plaintiffs and the other Class members – Ford continued to design, manufacture, advertise, market, sell, and lease the Ford Vehicles with ETC systems and no proper fail-safe to override the Ford Vehicles' inevitable electronic problems.

178.   Despite Ford's express knowledge of this dangerous product defect, Ford repeatedly omitted the true facts about sudden unintended acceleration events from the federal

government, courts, litigants, Plaintiffs, the other Class members, and the general public who purchased and/or leased Ford Vehicles.

179.    Ford's material misrepresentations and/or omissions regarding its unreasonably dangerous and defective vehicles include but are not limited to:

(a)    Concealing the results of inculpatory studies, investigations, and reports;

(b)    Maintaining a campaign of concealment and deceit designed to prevent the public from learning about the vulnerability of its ETC systems to suffer catastrophic failure;

(c)    Providing the federal government false and misleading information to be used in its reports;

(d)    Improperly citing government reports that Ford knew were erroneous and empirically and scientifically unreliable;

(e)    Falsely representing to the federal government that Ford's other electronic systems do not negatively interact with the ETC system in a way that can cause or contribute to a sudden unintended acceleration event;

(f)    Shielding its own witnesses and representatives from the results of internal studies and reports to avoid testimony that would implicate Ford's ETC system as a contributing cause to sudden unintended acceleration events;

(g)    Withholding from Ford technicians information, including training and instruction necessary for dealers and mechanics to correctly diagnose the cause of sudden unintended acceleration events;

(h)     Withholding from Ford dealers relevant service information and data needed to correctly diagnose electronically-induced sudden unintended acceleration events;

(i)     Failing to warn owners and lessees of Ford Vehicles about the possibility of a sudden electronically-induced loss of throttle control and the time in the specific drive cycle such a malfunction is likely to occur; and

(j)     Failing to inform owners and lessees of Ford Vehicles of the best response to an emergency situation such as a sudden unintended acceleration event.

## H.     Ford Failed to Provide Warnings and Instructions to Owners of the Ford Vehicles.

180.    Ford has long known that the Ford Vehicles have experienced sudden unintended accelerations; that during such a malfunction the driver must apply several times more than normal brake pedal force to have any chance of stopping the car; that under many circumstances even several times more than normal braking force has not prevented a serious accident; and that the best response to such a sudden emergency is to immediately disengage the engine by shifting to neutral, while braking with hard, constant force on the pedal and guiding the car to safety off the roadway.

181.    Ford could have provided such warnings and instructions but it did not.

## I.     Ford Continues to Misrepresent Information about Sudden Unintended Acceleration Events.

182.    In 2010, the United States Congress commenced hearings to address unintended acceleration problems.  As a result of those hearings, the U.S. Department of Transportation's Office of Inspector General ("OIG") issued a report identifying five car companies that accounted for 73% of sudden acceleration reports to NHTSA between 2002 and 2009.

44

183.    According to the OIG, 3,018 reports of sudden unintended acceleration events in Ford models were reported to the government during this time period, accounting for 22 percent of all reports, the most for any automobile manufacturer.

184.    The sudden acceleration figures referenced in the preceding paragraph are grossly understated, inasmuch as an OIG study published on January 3, 2002 found that less than 10% of sudden unintended acceleration events are contained in NHTSA's database.

185.    In June of 2010, NHTSA initiated a review of unintended acceleration events in Ford's Fusion and Mercury Milan sedans, focusing on whether the floor mat could be trapping the gas pedal.  Of note, Ford was aware that the floor mats in those vehicles were not the cause of unintended acceleration events.

186.    In March of 2012, NHTSA notified Ford that it was launching an investigation, referred to as a Preliminary Evaluation, into 2005 and 2006 Ford Taurus and Mercury Sable sedans after receiving thirty (30) complaints from drivers indicating they could not control the speed of their cars.

187.    In July of 2012, NHTSA alerted Ford that it was launching a Preliminary Evaluation into 2002-2004 Ford Escapes and other small crossover vehicles, including certain Mazda models that are mechanically identical to their Ford counterparts.

188.    NHTSA identified nearly one hundred (100) reports from owners of Ford Escapes and Mazda Tributes alleging the throttles on their vehicles failed to return to idle after they eased off the accelerator pedal.

189.    In December of 2012, NHTSA announced an upgrade to its investigation into the unintended acceleration events in Ford vehicles.  NHTSA classified its investigation as an "Engineering Analysis," its highest and most serious grade of investigation.

190.    The purpose of the Engineering Analysis was "to further assess the scope, frequency, and safety consequences of the alleged defect." Additionally, NHTSA's Engineering Analysis expanded the scope of the investigation to include almost twice as many Ford vehicles.

191.    Despite the intensified NHTSA investigation, Ford withheld internal reports and knowledge of sudden unintended acceleration complaints and the causes thereof from not only the federal government but also the general public, including Plaintiffs and the other Class members.

192.    Based upon reasonable belief and contrary to federal law, Ford has repeatedly and systematically failed to notify NHTSA of hundreds of credible sudden unintended acceleration event reports from owners and lessees of Ford Vehicles equipped with the ETC systems, including reports in which the sudden unintended accelerations have resulted in vehicle collisions and deaths and injuries to occupants and pedestrians.

193.    Ford's silence and concealment has enabled it to continue to sell and/or lease its Ford Vehicles without fail-safe systems, such as a BOA, that is necessary to overcome sudden unintended acceleration events, resulting in economic damages to Plaintiffs and the other Class members.

## VI.    CLASS ACTION ALLEGATIONS

194.    Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated. Plaintiffs seek to represent a Class (the "Nationwide Class") initially defined as:

> All current and former owners or lessees of a Ford Vehicle (as defined herein) in the United States.

195.    Additionally, Plaintiffs seek to represent the following statewide classes (the "Statewide Classes") defined as follows:

a.      All current and former owners or lessees of a Ford Vehicle (as defined herein) in West Virginia (the "West Virginia Class").

b.      All current and former owners or lessees of a Ford Vehicle (as defined herein) in Florida (the "Florida Class").

c.      All current and former owners or lessees of a Ford Vehicle (as defined herein) in Illinois (the "Illinois Class").

d.      All current and former owners or lessees of a Ford Vehicle (as defined herein) in Maryland (the "Maryland Class").

e.      All current and former owners or lessees of a Ford Vehicle (as defined herein) in Massachusetts (the "Massachusetts Class").

f.      All current and former owners or lessees of a Ford Vehicle (as defined herein) in Michigan (the "Michigan Class").

g.      All current and former owners or lessees of a Ford Vehicle (as defined herein) in Missouri (the "Missouri Class").

h.      All current and former owners or lessees of a Ford Vehicle (as defined herein) in New York (the "New York Class").

i.      All current and former owners or lessees of a Ford Vehicle (as defined herein) in North Carolina (the "North Carolina Class").

j.      All current and former owners or lessees of a Ford Vehicle (as defined herein) in Oklahoma (the "Oklahoma Class").

k.      All current and former owners or lessees of a Ford Vehicle (as defined herein) in Pennsylvania (the "Pennsylvania Class").

l.      All current and former owners or lessees of a Ford Vehicle (as defined
        herein) in South Carolina (the "South Carolina Class").

m.      All current and former owners or lessees of a Ford Vehicle (as defined
        herein) in Virginia (the "Virginia Class").

n.      All current and former owners or lessees of a Ford Vehicle (as defined
        herein) in Wisconsin (the "Wisconsin Class").

196.    Excluded from each of the Nationwide and Statewide Classes are Defendant Ford
Motor Company and any of its affiliates, parents, subsidiaries, officers, directors, employees,
successors, or assigns; the judicial officers and their immediate family members and court staff
assigned to this case, and any individuals claiming damages from personal injuries arising from
an unintended acceleration incident.  Plaintiffs reserve the right to modify or amend these Class
and Subclass definitions, as appropriate, during the course of this litigation.

197.    This action has been brought and may properly be maintained on behalf of the
Nationwide and Statewide Classes proposed herein under the criteria of Rule 23 of the Federal
Rules of Civil Procedure.

198.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).**  The members of the
Nationwide and State Classes are so numerous and geographically dispersed that individual
joinder of all Class members is impracticable.  While Plaintiffs are informed and believe that
there are not less than tens of thousands of members of the Nationwide and Statewide Classes
members, the precise number of Nationwide and Statewide Class members is unknown to
Plaintiffs, but may be ascertained from Ford's books and records.  Nationwide and Statewide
Class members may be notified of the pendency of this action by recognized, Court-approved

notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

199.   **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).**  This action involves common questions of law and fact, which predominate over any questions affecting individual Nationwide and Statewide Class members, including, without limitation:

      a.     whether Ford engaged in the conduct alleged herein;

      b.     whether Ford's alleged conduct violates applicable law;

      c.     whether Ford designed, advertised, marketed, distributed, leased, sold, or otherwise placed Ford Vehicles into the stream of commerce in the United States;

      d.     whether Ford misled Nationwide and Statewide Class members about the safety and quality of the Ford Vehicles;

      e.     whether the Ford Vehicles failed to contain fail-safe systems to prevent or otherwise mitigate unintended acceleration;

      f.     whether Ford's misrepresentations and omissions regarding the safety and quality of the Ford Vehicles were likely to deceive Nationwide and Statewide Class members in violation of the state consider protection statutes alleged herein;

      g.     whether Ford breached its express warranties to Nationwide and Statewide Class members with respect to the Ford Vehicles;

     h.     whether Ford breached the implied warranty of merchantability to Nationwide and Statewide Class members with respect to the Ford Vehicles;

     i.     whether Nationwide and Statewide Class members overpaid for their Ford Vehicles as a result of the defects alleged herein;

     j.     whether Ford was unjustly enriched as a result of its failure to disclose, repair, or recall the Ford Vehicles;

     k.     whether Nationwide and Statewide Class members are entitled to damages, restitution, restitutionary disgorgement, equitable relief, statutory damages, exemplary damages, and/or other relief; and

     l.     the amount and nature of relief to be awarded to Plaintiffs and the other Nationwide and Statewide Class members.

200.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).**  Plaintiffs' claims are typical of the other Nationwide and Statewide Class members' claims because, among other things, all Nationwide and Statewide Class members were comparably injured through Ford's wrongful conduct as described above.

201.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Nationwide and Statewide Classes they respectively seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The Nationwide and Statewide Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

202. **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**
Ford has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class and Subclasses, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Nationwide and Statewide Class members as a whole.

203. **Superiority – Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Nationwide and Statewide Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Ford, so it would be impracticable for Nationwide and Statewide Class members to individually seek redress for Ford's wrongful conduct.  Even if Nationwide and Statewide Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VII.    CLAIMS FOR RELIEF

**A.    Claim Brought on Behalf of the Nationwide Class**

### COUNT 1
### Violation of the Magnuson-Moss Warranty Act
### 15 U.S.C. § 2301, *et seq.*
### (Brought on behalf of the Nationwide Class)

204.    Plaintiffs Lance R. Belville, Donald C. Carr, Mindi Stewart, Stanley Stewart, Dean Richardson, Christine Salamone, Charles Johnson, Jill Durant, Beverly Gorton, Josh Legato, Michael Antramgarza, Roofwerks, Inc., Quintin Williams, ACA Legal Investigations, Inc., John McGee, Mills Allison, David H. Patton, Inez A. Patton, Laura Elsinger, and Gabriel Kletschka ("Plaintiffs," for the purposes of the Nationwide Class's claims) repeat and reallege paragraphs 1 through 203 as if fully set forth herein.

205.    Plaintiffs bring this Count on behalf of the Nationwide Class ("Class," for the purposes of this Count).

206.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

207.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

208.    Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

209.    The Ford Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

210.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

52

211. Ford's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6). The Ford Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

212. Ford breached these warranties as described in more detail above. Without limitation, the Ford Vehicles are equipped with an electronic control system and are vulnerable to sudden acceleration. The Ford Vehicles share a common design defect in that they lack adequate fail-safe systems, such as a reliable BOA, which would allow a driver to mitigate sudden acceleration by depressing the brake. Ford has admitted that the Ford Vehicles are prone to sudden unintended acceleration and that sudden unintended acceleration has numerous causes. In addition, and most significantly, regardless of the cause of these admittedly foreseeable events, the Ford Vehicles share a common design defect in that they lack adequate fail-safe systems, including a reliable BOA, which allows a driver to mitigate sudden unintended acceleration by depressing the brake.

213. Plaintiffs and each of the other Class members have had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford, on the one hand, and Plaintiffs and each of the other Class members, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Ford Vehicles and have no rights under the warranty agreements provided with the Ford Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Finally, privity is also not required because the Ford Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

214.     Affording Ford a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here.  At the time of sale or lease of each Ford Vehicle, Ford knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Ford Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.  Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Ford a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

215.     Plaintiffs and the other Class members would suffer economic hardship if they returned their Ford Vehicles but did not receive the return of all payments made by them. Because Ford is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Ford Vehicles by retaining them.

216.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

217.     Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.

**B.** **Claims Brought on Behalf of the Statewide Classes**

    **1.** **Claims Brought on Behalf of the West Virginia State Class**

**COUNT 2**
**Breach of Express Warranty**
**W. Va. Code § 46-2-313**
**(Brought on behalf of the West Virginia State Class)**

218.    Plaintiffs Lance R. Belville, Donald C. Carr, Mindi Stewart, and Stanley Stewart ("Plaintiffs," for the purposes of the West Virginia State Class's claims) repeat and reallege paragraphs 1 through 203 as if fully set forth herein.

219.    Plaintiffs bring this Count on behalf of the West Virginia State Class ("Class," for purposes of this Count).

220.    Ford is and was at all relevant times a seller of motor vehicles under W. Va. Code § 46-2-313, and is also a "merchant" as the term is used under West Virginia law.

221.    In the course of selling the Ford Vehicles, Ford expressly warranted to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford.  Ford has not repaired or adjusted, and has been unable to repair or adjust, the Ford Vehicles' materials and workmanship defects.

222.    These warranties were made, *inter alia*, in advertisements and in uniform statements provided by Ford to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between Ford, on the one hand, and Plaintiffs and the other Class members, on the other hand.

223.    Ford did not provide at the time of sale, and has not provided since then, Ford Vehicles conforming to these express warranties.

224.    Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiffs and the other Class members whole.

225.    Accordingly, recovery by Plaintiffs and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiffs, individually and on behalf of the other Class members, seek all remedies as allowed by law.

226.    Moreover, as alleged in more detail herein, at the time that Ford warranted and sold the Ford Vehicles, it knew that the Ford Vehicles did not conform to the warranties and were inherently defective, and Ford wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Ford Vehicles.

227.    Plaintiffs and the other Class members were therefore induced to purchase the Ford Vehicles under false and/or fraudulent pretenses.

228.    Moreover, many of the damages flowing from the Ford Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Ford's conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiffs' and the other Class members' remedies would be insufficient to make Plaintiffs and the other Class members whole.

229.    Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

230.    As a direct and proximate result of Ford's breach of express warranties, Plaintiffs and the other Class members have been damaged in an amount to be determined at trial.

231.    Finally, due to Ford's breach of warranties as set forth herein, Plaintiffs, individually and on behalf of the other Class members, assert as an additional and/or alternative remedy, as set forth under West Virginia law, for a revocation of acceptance of the goods, and for a return to Plaintiffs and to the other Class members of the purchase price of all Ford Vehicles currently owned.

**COUNT 3**
**Breach of Implied Warranty of Merchantability**
**W. Va. Code § 46-2-314**
**(Brought on behalf of the West Virginia State Class)**

232.    Plaintiffs Donald C. Carr, Mindi Stewart, and Stanley Stewart ("Plaintiffs," for the purposes of the West Virginia State Class's claims) repeat and reallege paragraphs 1 through 203 as if fully set forth herein.

233.    Plaintiffs bring this Count on behalf of the West Virginia State Class ("Class," for purposes of this Count).

234.    Ford is and was at all relevant times a seller of motor vehicles under W. Va. Code § 46-2-314, and is also a "merchant" as the term is used under West Virginia law.

235.    A warranty that the Ford Vehicles were in merchantable condition was implied by law in the instant transaction, pursuant to W. Va. Code § 46-2-314.

236.    These Ford Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Ford Vehicles were not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration, making them vulnerable to sudden unintended acceleration events.

237.     Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

238.     Plaintiffs and the other Class members have had sufficient dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford, on the one hand, and Plaintiffs and the other Class members, on the other hand.  Notwithstanding, privity is not required in this case for Plaintiff and the other Class members pursuant to West Virginia law. Moreover, privity is also not required in this case because Plaintiffs and the other Class members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's implied warranties.  The dealers were not intended to be the ultimate consumers of the Ford Vehicles and have no rights under the warranty agreements provided with the Ford Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiffs' and Class members' Ford Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

239.     As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT 4**
**Unjust Enrichment**
**(Brought on behalf of the West Virginia State Class)**
**Pled in the Alternative to the Other Claims under West Virginia Law**

240.     Plaintiffs Donald C. Carr, Mindi Stewart, and Stanley Stewart ("Plaintiffs," for the purposes of the West Virginia State Class's claims) repeat and reallege paragraphs 1 through 203 as if fully set forth herein.

241.    Plaintiffs bring this Count on behalf of the West Virginia State Class ("Class," for purposes of this Count).

242.    Ford had knowledge of the safety defects in the Ford Vehicles, which it failed to disclose to Plaintiffs and the other Class members.

243.    As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of the Ford Vehicles and the concealment of the defect, Ford charged a higher price for the Ford Vehicles than the Ford Vehicles' true value, and Ford obtained monies that rightfully belong to Plaintiffs and the other Class members.

244.    Ford accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the other Class members, who without knowledge of the safety defects paid a higher price for Ford Vehicles that actually had lower values.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

245.    Plaintiffs and the other Class members are therefore entitled to restitution in an amount to be determined at trial.

**2.      Claims Brought on Behalf of the Florida State Class**

**COUNT 5**
**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. § 501.201, *et seq.***
**(Brought on behalf of the Florida State Class)**

246.    Plaintiff Dean Richardson ("Plaintiff," for the purposes of the Florida State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

247.    Plaintiff brings this Count on behalf of the Florida State Class ("Class," for purposes of this Count).

248.    The conduct of Ford as set forth herein constitutes unfair or deceptive acts or practices, in violation of the provisions of Florida Statutes Chapter 501, Part II.  The prohibited

conduct includes but is not limited to, Ford's manufacture and sale of the Ford Vehicles not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration, making them vulnerable to sudden unintended acceleration events, Ford's failure to disclose and remedy this defect, and Ford's misrepresentations and omissions regarding the safety and reliability of the Ford Vehicles.

249.   Ford's actions as set forth above occurred in the conduct of trade or commerce.

250.   Ford's actions impact the public interest because Plaintiff and the other Class members were injured in exactly the same way as millions of others purchasing and/or leasing Ford Vehicles as a result of Ford's generalized course of deception.

251.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business.

252.   Plaintiff and the other Class members were injured and suffered economic damages as a result of Ford's conduct.

253.   Plaintiff and the other Class members overpaid for their Ford Vehicles and did not receive the benefit of their bargain, and the Ford Vehicles have suffered a diminution in value as a result of the conduct described herein.

254.   Ford's conduct proximately caused the injuries to Plaintiff and the other Class members.

255.   Ford is liable to Plaintiff and the other Class members for damages in amounts to be proven at trial, including attorneys' fees recoverable pursuant to Fla. Stat. § 501.2105, costs, and treble damages.

256.     Pursuant to Fla. Stat. § 501.208, Plaintiff will serve the Florida Attorney General with a copy of this complaint as Plaintiff, individually and on behalf of the other Class members, seeks injunctive relief.

## COUNT 6
### Breach of Express Warranty
### Fla. Stat. § 672.313
#### (Brought on behalf of the Florida State Class)

257.     Plaintiff Dean Richardson ("Plaintiff," for the purposes of the Florida State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

258.     Plaintiff brings this Count on behalf of the Florida State Class ("Class," for purposes of this Count).

259.     Ford is and was at all relevant times a merchant with respect to motor vehicles.

260.     In the course of selling the Ford Vehicles, Ford expressly warranted to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford.  Ford has not repaired or adjusted, and has been unable to repair or adjust the Ford Vehicles' materials and workmanship defects described herein.

261.     These warranties were made, *inter alia*, in advertisements and in uniform statements made by Ford to the public and consumers of the Ford Vehicles.  These affirmations and promises were part of the basis of the bargain between Ford, on the one hand, and Plaintiff and the other Class members, on the other hand.

262.     Ford did not provide at the time of sale, and has not provided since then, Ford Vehicles conforming to these express warranties.

263.     Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole.

264.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

265.    Moreover, as alleged in more detail herein, at the time that Ford warranted and sold the Ford Vehicles, Ford knew that the Ford Vehicles did not conform to the warranties and were inherently defective, and Ford wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Ford Vehicles.

266.    Plaintiff and the other Class members were therefore induced to purchase the Ford Vehicles under false and/or fraudulent pretenses and without the benefit of full disclosure of the problems described herein.

267.    Moreover, many of the damages flowing from the Ford Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Ford's conduct as alleged herein, and due to Ford's failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

268.    As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

### COUNT 7
### Fraud by Concealment
### (Brought on behalf of the Florida State Class)

269.    Plaintiff Dean Richardson ("Plaintiff," for the purposes of the Florida State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

270.    Plaintiff brings this Count on behalf of the Florida State Class ("Class," for purposes of this Count).

271.    Ford had a duty to disclose these safety, quality, dependability, and reliability issues because Ford consistently marketed the Ford Vehicles as safe.

272.    Once Ford made representations to the public about safety, quality, dependability, and reliability, Ford was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts that materially qualify those facts stated.  A manufacturer that volunteers information about its product must be truthful, and the telling of a half-truth calculated to deceive is fraud.

273.    In addition, Ford had a duty to disclose these omitted material facts because they were known and/or accessible only to Ford, which has superior knowledge and access to the facts, and Ford knew they were not known to or reasonably discoverable by Plaintiff and the other Class members.

274.    These omitted facts were material because they directly impact the safety, quality, and reliability of the Ford Vehicles.  Whether a vehicle is equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration, making them vulnerable to sudden unintended acceleration events and whether an automobile is a quality and reliable product and has been manufactured and designed according to industry standards are material facts for a reasonable consumer.  Ford possessed exclusive knowledge of the defects and quality control issues rendering the Ford Vehicles inherently more dangerous and unreliable than similar vehicles.

275.    Ford actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiffs and the other Class members to purchase Ford Vehicles at a higher price for the Ford Vehicles, which did not match the Ford Vehicles' true value.

276.    Ford still has not made full and adequate disclosure and continues to defraud Plaintiff and the other Class members.

277.    Plaintiff and the other Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiff's and the other Class members' actions were justified.

278.    Ford was in exclusive control of the material facts, and such facts were not known to Plaintiff or the other Class members.

279.    As a result of the concealment and/or suppression of the facts, Plaintiff and the other Class members sustained damage.  For those Class members who elect to affirm the sale, damages include the difference between the actual value of that for which Class members paid and the actual value of what they received, together with additional damages arising from the sales transaction.  Those Class members who want to rescind their purchase are entitled to restitution and consequential damages.

280.    Ford's acts were done maliciously, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the other Class members' rights and well-being.  Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, and Plaintiff, individually and on behalf of the other Class members, reserves the right to assert a claim for punitive damages upon satisfying the applicable statutory prerequisite pursuant to Florida law.

### 3.   Claims Brought on Behalf of the Illinois State Class

### COUNT 8
### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*
### (Brought on behalf of the Illinois State Class)

281.    Plaintiff Christine Salamone ("Plaintiff," for the purposes of the Illinois State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

282.    Plaintiff brings this Count individually and on behalf of the other members of the Illinois State Class (the "Class," for purposes of this Count).

283.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2 prohibits unfair or deceptive acts or practices in connection with any trade or commerce, including, among other things, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, . . . whether any person has in fact been misled, deceived, or damaged thereby." The Act also prohibits suppliers from representing that their goods are of a particular quality or grade they are not.

284.    The Ford Vehicles at issue are "merchandise" as that term is defined in the Act, 815 Ill. Comp. Stat. 505/1(b).

285.    Ford is a "person" as that term is defined in the Act, 815 Ill. Comp. Stat. 505/1(c).

286.    Plaintiff and each of the other Class members are "consumers" as that term is defined in the Act.  815 Ill. Comp. Stat. 505/1(e).

287.    The conduct of Ford, as set forth herein, including but not limited to, Ford's manufacture and sale and/or lease of the Ford Vehicles that are equipped with an electronic throttle control system and are vulnerable to sudden unintended acceleration events, but are not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration.

Ford has admitted that the Ford Vehicles are prone to sudden unintended acceleration and that sudden unintended acceleration has numerous causes.  In addition, and most significantly, regardless of the cause of these admittedly foreseeable events, the Ford Vehicles share a common design defect in that they lack adequate fail-safe systems, including a reliable BOA, which allows a driver to mitigate sudden unintended acceleration by depressing the brake.

288.    The aforementioned conduct constitutes an unfair and deceptive act or practice.

289.    Ford intended for Plaintiff and the other Class members to rely on its aforementioned unfair and deceptive acts and practices, and such unfair and deceptive acts and practices occurred in the course of conduct involving trade or commerce.

290.    As a result of the foregoing wrongful conduct of Ford, Plaintiff and the other Class members have been damaged in an amount to be proven at trial, including, but not limited to, actual damages, and reasonable costs and attorneys' fees pursuant to 815 Ill. Comp. Stat. 505/1, et seq.

291.    Ford's conduct in this regard was wanton, willful, outrageous, and in reckless indifference to the rights of Plaintiff and the other Class members and, as such, warrants the imposition of punitive damages.

292.    815 Ill. Comp. Stat. 505/7 permits the Court to enter injunctive relief to require Ford to stop the unfair and deceptive conduct alleged herein.

**COUNT 9**
**Violation of the Illinois Uniform Deceptive Trade Practices Act**
**815 ILCS 510/1, *et seq.***
**(Brought on behalf of the Illinois State Class)**

293.    Plaintiff Christine Salamone ("Plaintiff," for the purposes of the Illinois State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

294.     Plaintiff brings this Count individually and on behalf of the other members of the Illinois State Class (the "Class," for purposes of this Count).

295.     815 Ill. Comp. Stat. 510/2 provides that a:

person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:  . . . (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; . . . (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; . . . (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; . . . (9) advertises goods or services with intent not to sell them as advertised; . . . [and] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

296.     Ford is a "person" within the meaning of 815 Ill. Comp. Stat. 510/1(5).

297.     The Ford Vehicles sold or leased to Plaintiff and the other Class members were not of the particular characteristics, uses, benefits, or qualities represented by Ford.

298.     The Ford Vehicles sold or leased to Plaintiff and the other Class members were not of the particular standard, quality, and/or grade represented by Ford.

299.     Plaintiff and the other Class members are likely to be damaged as a result of the foregoing wrongful conduct of Ford.  815 Ill. Comp. Stat. 505/7 permits the Court to enter injunctive relief to require Ford to stop the unfair and deceptive conduct alleged herein and to assess costs and attorneys' fees against Ford for its willful deceptive trade practices.

**COUNT 10**
**Breach of Express Warranty**
**815 ILCS 5/2-313**
**(Brought on behalf of the Illinois State Class)**

300.     Plaintiff Christine Salamone ("Plaintiff," for the purposes of the Illinois State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

301.    Plaintiff brings this Count individually and on behalf of the other members of the Illinois State Class (the "Class," for purposes of this Count).

302.    Ford expressly warranted through statements and advertisements that the Ford Vehicles were of high quality, and at a minimum, would actually work properly and safely.

303.    Ford breached this warranty by knowingly selling or leasing to Plaintiff and the other Class members the Ford Vehicles with dangerous defects, and that were not of high quality.

304.    Ford has actual knowledge of the dangerous defects alleged herein.  Moreover, the filing of this complaint by Plaintiff and the other Class members has provided Ford with reasonable notice.  Nevertheless, Ford has failed to correct these defects in the Ford Vehicles.

305.    Plaintiff and the other Class members have been damaged as a direct and proximate result of the breaches by Ford in that the Ford Vehicles purchased or leased by Plaintiff and the other Class members were and are worth far less than what Plaintiff and the other Class members paid to purchase, which was reasonably foreseeable to Ford.

306.    As a direct and proximate result of Ford's breach of the warranties, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT 11**
**Unjust Enrichment**
**(Brought on behalf of the Illinois State Class)**
**Pled in the Alternative to the Other Claims under Illinois Law**

307.    Plaintiff Christine Salamone ("Plaintiff," for the purposes of the Illinois State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

308.    Plaintiff brings this Count individually and on behalf of the other members of the Illinois State Class (the "Class," for purposes of this Count).

309.    Plaintiff and the other Class members paid Ford the value of vehicles that are non-defective, and in exchange, Ford provided Plaintiff and the other Class members with Ford Vehicles that are, in fact, defective.

310.    As such, Plaintiff and the other Class members conferred a windfall upon Ford, which would be unjust for Ford to retain.

311.    As a direct and proximate result of Ford's unjust enrichment, Plaintiff and the other Class members have incurred damages.

312.    Plaintiff, individually and on behalf of the other Class members, seek full disgorgement and restitution of Ford's enrichment, benefit, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct described herein.

## COUNT 12
## Fraudulent Concealment
### (Brought on behalf of the Illinois State Class)

313.    Plaintiff Christine Salamone ("Plaintiff," for the purposes of the Illinois State Class's claims) repeat and reallege paragraphs 1 through 203 as if fully set forth herein.

314.    Plaintiff brings this Count individually and on behalf of the other members of the Illinois State Class (the "Class," for purposes of this Count).

315.    Ford intentionally concealed the above-described material safety information, or acted with reckless disregard for the truth, and denied Plaintiff and the other Class members information that is highly relevant to their purchasing and/or leasing decision concerning the Ford Vehicles.

316.    Through advertisements and other forms of communication, including standard and uniform material provided with each car sold, Ford represented that the Ford Vehicles had no significant defects and would perform and operate properly when driven in normal usage.

317.    Ford knew these representations were false when made.

318.    The Ford Vehicles purchased or leased by Plaintiff and the other Class members were, in fact, defective, unsafe, and unreliable, because the Ford Vehicles were not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration, making them vulnerable to sudden unintended acceleration events.

319.    Ford had a duty to disclose that these Ford Vehicles were defective, unsafe, and unreliable in that the Ford Vehicles not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration, making them vulnerable to sudden unintended acceleration events.

320.    Plaintiff and the other Class members relied upon Ford to disclose the defects in the Ford Vehicles they were purchasing.

321.    The aforementioned concealment was material because if it had been disclosed Plaintiff and the other Class members would not have bought or leased the Ford Vehicles.

322.    The aforementioned representations and omissions were material because they were facts that would typically be relied on by a person purchasing or leasing a new motor vehicle.

323.    As a proximate result of Ford's conduct, Plaintiff and the other Class members have been injured in an amount to be proven at trial.

324.    Ford's conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Plaintiff and the other Class members, such that punitive damages are appropriate.

4.      **Claims Brought on Behalf of the Maryland State Class**

**COUNT 13**
**Violation of the Maryland Consumer Protection Act**
**Md. Code Com. Law § 13-101, *et seq.***
**(Brought on behalf of the Maryland State Class)**

325.    Plaintiff Charles Johnson ("Plaintiff," for the purposes of the Maryland State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

326.    Plaintiff is a person within the meaning of the Maryland Consumer Protection Act (the "Act") for all purposes therein.

327.    Ford is a person within the meaning of the Act for all purposes therein.

328.    Ford's conduct complained of herein constitutes acts, uses or employment by Ford of unconscionable commercial practices, deception, fraud, false pretenses, false promises, misrepresentations or knowing concealment, suppression, or omission of material facts with the intent that Plaintiff and the other Class members would rely upon such concealment, suppression, or omission in connection with the sale, marketing, and advertisement of the Ford Vehicles.  Ford's conduct herein is an unfair practice that has the capacity to, and did, deceive consumers, as alleged herein.

329.    All of the conduct alleged herein occurred in the course of Ford's business and is part of a pattern or generalized course of conduct.

330.    Ford's actions, as complained of herein, constitute unfair or deceptive trade practices in violation of the Maryland Consumer Protection Act, as follows:

a.      Ford used false or misleading statements, descriptions, and representations to mislead Plaintiff and the other Class members into purchasing the Ford Vehicles;

b.      Ford falsely represented that the Ford Vehicles were of a standard and quality that they were not;

71

c.       Despite having knowledge of the defective nature of the Ford Vehicles, Ford

failed to inform Plaintiff and the other Class members of the Problem, thus

deceiving them into purchasing the Ford Vehicles;

d.       Ford used deception, fraud, false pretense, false premise, misrepresentation,

and/or knowing concealment, suppression, or omission of material facts with the

intent that Plaintiff and the other Class members rely on them in their purchases

of the Ford Vehicles; and

e.       Ford committed other deceptive or unfair trade practices described in Md. Code

Com. Law § 13-301.

331.    Plaintiff and the other Class members were injured by Ford's conduct.  As a direct

and proximate result of Ford's unfair methods of competition and unfair or deceptive acts or

practices, Plaintiff and the other Class members have suffered actual economic losses.

**COUNT 14**
**<u>Breach of Express Warranty</u>**
**<u>Md. Code Com. Law § 2-313</u>**
**(Brought on behalf of the Maryland State Class)**

332.    Plaintiff Charles Johnson ("Plaintiff," for the purposes of the Maryland State

Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

333.    Plaintiff brings this Count individually and on behalf of the other members of the

Maryland State Class (the "Class," for purposes of this Count).

334.    Ford expressly warranted through statements and advertisements that the Ford

Vehicles were of high quality, and at a minimum, would actually work properly and safely.

335.    Ford breached this warranty by knowingly selling or leasing to Plaintiff and the

other Class members the Ford Vehicles with dangerous defects, and that were not of high

quality.

336.     Ford has actual knowledge of the dangerous defects alleged herein.  Moreover, the filing of this complaint by Plaintiff, individually and on behalf of the other Class members, has provided Ford with reasonable notice.  Nevertheless, Ford has failed to correct these defects in the Ford Vehicles.

337.     Plaintiff and the other Class members have been damaged as a direct and proximate result of the breaches by Ford in that the Ford Vehicles purchased by Plaintiff and the other Class members were and are worth far less than what Plaintiff and the other Class members paid to purchase, which was reasonably foreseeable to Ford.

338.     As a direct and proximate result of Ford's breach of the warranties, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT 15**
**Unjust Enrichment**
**(Brought on behalf of the Maryland State Class)**
**Pled in the Alternative to the Other Claims under Maryland Law**

339.     Plaintiff Charles Johnson ("Plaintiff," for the purposes of the Maryland State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

340.     Plaintiff brings this Count individually and on behalf of the other members of the Maryland State Class (the "Class," for purposes of this Count).

341.     Plaintiff and the other Class members paid Ford the value of vehicles that are non-defective, and in exchange, Ford provided Plaintiff and the other Class members with Ford Vehicles that are, in fact, defective.

342.     As such, Plaintiff and the other Class members conferred a windfall upon Ford, which would be unjust for Ford to retain.

343.     As a direct and proximate result of Ford's unjust enrichment, Plaintiff and the other Class members have incurred damages.

344.     Plaintiff, individually and on behalf of the other Class members, seeks full disgorgement and restitution of Ford's enrichment, benefit, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct described herein.

**5.     Claims Brought on Behalf of the Massachusetts State Class**

**COUNT 16**
**Breach of Express Warranty**
**Mass. Gen. L. Ann. 106, § 2-313**
**(Brought on behalf of the Massachusetts State Class)**

345.     Plaintiff Jill Durant ("Plaintiff," for the purposes of the Massachusetts State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

346.     Plaintiff brings this Count individually and on behalf of the other members of the Massachusetts State Class (the "Class," for purposes of this Count).

347.     Ford expressly warranted through statements and advertisements that the Ford Vehicles were of high quality, and at a minimum, would actually work properly and safely.

348.     Ford breached this warranty by knowingly selling or leasing to Plaintiff and the other Class members the Ford Vehicles with dangerous defects, and that were not of high quality.

349.     Ford has actual knowledge of the dangerous defects alleged herein.  Moreover, the filing of this complaint by Plaintiff, individually and on behalf of the other Class members, has provided Ford with reasonable notice.  Nevertheless, Ford has failed to correct these defects in the Ford Vehicles.

350.     Plaintiff and the other Class members have been damaged as a direct and proximate result of the breaches by Ford in that the Ford Vehicles purchased by Plaintiff and the other Class members were and are worth far less than what Plaintiff and the other Class members paid to purchase, which was reasonably foreseeable to Ford.

351.    As a direct and proximate result of Ford's breach of the warranties, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT 17**
**<u>Unjust Enrichment</u>**
**(Brought on behalf of the Massachusetts State Class)**
**Pled in the Alternative to the Other Claims under Massachusetts Law**

352.    Plaintiff Jill Durant ("Plaintiff," for the purposes of the Massachusetts State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

353.    Plaintiff brings this Count individually and on behalf of the other members of the Massachusetts State Class (the "Class," for purposes of this Count).

354.    Plaintiff and the other Class members paid Ford the value of vehicles that are non-defective, and in exchange, Ford provided Plaintiff and the other Class members with Ford Vehicles that are, in fact, defective.

355.    As such, Plaintiff and the other Class members conferred a windfall upon Ford, which would be unjust for Ford to retain.

356.    As a direct and proximate result of Ford's unjust enrichment, Plaintiff and the other Class members have incurred damages.

357.    Plaintiff, individually and on behalf of the other Class members, seeks full disgorgement and restitution of Ford's enrichment, benefit, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct described herein.

**6.    Claims Brought on Behalf of the Michigan State Class**

**COUNT 18**
**<u>Violation of the Michigan Consumer Protection Act</u>**
**<u>Mich. Comp. Laws § 445.901, *et seq.*</u>**
**(Brought on behalf of the Michigan State Class)**

358.    Plaintiff Beverly Gorton ("Plaintiff," for the purposes of the Michigan State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

359.     Plaintiff brings this Count on behalf of the Michigan State Class ("Class," for purposes of this Count).

360.     At all times relevant to this suit, Ford was conducting trade or commerce, as defined under MCL 445.902(1)(g), which is also known as the Michigan Consumer Protection Act (MCPA).

361.     A party to a transaction covered under the MCPA must provide the other party the promised benefits of the transaction.

362.     Michigan courts, and federal courts applying Michigan law, have held that implied warranties contain a "promised benefit" that the product is fit for its intended and foreseeable use.

363.     The defective nature of the Ford Vehicles failed to provide Plaintiff and the other Class members the promised benefits of the implied warranties.

364.     Ford has committed unfair and deceptive acts by knowingly placing into the stream of commerce defectively designed Ford Vehicles that are equipped with an electronic throttle control system and are vulnerable to sudden unintended acceleration events, but are not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration.

365.     Ford committed these and other unfair and deceptive acts with regard to the marketing and sale of its Ford Vehicles.  For instance, Ford has made representations and/or public statements about the safety and reliability of its vehicles, which are unfair and deceptive in violation of Michigan law.

366.     Ford knew that the Ford Vehicles were defective, in that they are prone to sudden unintended acceleration and lack adequate fail-safe systems.

367.    Ford concealed and/or failed to warn Plaintiff and the other Class members that the Ford Vehicles were defective.

368.    Such concealment and/or failure to warn constitutes an unfair, unconscionable, or deceptive act or practice within the meaning of the MCPA.

369.    Based upon all of these allegations, Ford violated MCL 445.903(d), (p), and (s), as well as other sections of MCL 445.903 to be developed during the course of discovery.

370.    The unfair, unconscionable, and deceptive acts committed by Ford caused damages to Plaintiff and the other Class members.

371.    Ford is liable to Plaintiff and the other Class members under the MCPA for damages for breaching its implied warranties and for the aforesaid unfair, unconscionable, and deceptive acts.

372.    Plaintiff and the other Class members are entitled to compensatory damages. injunctive/equitable relief, and attorneys' fees under the MCPA.

373.    The allegations made by Plaintiff, individually and on behalf of the other Class members, meet the requirements of MCL 445.911(11)(3) because the acts and/or practices of Ford violate MCL 445.903, have been declared unlawful by an appellate court of the state which is either officially reported or made available for public dissemination in accordance with the MCPA, and/or have been declared by a circuit court and/or the United States Supreme Court to constitute unfair or deceptive acts under the specified standards set forth by the Federal Trade Commission.

## COUNT 19
## Breach of Implied Warranty of Merchantability
## Mich. Comp. Laws § 400.2314
## (Brought on behalf of the Michigan State Class)

374.    Plaintiff Beverly Gorton ("Plaintiff," for the purposes of the Michigan State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

375.    Plaintiff brings this Count on behalf of the Michigan State Class ("Class," for purposes of this Count).

376.    Ford is and was at all relevant times a merchant with respect to motor vehicles.

377.    A warranty that the Ford Vehicles were in merchantable condition is implied by law in the instant transactions, pursuant to MCL 400.2-314.

378.    These Ford Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Ford Vehicles are inherently defective in that the Ford Vehicles are equipped with an electronic throttle control system and are vulnerable to sudden unintended acceleration events, but are not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration.  Ford has admitted that the Ford Vehicles are prone to sudden unintended acceleration and that sudden unintended acceleration has numerous causes.  In addition, and most significantly, regardless of the cause of these admittedly foreseeable events, the Ford Vehicles share a common design defect in that they lack adequate fail-safe systems, including a reliable BOA, which allows a driver to mitigate sudden unintended acceleration by depressing the brake.

379.    Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

380.    Plaintiff and the other Class members have had sufficient dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford, on the one hand, and Plaintiff and the other Class members, on the other hand.  Notwithstanding this, privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's implied warranties.  The dealers were not intended to be the ultimate consumers of the Ford Vehicles and have no rights under the warranty agreements provided with the Ford Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiff's and the other Class members' vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

381.    As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

### 7.    Claims Brought on Behalf of the Missouri State Class

**COUNT 20**
**Violation of the Missouri Merchandising Practices Act**
**Mo. Rev. Stat. § 407.010,** *et seq.*
**(Brought on behalf of the Missouri State Class)**

382.    Plaintiff Josh Legato ("Plaintiff," for the purposes of the Missouri State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

383.    Plaintiff brings this Count on behalf of the Missouri State Class ("Class," for purposes of this Count).

384.    The conduct of Ford as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Ford's manufacture and sale of Ford Vehicles not

equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration, making them vulnerable to sudden unintended acceleration events.  Ford failed to adequately disclose, or remedy, its misrepresentations and omissions regarding the safety and reliability of its vehicles.

385.    Ford's actions as set forth above occurred in the conduct of trade or commerce.

386.    Ford's actions impact the public interest because Plaintiff and the other Class members were injured in exactly the same way as millions of others purchasing and/or leasing Ford Vehicles as a result of Ford's generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business.

387.    Plaintiff and the other Class members were injured as a result of Ford's conduct.

388.    Plaintiff and the other Class members overpaid for their Ford Vehicles and did not receive the benefit of their bargain, and their Ford Vehicles have suffered a diminution in value.

389.    Ford's conduct proximately caused the injuries to Plaintiff and the other Class members.

390.    Ford is liable to Plaintiffs and the other Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

391.    Pursuant to Mo. Rev. Stat. § 407.010, Plaintiff, individually and on behalf of the other Class members, will serve the Missouri Attorney General with a copy of this complaint as Plaintiff, individually and on behalf of the other Class members, seeks injunctive relief.

**COUNT 21**
**Breach of Express Warranty**
**Mo. Rev. Stat. § 400.2-313**
**(Brought on behalf of the Missouri State Class)**

392.    Plaintiff Josh Legato ("Plaintiff," for the purposes of the Missouri State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

393.   Plaintiff brings this Count on behalf of the Missouri State Class ("Class," for purposes of this Count).

394.   Ford is and was at all relevant times a merchant with respect to motor vehicles.

395.   In the course of selling the Ford Vehicles, Ford expressly warranted to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford.  Ford has not repaired or adjusted, and has been unable to repair or adjust, the Ford Vehicles' materials and workmanship defects.

396.   These warranties were made, *inter alia*, in advertisements and in uniform statements provided by Ford to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between Ford, on the one hand, and Plaintiff and the other Class members, on the other hand.

397.   Ford did not provide at the time of sale, and has not provided since then, Ford Vehicles conforming to these express warranties.

398.   Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole.

399.   Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

400.   Moreover, as alleged in more detail herein, at the time that Ford warranted and sold the Ford Vehicles it knew that the Ford Vehicles did not conform to the warranties and were

inherently defective, and Ford wrongfully and fraudulently misrepresented and/or concealed material facts regarding their Ford Vehicles.

401.    Plaintiff and the other Class members were therefore induced to purchase the Ford Vehicles under false and/or fraudulent pretenses.

402.    Moreover, many of the damages flowing from the Ford Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Ford's conduct as alleged herein, and due to its failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

403.    Finally, due to Ford's breach of warranties as set forth herein, Plaintiff, individually and on behalf of the other Class members, asserts as an additional and/or alternative remedy, as set forth in Mo. Rev. Stat. § 400.2-608, for a revocation of acceptance of the goods, and for a return to Plaintiffs and the other Class members of the purchase price of all Ford Vehicles currently owned.

404.    Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

405.    As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

## COUNT 22
## <u>Breach of Implied Warranty of Merchantability</u>
## <u>Mo. Rev. Stat. § 400.2-314</u>
## (Brought on behalf of the Missouri State Class)

406.    Plaintiff Josh Legato ("Plaintiff," for the purposes of the Missouri State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

407.    Plaintiff brings this Count on behalf of the Missouri State Class ("Class," for purposes of this Count).

408.    Ford is and was at all relevant times a merchant with respect to motor vehicles.

409.    A warranty that the Ford Vehicles were in merchantable condition is implied by law in the instant transactions, pursuant to Mo. Rev. Stat. § 400.2-314.

410.    These Ford Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Ford Vehicles are inherently defective in that the Ford Vehicles are equipped with an electronic throttle control system and are vulnerable to sudden unintended acceleration events, but are not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration.   Ford has admitted that the Ford Vehicles are prone to sudden unintended acceleration and that sudden unintended acceleration has numerous causes.   In addition, and most significantly, regardless of the cause of these admittedly foreseeable events, the Ford Vehicles share a common design defect in that they lack adequate fail-safe systems, including a reliable BOA, which allows a driver to mitigate sudden unintended acceleration by depressing the brake.

411.    Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

412. Plaintiff and the other Class members have had sufficient dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford, on the one hand, and Plaintiff and the other Class members, on the other hand. Notwithstanding this, privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Ford Vehicles and have no rights under the warranty agreements provided with the Ford Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only. Finally, privity is also not required because Plaintiff's and the other Class members' vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

413. As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT 23**
**Fraud by Concealment**
**Mo. Rev. Stat. § 400.2-608**
**(Brought on behalf of the Missouri State Class)**

414. Plaintiff Josh Legato ("Plaintiff," for the purposes of the Missouri State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

415. Plaintiff brings this Count on behalf of the Missouri State Class ("Class," for purposes of this Count).

416. As set forth above, Ford concealed and/or suppressed material facts concerning the safety of the Ford Vehicles.

417.    Ford had a duty to disclose these safety issues because Ford consistently marketed its vehicles as safe and proclaimed that safety is one of Ford's highest corporate priorities.  Once Ford made representations to the public about safety, Ford was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts that materially qualify those facts stated.  A manufacturer that volunteers information about its product must be truthful, and the telling of a half-truth calculated to deceive is fraud.

418.    In addition, Ford had a duty to disclose these omitted material facts because they were known and/or accessible only to Ford who had superior knowledge and access to the facts, and Ford knew they were not known to or reasonably discoverable by Plaintiffs and the other Class members.  These omitted facts were material because they directly impact the safety of the Ford Vehicles.

419.    The defects described herein are material safety concerns.  Ford possessed exclusive knowledge of the defects rendering the Ford Vehicles inherently more dangerous and unreliable compound with similar automobiles.

420.    Ford actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the other Class members to purchase Ford Vehicles at a price that did not match the Ford Vehicles' true value.

421.    Plaintiff and the other Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiff's and the other Class members' actions were justified.  Ford was in exclusive control of the material facts, and such facts were not known to the public or the other Class members.

422.    As a result of the concealment and/or suppression of the facts, Plaintiff and the other Class members have sustained damages.  For those Class members who elect to affirm the sale, these damages, include without limitation the difference between the actual value of what the Class members paid for and the actual value of what they received.

423.    Ford's acts were done maliciously, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the other Class members' rights and well-being, such that an award of punitive damages is appropriate.

**COUNT 24**
**Unjust Enrichment**
**(Brought on behalf of the Missouri State Class)**
**Pled in the Alternative to the Other Claims under Missouri Law**

424.    Plaintiff Josh Legato ("Plaintiff," for the purposes of the Missouri State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

425.    Plaintiff brings this Count on behalf of the Missouri State Class ("Class," for purposes of this Count).

426.    Ford had knowledge of the safety defects in the Ford Vehicles, which it failed to disclose to Plaintiff and the other Class members.

427.    As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their Ford Vehicles and the concealment of the defect, Ford charged a higher price for the Ford Vehicles than the Ford Vehicles' true value, and Ford obtained monies that rightfully belong to Plaintiff and the other Class members.

428.    Ford accepted and retained the non-gratuitous benefits conferred by Plaintiff and the other Class members, who, without knowledge of the safety defects, paid a higher price for Ford Vehicles that actually had lower values.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

429.    Plaintiff and the other Class members are therefore entitled to restitution in an amount to be determined at trial.

**8.    Claims Brought on Behalf of the New York State Class**

**COUNT 25**
**Violation of the New York Consumer Protection from Deceptive Acts and Practices Act,**
**N.Y. Gen. Bus. § 349,** *et seq.*
**(Brought on behalf of the New York State Class)**

430.    Plaintiff Michael Antramgarza ("Plaintiff," for the purposes of the New York State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

431.    Plaintiff brings this Count on behalf of the New York State Class ("Class," for purposes of this Count).

432.    New York General Business Law ("G.B.L.") § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

433.    In the course of Ford's business, it willfully failed to disclose that the Ford Vehicles are equipped with an electronic throttle control system and are vulnerable to sudden unintended acceleration events, but are not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration.  Ford has admitted that the Ford Vehicles are prone to sudden unintended acceleration and that sudden unintended acceleration has numerous causes. In addition, and most significantly, regardless of the cause of these admittedly foreseeable events, the Ford Vehicles share a common design defect in that they lack adequate fail-safe systems, including a reliable BOA, which allows a driver to mitigate sudden unintended acceleration by depressing the brake.

434.    Ford made untrue, deceptive, or misleading representations of material facts and omitted and/or concealed material facts.

435.    Ford engaged in deceptive acts or practices when it failed to disclose material information concerning the Ford Vehicles that was known to Ford at the time of the sale.  Ford deliberately withheld the information that the Ford Vehicles were not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration, making them vulnerable to sudden unintended acceleration events and safety issues in order to ensure that consumers would purchase the Ford Vehicles and to induce the consumer to enter into a transaction.

436.    The defects described herein were material to Plaintiff and the other Class members.  Had Plaintiff and the other Class members known that their Ford Vehicles had these serious safety, quality, and reliability issues, they would not have purchased their Ford Vehicles.

437.    Because Ford's deception takes place in the context of automobile safety, that deception affects the public interest.

438.    Ford's unlawful conduct constitutes unfair acts or practices that have the capacity to and that do deceive consumers and have a broad impact on consumers at large.

439.    Plaintiff and the other Class members suffered injury caused by Ford's failure to disclose material information.  Plaintiff and the other Class members overpaid for their Ford Vehicles and did not receive the benefit of their bargain.  The value of their Ford Vehicles has diminished now that the safety issues have come to light, and Plaintiffs and the other Class members own Ford Vehicles that are not safe.

440.    Pursuant to G.B.L. § 349, Plaintiff and the other Class members are entitled to recover the greater of actual damages or $50.  Because Ford acted willfully or knowingly, Plaintiff and the other Class members are entitled to recover three times actual damages, up to $1,000.

**COUNT 26**
**Violation of the New York Consumer Protection from Deceptive Acts and Practices Act,**
**N.Y. Gen. Bus. § 350, *et seq.***
**(Brought on behalf of the New York State Class)**

441.    Plaintiff Michael Antramgarza ("Plaintiff," for the purposes of the New York State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

442.    Plaintiff brings this Count on behalf of the New York State Class ("Class," for purposes of this Count).

443.    New York G.B.L. § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce . . . ."  False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity. . . ."  N.Y. G.B.L. § 350-a.

444.    Ford caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and that were known, or that by the exercise of reasonable care should have been known to Ford, to be untrue and misleading to Plaintiff and the other Class members.

445.    Ford has violated § 350 because the misrepresentations and omissions regarding the safety, quality, and reliability of the Ford Vehicles were material and likely to deceive a reasonable consumer.

446.    Plaintiff and the other Class members have suffered an injury, including the loss of money or property, as a result of Defendants' false advertising.  In purchasing or leasing their Ford Vehicles, the Plaintiff and the other Class members relied on the misrepresentations and/or omissions of Ford with respect to the safety, quality, and reliability of the Ford Vehicles.  Ford's representations turned out not to be true because the Ford Vehicles were not equipped with

adequate fail-safe systems to prevent incidents of sudden unintended acceleration, making them vulnerable to sudden unintended acceleration events.

447.    Had Plaintiff and the other Class members known of the defects, they would not have purchased or leased their Ford Vehicles and/or paid as much for them.

448.    Accordingly, Plaintiff and the other Class members overpaid for their Ford Vehicles and did not receive the benefit of the bargain for their Ford Vehicles, which have also suffered a diminution in value.

449.    Plaintiff, individually and on behalf of the other Class members, requests that this Court enter such orders or judgments as may be necessary to enjoin Ford from continuing their unfair, unlawful, and/or deceptive practices.  Plaintiff and the other Class members are also entitled to recover their actual damages or $500, whichever is greater.  Because Ford acted willfully or knowingly, Plaintiff and the other Class members are entitled to recover three times actual damages, up to $10,000.

**COUNT 27**
**<u>Breach of Express Warranty</u>**
**<u>N.Y. U.C.C. § 2-313</u>**
**(Brought on behalf of the New York State Class)**

450.    Plaintiff Michael Antramgarza ("Plaintiff," for the purposes of the New York State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

451.    Plaintiff brings this Count on behalf of the New York State Class ("Class," for purposes of this Count).

452.    Ford is and was at all relevant times a merchant with respect to motor vehicles under N.Y. U.C.C. § 2-313.

453.    The Ford Vehicles are "things of danger," in that they are of such a character that when used for the purpose for which they are made they are likely to be a source of danger to several or many people if not properly designed and fashioned.

454.    In the course of selling the Ford Vehicles, Ford expressly warranted to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford.  Ford has not repaired or adjusted, and has been unable to repair or adjust, the Ford Vehicles' materials and workmanship defects.

455.    These warranties were made, *inter alia*, in advertisements and in uniform statements provided by Ford to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between Ford, on the one hand, and Plaintiff and the other Class members, on the other hand.

456.    Ford did not provide at the time of sale, and has not provided since then, Ford Vehicles conforming to these express warranties.

457.    Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole.

458.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seeks all remedies as allowed by law.

459.    Moreover, as alleged in more detail herein, at the time that Ford warranted and sold the Ford Vehicles, it knew that the Ford Vehicles did not conform to the warranties and

were inherently defective, and Ford wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Ford Vehicles.

460. Plaintiff and the other Class members therefore purchased the Ford Vehicles under false and/or fraudulent pretenses.

461. Moreover, many of the damages flowing from the Ford Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Ford's conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

462. As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

**COUNT 28**
**Breach of Implied Warranty of Merchantability**
**N.Y. U.C.C. § 2-314**
**(Brought on behalf of the New York State Class)**

463. Plaintiff Michael Antramgarza ("Plaintiff," for the purposes of the New York State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

464. Plaintiff brings this Count on behalf of the New York State Class ("Class," for purposes of this Count).

465. The Ford Vehicles are "things of danger," in that they are of such a character that when used for the purpose for which they are made they are likely to be a source of danger to several or many people if not properly designed and fashioned.

466. Ford is and was at all relevant times a merchant with respect to motor vehicles.

467.    A warranty that the Ford Vehicles were in merchantable condition is implied by law in the instant transactions.

468.    These Ford Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Ford Vehicles are equipped with an electronic throttle control system and are vulnerable to sudden unintended acceleration events, but are not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration.  Ford has admitted that the Ford Vehicles are prone to sudden unintended acceleration and that sudden unintended acceleration has numerous causes.  In addition, and most significantly, regardless of the cause of these admittedly foreseeable events, the Ford Vehicles share a common design defect in that they lack adequate fail-safe systems, including a reliable BOA, which allows a driver to mitigate sudden unintended acceleration by depressing the brake.

469.    Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

470.    As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT 29**
**Fraud by Concealment**
**(Brought on behalf of the New York State Class)**

471.    Plaintiff Michael Antramgarza ("Plaintiff," for the purposes of the New York State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

472.    Plaintiff brings this Count on behalf of the New York State Class ("Class," for purposes of this Count).

473.    As set forth above, Ford concealed and/or suppressed material facts concerning the safety of its vehicles.

474.    Ford had a duty to disclose these safety issues because Ford consistently marketed the Ford Vehicles as safe and proclaimed that safety is one of Ford's highest corporate priorities. Once Ford made representations to the public about safety, Ford was under a duty to disclose these material omitted facts, because where one does speak one must speak the whole truth and not conceal any facts that materially qualify those facts stated.  A manufacturer that volunteers information about its product must be truthful, and the telling of a half-truth calculated to deceive is fraud.

475.    In addition, Ford had a duty to disclose these omitted material facts because they were known and/or accessible only to Ford who had superior knowledge and access to the facts, and Ford knew they were not known to or reasonably discoverable by Plaintiffs and the other Class members.  These omitted facts were material because they directly impact the safety of the Ford Vehicles.

476.    The defects described herein are material safety concerns.  Ford possessed exclusive knowledge of the defects rendering the Ford Vehicles inherently more dangerous and unreliable than similar vehicles.

477.    Ford actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the other Class members to purchase Ford Vehicles at a higher price for the Ford Vehicles, which did not match the Ford Vehicles' true value.

478.    Plaintiff and the other Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed

facts.  Plaintiff's and the other Class members' actions were justified.  Ford was in exclusive control of the material facts, and such facts were not known to the public or the Class.

479.    As a result of the concealment and/or suppression of the facts, Plaintiff and the other Class members sustained damages.  For those Class members who elect to affirm the sale, these damages, include without limitation the difference between the actual value of what Class members paid for and the actual value of what they received.

480.    Ford's acts were done maliciously, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the other Class members' rights and well-being, such that an award of punitive damages is appropriate.

**9.    Claims Brought on Behalf of the North Carolina State Class**

**COUNT 30**
**Breach of Implied Warranty of Merchantability**
**N.C. Gen. Stat. § 25-2-314**
**(Brought on behalf of the North Carolina State Class)**

481.    Plaintiffs Roofwerks, Inc. and Quintin Williams ("Plaintiffs," for the purposes of the North Carolina State Class's claims) repeat and reallege paragraphs 1 through 203 as if fully set forth herein.

482.    Plaintiffs bring this Count on behalf of the North Carolina State Class ("Class," for purposes of this Count).

483.    Ford is and was at all relevant times a merchant with respect to motor vehicles under N.C. Gen. Stat. § 25-2-314.

484.    Pursuant to N.C. Gen. Stat. § 25-2-314, a warranty that the Ford Vehicles were in merchantable condition was implied by law, and the Ford Vehicles were bought and sold subject to an implied warranty of merchantability.

485.    The Ford Vehicles did not comply with the implied warranty of merchantability as, at the time of sale and at all times thereafter, they were defective and not in merchantable condition and not fit for the ordinary purpose for which vehicles are used.  Specifically, the Ford Vehicles are equipped with an electronic throttle control system and are vulnerable to sudden unintended acceleration events, but are not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration.  Ford has admitted that the Ford Vehicles are prone to sudden unintended acceleration and that sudden unintended acceleration has numerous causes.  In addition, and most significantly, regardless of the cause of these admittedly foreseeable events, the Ford Vehicles share a common design defect in that they lack adequate fail-safe systems, including a reliable BOA, which allows a driver to mitigate sudden unintended acceleration by depressing the brake.

486.    Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

487.    Plaintiffs and the other Class members suffered injuries due to the defective nature of the Ford Vehicles and Ford's breach of the warranty of merchantability.

488.    As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

**COUNT 31**
**Violation of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. § 75-1.1, *et seq.***
**(Brought on Behalf of the North Carolina State Class)**

489.     Plaintiffs Roofwerks, Inc. and Quintin Williams ("Plaintiffs," for the purposes of the North Carolina State Class's claims) repeat and reallege paragraphs 1 through 203 as if fully set forth herein.

490.     Plaintiffs bring this Count on behalf of the North Carolina State Class ("Class," for purposes of this Count).

491.     Ford's unfair and deceptive trade practices as described above were in and affecting trade or commerce.

492.     Ford's violations of the Act as set forth above proximately caused actual damage to Plaintiffs and the other Class members.

493.     Ford's unfair or deceptive trade practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class members, about the true safety and reliability of the Ford Vehicles.

494.     Plaintiffs and the other Class members reasonably relied on Defendant's unfair and deceptive acts and practices.

495.     Plaintiffs and the other Class members risk irreparable injury as a result of Ford's acts and omissions in violation of the Act, and these violations present a continuing risk to Plaintiffs and the other Class members as well as to the general public.

496.     Pursuant to N.C. Gen. Stat. § 75-1.1 et seq., Plaintiffs, individually and on behalf of the other Class members, seek monetary relief against Ford.

497.     Ford acted with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the other Class members to cruel and unjust hardship as a result, such that an award of punitive damages is appropriate.

498.     Plaintiffs, individually and on behalf of the other Class members, further seek an order enjoining Ford's unfair or deceptive acts or practices, restitution, treble damages, punitive damages, attorney's fees, and any other just and proper relief available under the Act.

### COUNT 32
### Fraud by Concealment
### (Brought on behalf of the North Carolina State Class)

499.     Plaintiffs Roofwerks, Inc. and Quintin Williams ("Plaintiffs," for the purposes of the North Carolina State Class's claims) repeat and reallege paragraphs 1 through 203 as if fully set forth herein.

500.     Plaintiffs bring this Count on behalf of the North Carolina State Class ("Class," for purposes of this Count).

501.     As set forth above, Ford concealed and/or suppressed material facts concerning the safety of their Ford Vehicles, which it had a duty to disclose.

502.     The omitted facts were material because they directly impact the safety of the Ford Vehicles.  Whether a vehicle accelerates only at the driver's command, and whether a vehicle will stop upon application of the brake by the driver, are material safety concerns.

503.     Ford had a duty to disclose these omitted material facts because it took affirmative steps to conceal these material facts.  Specifically, Ford took affirmative steps to conceal these material facts by consistently marketing their Ford Vehicles as safe and proclaiming that safety is one of Ford's highest corporate priorities.  Further, Ford had a duty to disclose these safety issues because once Ford made representations to the public about safety. Ford was under a duty to disclose these omitted facts, because where one does speak one must

speak the whole truth and not conceal any facts that materially qualify those facts stated.  A manufacturer that volunteers information about its product must be truthful, and the telling of a half-truth calculated to deceive is fraud.

504.    In addition, Ford had a duty to disclose these omitted material facts because they were latent defects that were known and/or accessible only to Ford, who has superior knowledge and access to the facts.  Ford knew that these material facts were not known to Plaintiffs and the other Class members and that Plaintiffs and the other Class members were unable to discover these material facts through reasonable diligence.

505.    Ford possessed exclusive knowledge of the defects rendering the Ford Vehicles inherently more dangerous and unreliable than similar vehicles.

506.    Ford's concealment and/or suppression of these material facts was reasonably calculated to deceive Plaintiffs and the other Class members.

507.    Ford actively concealed and/or suppressed these material facts, in whole or in part, with the intent to deceive Plaintiffs and the other Class members and to induce Plaintiffs and the other Class members to purchase Ford Vehicles at a higher price, which did not match the Ford Vehicles' true value.

508.    Ford's concealment and/or suppression of these material facts did in fact deceive Plaintiffs and the other Class members, as Plaintiffs and the other Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.   Plaintiffs' and the other Class members' actions were justified.

509.    As a result of the concealment and/or suppression of the facts, Plaintiffs and the other Class members sustained damage in an amount to be determined at trial.

510.     Ford's acts were done maliciously, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the other Class members' rights, such that an award of punitive damages is appropriate.

**COUNT 33**
**Unjust Enrichment**
**(Brought on behalf of the North Carolina State Class)**
**Pled in the Alternative to the Other Claims under North Carolina Law**

511.     Plaintiffs Roofwerks, Inc. and Quintin Williams ("Plaintiffs," for the purposes of the North Carolina State Class's claims) repeat and reallege paragraphs 1 through 203 as if fully set forth herein.

512.     Plaintiffs bring this Count on behalf of the North Carolina State Class ("Class," for purposes of this Count).

513.     Ford had knowledge of the safety defects in the Ford Vehicles, which it failed to disclose to Plaintiffs and the other Class members.

514.     As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their Ford Vehicles and the concealment of the defect, Ford charged a higher price for the Ford Vehicles than the Ford Vehicles' true value and Ford obtained monies that rightfully belong to Plaintiffs and the other Class members.  Ford received a measurable benefit.

515.     Ford accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the other Class members, who without knowledge of the safety defects paid a higher price for Ford Vehicles that actually had lower values.  Plaintiffs and the other Class members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

516.   Plaintiffs and the other Class members are therefore entitled to restitution in an amount to be determined at trial.

**10.   Claims Brought on Behalf of the Oklahoma State Class**

**COUNT 34**
**Violation of the Oklahoma Consumer Protection Act**
**Okla. Stat. tit. 15 § 751, *et seq*.**
**(Brought on behalf of the Oklahoma State Class)**

517.   Plaintiff ACA Legal Investigations, Inc. ("Plaintiff," for the purposes of the Oklahoma State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

518.   Plaintiff brings this Count on behalf of the Oklahoma State Class ("Class," for purposes of this Count).

519.   The conduct of Ford as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Ford's manufacture and sale of Ford Vehicles not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration, making them vulnerable to sudden unintended acceleration events.

520.   Ford's actions as set forth above occurred in the conduct of trade or commerce.

521.   Ford's actions impact the public interest because Plaintiff and the Class were injured in exactly the same way as millions of others purchasing and/or leasing Ford vehicles as a result of Ford's generalized course of deception.

522.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business.

523.   Plaintiff and the Class were injured as a result of Ford's conduct.

524.   Plaintiff and the Class overpaid for their Ford Vehicles and did not receive the benefit of their bargain, and their Ford Vehicles have suffered a diminution in value.

525.   Ford's conduct proximately caused the injuries to Plaintiff and the Class.

526.   Ford is liable to Plaintiff and the Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

527.   Pursuant to Okla. Stat. tit. 15 § 751, Plaintiff will serve the Oklahoma Attorney General with a copy of this complaint as Plaintiff seeks injunctive relief.

**COUNT 35**
**Violation of the Oklahoma Deceptive Trade Practices Act**
**78 Okla. Stat. Ann. § 51, *et seq.***
**(Brought on behalf of the Oklahoma State Class)**

528.   Plaintiff ACA Legal Investigations, Inc. ("Plaintiff," for the purposes of the Oklahoma State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

529.   Plaintiff brings this Count on behalf of the Oklahoma State Class ("Class," for purposes of this Count).

530.   The conduct of Ford as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, the Ford Vehicles are equipped with an electronic throttle control system and are vulnerable to sudden unintended acceleration events, but are not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration.  Ford has admitted that the Ford Vehicles are prone to sudden unintended acceleration and that sudden unintended acceleration has numerous causes.  In addition, and most significantly, regardless of the cause of these admittedly foreseeable events, the Ford Vehicles share a common design defect in that they lack adequate fail-safe systems, including a reliable BOA, which allows a driver to mitigate sudden unintended acceleration by depressing the brake.

531.   Ford failed to adequately investigate, disclose, and remedy the defects or correct its misrepresentations and omissions regarding the safety and reliability of its vehicles.

532.   Ford's actions as set forth above occurred in the conduct of trade or commerce.

533.   Ford's actions impact the public interest because Plaintiff and the other Class members were injured in exactly the same way as millions of others purchasing and/or leasing Ford vehicles as a result of Ford's generalized course of deception.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business.

534.   Plaintiff and the other Class members overpaid for their Ford Vehicles and did not receive the benefit of their bargain, and their Ford Vehicles have suffered a diminution in value.

535.   Ford's conduct proximately caused the injuries to Plaintiff and the other Class members.

536.   Ford is liable to Plaintiff and the other Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

537.   Pursuant to Okla. Stat. tit. 78 § 51, Plaintiffs will serve the Oklahoma Attorney General with a copy of this complaint as Plaintiff seeks injunctive relief.

**COUNT 36**
**Breach of Express Warranty**
**12A Okla. Stat. Ann. § 2-313**
**(Brought on behalf of the Oklahoma State Class)**

538.   Plaintiff ACA Legal Investigations, Inc. ("Plaintiff," for the purposes of the Oklahoma State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

539.   Plaintiff brings this Count on behalf of the Oklahoma State Class ("Class," for purposes of this Count).

540.   Ford is and was at all relevant times a merchant with respect to motor vehicles.

541.   In the course of selling the Ford Vehicles, Ford expressly warranted to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford.  Ford has

103

not repaired or adjusted, and has been unable to repair or adjust, the Ford Vehicles' materials and workmanship defects.

542.    These warranties were made, *inter alia*, in advertisements and in uniform statements provided by Ford to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between Ford, on the one hand, and Plaintiff and the other Class members, on the other hand.

543.    Ford did not provide at the time of sale, and has not provided since then, Ford Vehicles conforming to these express warranties.

544.    Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole.

545.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited remedy repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seek all remedies as allowed by law.

546.    Moreover, as alleged in more detail herein, at the time that Ford warranted and sold the Ford Vehicles, it knew that the Ford Vehicles did not conform to the warranties and were inherently defective, and Ford wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Ford Vehicles.

547.    Plaintiff and the other Class members were therefore induced to purchase the Ford Vehicles under false and/or fraudulent pretenses.

548.    Moreover, many of the damages flowing from the Ford Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and

consequential damages have already been suffered due to Ford's conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

549.    As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

550.    Finally, due to Ford's breach of warranties as set forth herein, Plaintiff, individually and on behalf of the other Class members, asserts as an additional and/or alternative remedy, as set forth in 12A Okla. Stat. Ann. § 2-608, for a revocation of acceptance of the goods, and for a return to Plaintiff and to the other Class members of the purchase price of all Ford Vehicles currently owned.

551.    Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

552.    As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

**COUNT 37**
**Breach of Implied Warranty of Merchantability**
**12A Okla. Stat. Ann. § 2-314**
**(Brought on behalf of the Oklahoma State Class)**

553.    Plaintiff ACA Legal Investigations, Inc. ("Plaintiff," for the purposes of the Oklahoma State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

554.    Plaintiff brings this Count on behalf of the Oklahoma State Class ("Class," for purposes of this Count).

555.    Ford is and was at all relevant times a merchant with respect to motor vehicles.

556.    A warranty that the Ford Vehicles were in merchantable condition is implied by law pursuant to 12A Okla. Stat. Ann. § 2-314.

557.    These Ford Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Ford Vehicles are equipped with an electronic throttle control system and are vulnerable to sudden unintended acceleration events, but are not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration.  Ford has admitted that the Ford Vehicles are prone to sudden unintended acceleration and that sudden unintended acceleration has numerous causes.   In addition, and most significantly, regardless of the cause of these admittedly foreseeable events, the Ford Vehicles share a common design defect in that they lack adequate fail-safe systems, including a reliable BOA, which allows a driver to mitigate sudden unintended acceleration by depressing the brake.

558.    Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

559.    Plaintiff and the other Class members have had sufficient dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford, on the one hand, and Plaintiff and the other Class members, on the other hand.  Notwithstanding, privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's implied warranties.  The dealers were not intended to be the ultimate consumers of the Ford Vehicles and have no rights under the warranty agreements provided with

the Ford Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiff's and the other Class members' Ford Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

560.   As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT 38**
**<u>Fraud by Concealment</u>**
**(Brought on behalf of the Oklahoma State Class)**

561.   Plaintiff ACA Legal Investigations, Inc. ("Plaintiff," for the purposes of the Oklahoma State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

562.   Plaintiff brings this Count on behalf of the Oklahoma State Class ("Class," for purposes of this Count).

563.   As set forth above, Ford concealed and/or suppressed material facts concerning the safety of their Ford Vehicles, which they were legally obligated to disclose.

564.   Ford had a duty to disclose these safety issues because they consistently marketed the Ford Vehicles as safe and proclaimed that safety is one of Ford's highest corporate priorities. Once Ford made representations to the public about safety, Ford was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts that materially qualify those facts stated.  A manufacturer that volunteers information about its product must be truthful, and the telling of a half-truth calculated to deceive is fraud.

107

565.    In addition, Ford had a duty to disclose these omitted material facts because they were known and/or accessible only to Ford, who has superior knowledge and access to the facts, and Ford knew they were not known to or reasonably discoverable by Plaintiff and the other Class members.  These omitted facts were material because they directly impact the safety of the Ford Vehicles.

566.    These defects are material safety concerns.

567.    Ford possessed exclusive knowledge of the defects rendering the Ford Vehicles inherently more dangerous and unreliable than similar vehicles.

568.    Ford actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the other Class members to purchase Ford Vehicles at a higher price for the Ford Vehicles, which did not match the vehicles' true value.

569.    Plaintiff and the other Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiff and the other Class members' actions were justified.  Ford was in exclusive control of the material facts, and such facts were not known to the public or to Plaintiff and the other Class members.

570.    As a result of the concealment and/or suppression of the facts, Plaintiff and the other Class members sustained damage in an amount to be determined at trial.

571.    Ford's acts were done maliciously, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the other Class members' rights, such that an award of punitive damages is appropriate.

**COUNT 39**
**Unjust Enrichment**
**(Brought on behalf of the Oklahoma State Class)**
**Pled in the Alternative to the Other Claims under Oklahoma Law**

572.    Plaintiff ACA Legal Investigations, Inc. ("Plaintiff," for the purposes of the Oklahoma State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

573.    Plaintiff brings this Count on behalf of the Oklahoma State Class ("Class," for purposes of this Count).

574.    Ford had knowledge of the safety defects in the Ford Vehicles, which it failed to disclose to Plaintiff and the other Class members.

575.    As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of the Ford Vehicles and the concealment of the defect, Ford charged a higher price for the Ford Vehicles than the Ford Vehicles' true value, and Ford obtained monies that rightfully belong to Plaintiff and the Class.

576.    Ford accepted and retained the non-gratuitous benefits conferred by Plaintiff and the other Class members, who without knowledge of the safety defects paid a higher price for Ford Vehicles that actually had lower values.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

577.    Plaintiff and the other Class members are therefore entitled to restitution in an amount to be determined at trial.

11.     **Claims Brought on Behalf of the Pennsylvania State Class**

### COUNT 40
### Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law
### Pa. Stat. Ann. § 201-1, *et seq.*
### (Brought on behalf of the Pennsylvania State Class)

578.    Plaintiff John McGee ("Plaintiff," for the purposes of the Pennsylvania State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

579.    Plaintiff brings this Count on behalf of the Pennsylvania State Class ("Class," for purposes of this Count).

580.    The conduct of Ford as set forth herein constitutes unfair or deceptive acts or practices, including, but not limited to, Ford's manufacture and sale of Ford Vehicles not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration, making them vulnerable to sudden unintended acceleration events.

581.    Ford failed to adequately investigate, disclose, and remedy the defects described herein, and concealed material facts regarding the safety and reliability of the Ford Vehicles.

582.    Ford's actions as set forth above occurred in the conduct of trade or commerce. Ford's actions impact the public interest because Plaintiff and the other Class members were injured in exactly the same way as millions of others purchasing and/or leasing Ford Vehicles as a result of Ford's generalized course of deception.

583.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Ford's business.

584.    Plaintiff and the other Class members suffered ascertainable loss as a result of Ford's conduct.  Plaintiff and the other Class members overpaid for their Ford Vehicles and did not receive the benefit of their bargain, and their Ford Vehicles have suffered a diminution in value.

585.    Ford's conduct proximately caused the injuries to Plaintiff and the other Class members.

586.    Ford is liable to Plaintiffs and the other Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages.

### COUNT 41
### Breach of Express Warranty
### 13 Pa. Stat. Ann. § 2313
### (Brought on behalf of the Pennsylvania State Class)

587.    Plaintiff John McGee ("Plaintiff," for the purposes of the Pennsylvania State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

588.    Plaintiff brings this Count on behalf of the Pennsylvania State Class ("Class," for purposes of this Count).

589.    Ford is and was at all relevant times a seller with respect to motor vehicles.

590.    In the course of selling the Ford Vehicles, Ford expressly warranted to repair and adjust to correct defects in materials and workmanship of any part supplied by Ford.  Ford has not repaired or adjusted, and has been unable to repair or adjust, the Ford Vehicles' materials and workmanship defects.

591.    These warranties were made, *inter alia*, in advertisements and in uniform statements provided by Ford to be made by salespeople.  These affirmations and promises were part of the basis of the bargain between Ford, on the one hand, and Plaintiff and the other Class members, on the other hand.

592.    Ford did not provide at the time of sale, and has not provided since then, Ford Vehicles conforming to these express warranties.

593.    Furthermore, the limited warranty of repair and/or adjustments to defective parts fails in its essential purpose because the contractual remedy is insufficient to make the Plaintiff and the other Class members whole.

594.    Accordingly, recovery by Plaintiff and the other Class members is not limited to the limited warranty of repair or adjustments to parts defective in materials or workmanship, and Plaintiff, individually and on behalf of the other Class members, seek all remedies as allowed by law.

595.    Moreover, as alleged in more detail herein, at the time that Ford warranted and sold the Ford Vehicles, it knew that the Ford Vehicles did not conform to the warranties and were inherently defective, and Ford wrongfully and fraudulently misrepresented and/or concealed material facts regarding the Ford Vehicles.

596.    Plaintiff and the other Class members were therefore induced to purchase the Ford Vehicles under false and/or fraudulent pretenses.

597.    Moreover, many of the damages flowing from the Ford Vehicles cannot be resolved through the limited remedy of "replacement or adjustments," as those incidental and consequential damages have already been suffered due to Ford's conduct as alleged herein, and due to their failure and/or continued failure to provide such limited remedy within a reasonable time, and any limitation on Plaintiff's and the other Class members' remedies would be insufficient to make Plaintiff and the other Class members whole.

598.    Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

599.    As a direct and proximate result of Ford's breach of express warranties, Plaintiff and the other Class members have been damaged in an amount to be determined at trial.

600.    Finally, due to Ford's breach of warranties as set forth herein, Plaintiff, individually and on behalf of the other Class members, asserts as an additional and/or alternative remedy, as set forth in 13 Pa. Cons. Stat. § 2608, for a revocation of acceptance of the goods, and for a return to Plaintiff and the other Class members of the purchase price of all Ford Vehicles currently owned.

**COUNT 42**
**Breach of Implied Warranty of Merchantability**
**13 Pa. Stat. Ann. § 2314**
**(Brought on behalf of the Pennsylvania State Class)**

601.    Plaintiff John McGee ("Plaintiff," for the purposes of the Pennsylvania State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

602.    Plaintiff brings this Count on behalf of the Pennsylvania State Class ("Class," for purposes of this Count).

603.    Ford is and was at all relevant times a merchant with respect to motor vehicles.

604.    A warranty that the Ford Vehicles were in merchantable condition is implied by law pursuant to 13 Pa. Stat. Ann. § 2314.

605.    These Ford Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. Specifically, the Ford Vehicles were not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration, making them vulnerable to sudden unintended acceleration events.

606.     Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

607.     Plaintiff and the other Class members have had sufficient dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford, on the one hand, and Plaintiff and the other Class members, on the other hand.  Notwithstanding, privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's implied warranties.  The dealers were not intended to be the ultimate consumers of the Ford Vehicles and have no rights under the warranty agreements provided with the Ford Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiff's and the other Class members' Ford Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

608.     As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT 43**
**Unjust Enrichment**
**13 Pa. Stat. Ann. § 2314**
**(Brought on behalf of the Pennsylvania State Class)**
**Pled in the Alternative to the Other Claims under Pennsylvania Law**

609.     Plaintiff John McGee ("Plaintiff," for the purposes of the Pennsylvania State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

610.    Plaintiff brings this Count on behalf of the Pennsylvania State Class ("Class," for purposes of this Count).

611.    Ford had knowledge of the safety defects in the Ford Vehicles, which it failed to disclose to Plaintiff and the other Class members.

612.    As a result of their wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of the Ford Vehicles and the concealment of the defect, Ford charged a higher price for the Ford Vehicles than the Ford Vehicles' true value, and Ford obtained monies that rightfully belong to Plaintiff and the other Class members.

613.    Ford accepted and retained the non-gratuitous benefits conferred by Plaintiff and the other Class members, who without knowledge of the safety defects paid a higher price for Ford Vehicles that actually had lower values.  It would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

614.    Plaintiff and the other Class members are therefore entitled to restitution in an amount to be determined at trial.

**12.    Claims Brought on Behalf of the South Carolina State Class**

**COUNT 44**
**Breach of Implied Warranty of Merchantability**
**S.C. Code § 36-2-314**
**(Brought on behalf of the South Carolina State Class)**

615.    Plaintiff Mills Allison ("Plaintiff," for the purposes of the South Carolina State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

616.    Plaintiff brings this Count on behalf of the South Carolina State Class ("Class," for purposes of this Count).

617.    Ford is and was at all relevant times a merchant with respect to motor vehicles.

618.    Pursuant to S.C. Code § 36-2-314, a warranty that the Ford Vehicles were fit for the ordinary purpose for which the Ford Vehicles are used was implied by law, and the Ford Vehicles were bought and sold subject to an implied warranty of merchantability.

619.    As described above, the Ford Vehicles were not merchantable at the time of their sale.

620.    Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

621.    Plaintiff and the other Class members have had sufficient dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford, on the one hand, and Plaintiff and the other Class members, on the other hand.  Notwithstanding, privity is not required in this case because Plaintiff and the other Class members are intended third-party beneficiaries of contracts between Ford and its dealers; specifically, they are the intended beneficiaries of Ford's implied warranties.  The dealers were not intended to be the ultimate consumers of the Ford Vehicles and have no rights under the warranty agreements provided with the Ford Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiff's and Class members' Ford Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

622.    As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiff and the other Class members have been damaged in an amount to be proven at trial.

**COUNT 45**
**Unjust Enrichment**
**(Brought on behalf of the South Carolina State Class)**
**Pled in the Alternative to the Other Claims under South Carolina Law**

623.     Plaintiff Mills Allison ("Plaintiff," for the purposes of the South Carolina State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

624.     Plaintiff brings this Count on behalf of the South Carolina State Class ("Class," for purposes of this Count).

625.     Ford had knowledge of the safety defects in the Ford Vehicles, which it failed to disclose to Plaintiff and the other Class members.

626.     As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of their vehicles and the concealment of the defect, Ford charged a higher price for the Ford Vehicles than the Ford Vehicles' true value, and Ford obtained monies that rightfully belong to Plaintiff and the other Class members.  As such, Ford received a measurable benefit from Plaintiff and the other Class members.

627.     Ford realized that it received a benefit from Plaintiff and the other Class members and accepted and retained the non-gratuitous benefits conferred by Plaintiff and the other Class members, who without knowledge of the safety defects paid a higher price for Ford Vehicles that actually had lower values.  Plaintiff and the other Class members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

628.     By virtue of Ford's superior knowledge of the defects in the Ford Vehicles and its affirmative misrepresentations and omissions regarding the safety of the Ford Vehicles, Ford owed a duty to Plaintiff and the other Class members to inform them of the grave risk of driving the Ford Vehicles and the true value of the Ford Vehicles.

117

629.    Plaintiff and the other Class members are therefore entitled to restitution in an amount to be determined at trial.

## COUNT 46
### Violation of the South Carolina Unfair Trade Practices Act
### S.C. Code Ann. 39-5-10, *et seq.*
### (Brought on behalf of the South Carolina State Class)

630.    Plaintiff Mills Allison ("Plaintiff," for the purposes of the South Carolina State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

631.    Plaintiff brings this Count on behalf of the South Carolina State Class ("Class," for purposes of this Count).

632.    Ford is a "person" under S.C. Code Ann. § 39-5-10.

633.    Specifically, the Ford Vehicles are equipped with an electronic throttle control system and are vulnerable to sudden unintended acceleration events, but are not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration.  Ford has admitted that the Ford Vehicles are prone to sudden unintended acceleration and that sudden unintended acceleration has numerous causes.  In addition, and most significantly, regardless of the cause of these admittedly foreseeable events, the Ford Vehicles share a common design defect in that they lack adequate fail-safe systems, including a reliable BOA, which allows a driver to mitigate sudden unintended acceleration by depressing the brake.  Defendants engaged in unfair or deceptive practices prohibited by the Act, S.C. Code Ann. § 39-5-10, *et seq.*

634.    As alleged above, Ford made numerous material statements about the safety and reliability of Ford Vehicles that were false and/or misleading.

635.    Each of these statements contributed to the deceptive context of Ford's unlawful advertising and representations as a whole.

636.    Ford knew that the Ford Vehicles were defectively designed or manufactured, would fail without warning, and were not suitable for their intended use.  Ford nevertheless failed to warn Plaintiff and the other Class members about these inherent dangers despite having a duty to do so.

637.    By virtue of Plaintiff's and the other Class members' dealings with and position towards Ford, who possessed exclusive knowledge of the defects in the Ford Vehicles, and in whom a trust and confidence is necessarily implied, Ford owed a duty to inform Plaintiff and the other Class members of the true nature of the Ford Vehicles.

638.    Ford's unfair or deceptive trade practices were likely to and did in fact deceive reasonable consumers, including Plaintiff and the other Class members, about the true safety and reliability of the Ford Vehicles.

639.    Ford's unfair or deceptive trade practices occurred in and were conducted in trade or commerce.

640.    As a result of its violations of the Act detailed above, Ford caused actual damage to Plaintiff and the other Class members.

641.    Plaintiff and the other Class members risk irreparable injury as a result of Ford's acts and omissions in violation of the Act, and these violations present a continuing risk to Plaintiff and the other Class members as well as to the general public.

642.    Pursuant to S.C. Code Ann. § 39-5-140, Plaintiff, individually and on behalf of the other Class members, seeks monetary relief against Ford.

643.    Ford acted with willful and conscious disregard of the rights and safety of others, subjecting Plaintiff and the other Class members to cruel and unjust hardship as a result, such that an award of punitive damages is appropriate.

644. Plaintiff, individually and on behalf of the other Class members, further seeks an order enjoining Ford's unfair or deceptive acts or practices, restitution, treble damages, punitive damages, attorney's fees, and any other just and proper relief available under the Act.

**COUNT 47**
**Violation of the South Carolina Regulation of**
**Manufacturers, Distributors, and Dealers Act**
**S.C. Code Ann. 56-15-10, *et seq.***
**(Brought on behalf of the South Carolina State Class)**

645. Plaintiff Mills Allison ("Plaintiff," for the purposes of the South Carolina State Class's claims) repeats and realleges paragraphs 1 through 203 as if fully set forth herein.

646. Plaintiff brings this Count on behalf of the South Carolina State Class ("Class," for purposes of this Count).

647. Ford is a "manufacturer" as set forth in S.C. Code Ann. § 56-15-10, as Ford is engaged in the business of manufacturing or assembling new and unused motor vehicles.

648. Ford participated in unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. Code Ann. § 56-15-30, by engaging in actions in bad faith or unconscionable and that caused damage to Plaintiff and the other Class members, as more fully described above.

649. Ford's bad faith and unconscionable actions include, but are not limited to: (1) representing that the Ford Vehicles have characteristics, uses, benefits, and qualities that they do not have, (2) representing that the Ford Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising the Ford Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving the Ford Vehicles confers or involves rights, remedies, and obligations that it does not, and (5) representing that the subject of a transaction involving the Ford Vehicles has been supplied in accordance with a previous representation when it has not.

120

650.     Ford has resorted to and used false and misleading advertisements in the course of its business.

651.     Pursuant to S.C. Code Ann. § 56-15-110(2), Plaintiff bring this claim on behalf of themselves and the other Class members, as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

652.     Plaintiff and the other Class members are entitled to attorney's fees pursuant to S.C. Code Ann. § 56-15-110.

653.     Plaintiff, individually and on behalf of the other Class members, also seeks injunctive relief under S.C. Code Ann. § 56-15-110.

654.     Plaintiff, individually and on behalf of the other Class members, also seeks treble damages because Defendants have acted maliciously.

**13.      Claims Brought on Behalf of the Virginia State Class**

**COUNT 48**
**Breach of Implied Warranty of Merchantability**
**(Va. Code Ann. § 8.2-314)**
**(Brought on Behalf of the Virginia State Class)**

655.     Plaintiffs David H. Patton and Inez A. Patton ("Plaintiffs," for the purposes of the Virginia State Class's claims) repeat and reallege paragraphs 1 through 203 as if fully set forth herein.

656.     Plaintiffs bring this Count on behalf of the Virginia State Class ("Class," for purposes of this Count).

657.     Ford is and was at all relevant times a merchant with respect to motor vehicles under Va. Code Ann. § 8.2-314.   Privity between Ford and Plaintiffs and the other Class members exists.

658.    Pursuant to Va. Code Ann. § 8.2-314, a warranty that the Ford Vehicles were in merchantable condition was implied by law, and the Ford Vehicles were bought and sold subject to an implied warranty of merchantability.  To be merchantable, the Ford Vehicles must be such as would "pass without objection in the trade" and as "are fit for the ordinary purposes for which such goods are used."  Va. Code Ann. § 8.2-314(2)(a), (c).

659.    These Ford Vehicles did not comply with the implied warranty of merchantability as, at the time of sale and at all times thereafter, they were defective, not in merchantable condition, and unreasonably dangerous for the use to which such vehicles would ordinarily be put, or for other reasonably foreseeable purposes.  Specifically, the Ford Vehicles are not equipped with adequate fail-safe systems to prevent incidents of sudden unintended acceleration, making them vulnerable to sudden unintended acceleration events.

660.    Ford was provided notice of these issues and defects through numerous complaints filed against it, as well as internal knowledge derived from testing and internal expert analysis.

661.    Plaintiffs and the other Class members suffered injuries due to the defective nature of the Ford Vehicles and Ford's breach of the warranty of merchantability.

662.    As a direct and proximate result of Ford's breach of the warranties of merchantability, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 49
## Fraud by Concealment
### (Brought on Behalf of the Virginia State Class)

663.    Plaintiffs David H. Patton and Inez A. Patton ("Plaintiffs," for the purposes of the Virginia State Class's claims) repeat and reallege paragraphs 1 through 203 as if fully set forth herein.

664.    Plaintiffs bring this Count on behalf of the Virginia State Class ("Class," for purposes of this Count).

665.    As set forth above, Ford concealed and/or suppressed material facts concerning the safety of the Ford Vehicles, which it had a duty to disclose.

666.    The omitted facts were material because they directly impact the safety of the Ford Vehicles.

667.    Ford knew that Plaintiffs and the other Class members were acting on the assumption that the Ford Vehicles were not defective and that Ford was not concealing any such information.

668.    Ford had a duty to disclose these omitted material facts because it took affirmative steps to conceal these material facts.

669.    In addition, Ford had a duty to disclose these omitted material facts because they were latent defects that were known and/or accessible only to Ford, who has superior knowledge and access to the facts.  Ford knew that these material facts were not known to Plaintiffs and the other Class members and that Plaintiffs and the other Class members were unable to discover these material facts through reasonable diligence.  These defects were material because they directly impact the safety of the Ford Vehicles.

670.    Ford possessed exclusive knowledge of the defects rendering the Ford Vehicles inherently more dangerous and unreliable than similar vehicles.

671.    Ford's concealment and/or suppression of these material facts was made intentionally and knowingly.

672.    Ford actively concealed and/or suppressed these material facts, in whole or in part, with the intent to deceive and mislead Plaintiffs and the other Class members and to induce Plaintiffs and the other Class members to purchase Ford Vehicles at a higher price that did not match the Ford Vehicles' true value.

673.    Plaintiffs and the other Class members were unaware of these omitted material facts and would not have acted as they did had they known of the concealed facts.

674.    Ford's concealment and/or suppression of these material facts did in fact deceive Plaintiffs and the other Class members and, a result of the concealment and/or suppression of the facts, Plaintiffs and the other Class members sustained damage in an amount to be determined at trial.

675.    Ford's acts were done maliciously, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the other Class members' rights, such that an award of punitive damages is appropriate.

### COUNT 50
### Violation of the Virginia Consumer Protection Act
### Va. Code Ann. § 59.1-196 *et seq.*
### (Brought on Behalf of the Virginia State Class)

676.    Plaintiffs David H. Patton and Inez A. Patton ("Plaintiffs," for the purposes of the Virginia State Class's claims) repeat and reallege paragraphs 1 through 203 as if fully set forth herein.

677.     Plaintiffs bring this Count on behalf of the Virginia State Class ("Class," for purposes of this Count).

678.     Ford is a "person" as defined by Va. Code Ann. § 59.1-198.

679.     As set forth above, Ford concealed and/or suppressed material facts concerning the safety of the Ford Vehicles, which it had a duty to disclose.

680.     Defendants engaged in unfair or deceptive practices prohibited by Va. Code Ann. § 59.1-200, including (1) misrepresenting that the Ford Vehicles have certain quantities, characteristics, ingredients, uses, or benefits; (2) misrepresenting that the Ford Vehicles are of a particular standard, quality, grade, style, or model; and (3) using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

681.     As alleged above, Ford made numerous material statements about the safety and reliability of the Ford Vehicles that were either false or misleading.  In addition, Ford omitted material facts regarding the safety of the Ford Vehicles.

682.     By failing to disclose and actively concealing the defects described herein Ford engaged in unfair or deceptive practices prohibited by Va. Code Ann. § 59.1-200, including (1) misrepresenting that the Ford Vehicles have certain quantities, characteristics, ingredients, uses, or benefits; (2) misrepresenting that the Ford Vehicles are of a particular standard, quality, grade, style, or model; and (3) using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

683.     Ford nevertheless failed to warn Plaintiffs and the other Class members about these inherent dangers despite having a duty to do so.

684.     Each of these statements contributed to the deceptive context of Ford's unlawful advertising and representations as a whole.

685.    Ford owed Plaintiffs and the other Class members a duty to disclose the defective nature of the Ford Vehicles because it:  possessed exclusive knowledge of the defects rendering the Ford Vehicles inherently more dangerous and unreliable than similar automobiles; intentionally concealed the hazardous situation with Ford Vehicles through their deceptive marketing campaign; and/or made incomplete representations about the safety and reliability of the Ford Vehicles generally, while purposefully withholding material facts from the Plaintiffs and the other Class members that contradicted these representations.

686.    Ford possessed exclusive knowledge of the defects described herein, which render the Ford Vehicles inherently more dangerous and unreliable than similar automobiles.

687.    Ford's concealment and/or suppression of these material facts was made intentionally and knowingly.

688.    Ford actively and willfully concealed and/or suppressed these material facts, in whole or in part, with the intent to deceive and mislead Plaintiffs and the other Class members and to induce Plaintiffs and the other Class members to purchase Ford Vehicles at a higher price, which did not match the Ford Vehicles' true value.

689.    Plaintiffs and the other Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.  Plaintiffs' and the other Class members' actions were justified.  Ford was in exclusive control of the material facts related to the defects described herein and such facts were not known to the public or to Plaintiffs and the other Class members.

690.    Ford's unfair and deceptive trade practices did deceive Plaintiffs and the other Class members and as a result of the concealment and/or suppression of the facts, Plaintiffs and the other Class members sustained damage in an amount to be determined at trial.

691.    Plaintiffs, individually and on behalf of the other Class members, also seek actual damages, which may be trebled because Ford's violations were willful, and reasonable attorneys' fees and court costs.

**COUNT 51**
**Unjust Enrichment**
**(Brought on Behalf of the Virginia State Class)**
**Pled in the Alternative to the Other Claims under Virginia Law**

692.    Plaintiffs David H. Patton and Inez A. Patton ("Plaintiffs," for the purposes of the Virginia State Class's claims) repeat and reallege paragraphs 1 through 203 as if fully set forth herein.

693.    Plaintiffs bring this Count on behalf of the Virginia State Class ("Class," for purposes of this Count).

694.    Ford had knowledge of the safety defects in the Ford Vehicles, which it failed to disclose to Plaintiffs and the other Class members.

695.    As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of the Ford Vehicles and the concealment of the defect, Ford charged a higher price for the Ford Vehicles than the Ford Vehicles' true value, and Ford obtained monies that rightfully belong to Plaintiffs and the other Class members, so Ford received a benefit from Plaintiffs and the other Class members.

696.    Ford realized that it received a benefit from Plaintiffs and the other Class members and accepted and retained the non-gratuitous benefits conferred by Plaintiffs and the other Class members, who without knowledge of the safety defects paid a higher price for Vehicles that actually had lower values.  Plaintiffs and the other Class members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for Ford to retain these wrongfully obtained profits.

127

697. Plaintiffs and the other Class members are therefore entitled to restitution in an amount to be determined at trial.

**14. Claims Brought on Behalf of the Wisconsin State Class**

**COUNT 52**
**Violation of the Wisconsin Deceptive Trade Practices Act**
**Wisc. Stat. § 110.18**
**(Brought on Behalf of the Wisconsin State Class)**

698. Plaintiffs Laura Elsinger and Gabriel Kletschka ("Plaintiffs," for the purposes of the Wisconsin State Class's claims) repeat and reallege paragraphs 1 through 203 as if fully set forth herein.

699. Plaintiffs bring this Count on behalf of the Wisconsin State Class ("Class," for purposes of this Count).

700. Ford's above-described acts and omissions constitute false, misleading, or deceptive acts or practices under the Wisconsin Deceptive Trade Practices Act § 110.18 ("Wisconsin DTPA").

701. By failing to disclose and misrepresenting the risk of sudden acceleration and the lack of adequate fail-safe systems in the Ford Vehicles, Ford engaged in deceptive business practices prohibited by the Wisconsin DTPA, including: (1) representing that Ford Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that Ford Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising Ford Vehicles with the intent not to sell them as advertised, (4) representing that a transaction involving Ford Vehicles confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving Ford Vehicles has been supplied in accordance with a previous representation when it has not.

702.   As alleged above, Ford made numerous material statements about the safety and reliability of Ford Vehicles that were either false or misleading.

703.   Each of these statements contributed to the deceptive context of Ford's unlawful advertising and representations as a whole.

704.   Ford's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the other Class members, about the true safety and reliability of Ford Vehicles.

705.   In purchasing or leasing their vehicles, Plaintiffs and the other Class members relied on the misrepresentations and/or omissions of Ford with respect of the safety and reliability of the Ford Vehicles.  Ford's representations turned out not to be true because the Ford Vehicles can unexpectedly and dangerously accelerate out of the drivers' control and lack adequate fail-safe systems to prevent this.

706.   Had Plaintiffs and the other Class members known this, they would not have purchased or leased their Ford Vehicles and/or paid as much for them.

**COUNT 53**
**Breach of Express Warranty**
**Wisc. Stat. § 402.313**
**(Brought on Behalf of the Wisconsin State Class)**

707.   Plaintiffs Laura Elsinger and Gabriel Kletschka ("Plaintiffs," for the purposes of the Wisconsin State Class's claims) repeat and reallege paragraphs 1 through 203 as if fully set forth herein.

708.   Plaintiffs bring this Count on behalf of the Wisconsin State Class ("Class," for purposes of this Count).

709.   Ford expressly warranted through statements and advertisements that the Ford Vehicles were of high quality, and at a minimum, would actually work properly and safely.

129

710.   Ford breached this warranty by knowingly selling or leasing to Plaintiffs and the other Class members the Ford Vehicles with dangerous defects, and that were not of high quality.

711.   Ford has actual knowledge of the dangerous defects alleged herein.  Moreover, the filing of this complaint by Plaintiffs, individually and on behalf of the other Class members, has provided Ford with reasonable notice.  Nevertheless, Ford has failed to correct these defects in the Ford Vehicles.

712.   Plaintiffs and the other Class members have been damaged as a direct and proximate result of the breaches by Ford in that the Ford Vehicles purchased by Plaintiffs and the other Class members were and are worth far less than what Plaintiffs and the other Class members paid to purchase, which was reasonably foreseeable to Ford.

713.   As a direct and proximate result of Ford's breach of the warranties, Plaintiffs and the other Class members have been damaged in an amount to be proven at trial.

## COUNT 54
## Unjust Enrichment
### (Brought on Behalf of the Wisconsin State Class)

714.   Plaintiffs Laura Elsinger and Gabriel Kletschka ("Plaintiffs," for the purposes of the Wisconsin State Class's claims) repeat and reallege paragraphs 1 through 203 as if fully set forth herein.

715.   Plaintiffs bring this Count on behalf of the Wisconsin State Class ("Class," for purposes of this Count).

716.   Plaintiff and the other Class members paid Ford the value of vehicles that are non-defective, and in exchange, Ford provided Plaintiff and the other Class members with Ford Vehicles that are, in fact, defective.

717. As such, Plaintiff and the other Class members conferred a windfall upon Ford, which would be unjust for Ford to retain.

718. As a direct and proximate result of Ford's unjust enrichment, Plaintiff and the other Class members have incurred damages.

719. Plaintiff, individually and on behalf of the other Class members, seeks full disgorgement and restitution of Ford's enrichment, benefit, and ill-gotten gains acquired as a result of the unlawful and/or wrongful conduct described herein.

## VIII. JURY DEMAND

720. Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury with respect to all issues so triable.

## IX. REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Nationwide Class and on behalf of the Statewide Classes they respectively seek to represent, as proposed in this Consolidated Complaint, respectfully request that the Court enter judgment in their favor and against Defendant, Ford Motor Company, as follows:

1. Declaring that this action is a proper class action, certifying the Nationwide and Statewide Classes as requested herein, designating Plaintiffs as Nationwide and Statewide Class Representatives, and appointing Plaintiffs' attorneys as Class Counsel;

2. Enjoining Defendant from continuing the unfair business practices alleged in this Complaint and requiring Defendant to institute a recall or free replacement program;

3. Ordering Defendant to pay actual damages (including punitive damages) to Plaintiffs and the other Nationwide and Statewide Classes members, as allowable by law;

4. Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded;

5.      Ordering Defendant to pay attorney fees and costs of suit; and

6.      Ordering such other and further relief as may be just and proper.

Dated:  March 28, 2013

                                              Respectfully submitted,


                                            */s/ Niall A. Paul*
Niall A. Paul (WV Bar No. 5622)
**SPILMAN, THOMAS & BATTLE, PLLC**
300 Kanawha Boulevard, East (25301)
Post Office Box 273
Charleston, West Virginia  25321
Tel:  (304) 340-3800
Fax:  (304) 340-3801
npaul@spilmanlaw.com

Nathan B. Atkinson (WV Bar No. 10757)
**SPILMAN, THOMAS & BATTLE, PLLC**
110 Oakwood Drive, Suite 500
Winston-Salem, North Carolina  25321
Tel:  (336) 725-4710
Fax:  (336) 725-4476
natkinson@spilmanlaw.com

Adam J. Levitt
John E. Tangren
**GRANT & EISENHOFER P.A.**
30 North LaSalle Street, Suite 1200
Chicago, Illinois  60602
Tel:  (312) 214-0000
Fax:  (312) 214-0001
alevitt@gelaw.com
jtangren@gelaw.com

Mark DiCello
Robert F. DiCello
**THE DICELLO LAW FIRM**
Western Reserve Law Building
7556 Mentor Avenue
Mentor, Ohio  44060
Tel:  (440) 953-8888
Fax:  (440) 953-9138
markdicello@dicellolaw.com
rfdicello@dicellolaw.com

Guy R. Bucci (WV Bar No. 0521)
Timothy C. Bailey (WV Bar No. 5839)
Lee Javins (WV Bar No. 6613)
**BUCCI BAILEY & JAVINS L.C.**
213 Hale Street
Charleston, West Virginia  25301
Tel:  (304) 932-4639
Fax:  (304) 345-0375
Gbucci@BBJLC.com
Timbailey@BBJLC.com
Ljavins@BBJLC.com

James R. Bartimus
Stephen M. Gorny
**BARTIMUS, FRICKLETON, ROBERTSON
  & GORNY, P.C.**
11150 Overbrook Road, Suite 200
Leawood, Kansas  66211
Tel:  (913) 266-2300
Fax:  (913) 266-2366
jb@bflawfirm.com
steve@bflawfirm.com

John T. Murray
**MURRAY AND MURRAY CO., L.P.A.**
111 East Shoreline Drive
Sandusky, Ohio  44870
Tel:  (419) 624-3000
Fax:  (419) 624-0707
jotm@murrayandmurray.com

133

John Scarola
C. Calvin Warriner III
**SEARCY, DENNEY, SCAROLA,**
  **BARNHART & SHIPLEY PA**
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Tel:  (800) 780-8607
Fax:  (561) 686-6300
jsx@searcylaw.com
ccw@searcylaw.com

Joseph J. Siprut
Aleksandra M.S. Vold
**SIPRUT P.C.**
17 North State Street, Suite 1600
Chicago, Illinois  60602
Tel:  (312) 236-0000
Fax:  (312) 948-9212
jsiprut@siprut.com
avold@siprut.com

Keith G. Bremer
Alison K. Hurley
Benjamin L. Price
**BREMER, WHYTE, BROWN**
  **& O'MEARA LLP**
20320 S.W. Birch Street, Second Floor
Newport Beach, California  92660
Tel:  (949) 221-1000
Fax:  (949) 221-1001
kbremer@bremerwhyte.com
ahurley@bremerwhyte.com
bprice@bremerwhyte.com

E. Powell Miller
Richard L. Merpi II
**THE MILLER LAW FIRM, P.C.**
950 West University Drive, Suite 300
Rochester, Michigan  48307
Tel:  (248) 841-2200
Fax:  (248) 652-2852
epm@millerlawpc.com
rlm@millerlawpc.com

134

Grant L. Davis
Timothy C. Gaarder
**DAVIS, BETHUNE & JONES, LLC**
1100 Main Street, Suite 2930
Kansas City, Missouri  64105
Tel:  (816) 421-1600
Fax:  (816) 472-5972
gdavis@dbjlaw.net
tgaarder@dbjlaw.net

Edgar F. Heiskell, III (WV Bar No. 1668)
Attorney at Law
Post Office Box 3232
Charleston, West Virginia  25332
Tel:  (304) 989-4459
heiskell.action@ymail.com

*Counsel for Plaintiffs*