## IN THE UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF WEST VIRGINIA

### HUNTINGTON DIVISION

LANCE R. BELVILLE, DONALD C. CARR,
MINDI STEWART, STANLEY STEWART,
DEAN RICHARDSON, CHRISTINE
SALAMONE, CHARLES JOHNSON, JILL
DURANT, BEVERLY GORTON, JOSH
LEGATO, MICHAEL ANTRAMGARZA,
ROOFWERKS, INC., QUINTIN WILLIAMS,
ACA LEGAL INVESTIGATIONS, INC.,
JOHN MCGEE, MILLS ALLISON, DAVID H.
PATTON, INEZ A. PATTON, LAURA
ELSINGER, and GABRIEL KLETSCHKA,
individually and on behalf of all others
similarly situated,

                Plaintiffs,

v.                                                CIVIL ACTION NO.   3:13-6529

FORD MOTOR COMPANY,

                Defendant.


### MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant Ford Motor Company's Motion to Dismiss. ECF No. 34.  The Court held a hearing on the matter on February 6, 2014.  For the following reasons, the Court **GRANTS, IN PART,** and **DENIES, IN PART**, Ford's motion.

### I.
### FACTS

On March 28, 2013, Plaintiffs filed a 135 page Class Action Complaint against Defendant Ford Motor Company.   In their Complaint, Plaintiffs assert they purchased or leased Ford vehicles in West Virginia, Florida, Illinois, Maryland, Massachusetts, Michigan, Missouri,

New York, North Carolina, Oklahoma, Pennsylvania, South Carolina, Virginia, and Wisconsin.[1] The vehicles at issue involve various models of Ford vehicles manufactured between 2002 and 2010, which are equipped with electronic throttle control systems (referred to as ETC systems or ETCS).

At the hearing, Plaintiffs explained the ETC system receives and sends data to various components and sensors in the vehicles, which includes opening and closing the throttle. Plaintiffs assert these ETC systems are defectively designed and may malfunction and cause sudden unintended acceleration. To mitigate a sudden unintended acceleration, which is what Plaintiffs refer to as a consequence of the alleged defect, they assert Ford should have installed a Break Over Accelerator system (BOA system, also referred to as a Brake Override System), which Plaintiffs claim allows a driver to depress the brake pedal and mitigate a sudden unintended acceleration event. According to Plaintiffs, these malfunctions in the ETC systems may be the result of electromagnetic interference (EMI), resistive shorts, or other voltage and resistance fluctuations. *Compl.* at ¶105. At the hearing, Plaintiffs summarized their allegations in the Complaint regarding the problem with this system as follows:

1. The electronics do not properly communicate in a fault tolerant manner:

    a. The ETCS can only detect a single point of failure which results in an unwanted open throttle. (¶172)

---

[1]All the named Plaintiffs either purchased or leased a Ford vehicle in the State in which they either reside or are located except for Plaintiffs Charles Johnson and Mills Allison, who are both residents of California, and Josh Legato, who is a resident of Kansas. Mr. Johnson leased his vehicle from a dealership in Maryland, Mr. Allison purchased his vehicle in South Carolina, and Mr. Legato purchased his vehicle in Missouri.

    b.   The accelerator pedal sensors are designed to ignore one of the sensor signals which can result in an open throttle. (¶ 173)

    c.   The ETCS improperly goes into and out of limp home mode resulting in an[] open throttle (¶¶ 172, 173, 174)

2.   The failsafe limp home mode is unreliable. (For example, the signal for the diagnostic trouble code can indicate that the limp home mode should trigger but does not) (¶¶10, 136, 172, 173, 174)

3.   The ETCS is a safety critical system which does not work – the lack of a Brake–Over Accelerator is just one aspect of its defective condition (¶¶100, 106, 131, 132, 133, 134, 137)

Plaintiffs assert that Ford's failure to equip its ETC vehicles with a failsafe system rendered the vehicles unreasonably dangerous and defective at the time of purchase. As a result, Plaintiffs allege they have suffered economic damages because they paid more to purchase or lease the vehicles than their actual worth.[2]

---

[2]Plaintiffs specific claims are as follows: Count 1—Violation of the Magnuson-Moss Warranty Act; Count 2—Breach of Express Warranty on behalf of the West Virginia State Class; Count 3—Breach of Implied Warranty of Merchantability on behalf of the West Virginia State Class; Count 4—Unjust Enrichment on behalf of the West Virginia State Class; Count 5—Violation of the Florida Deceptive and Unfair Trade Practices Act on behalf of the Florida State Class; Count 6—Breach of Express Warranty on behalf of the Florida State Class; Count 7—Fraud by Concealment brought on behalf of the Florida State Class; Count 8—Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act on behalf of the Illinois State Class; Count 9—Violation of the Illinois Uniform Deceptive Trade Practices Act in violation of the Illinois State Class; Count 10—Breach of Express Warranty on behalf of the Illinois State Class; Count 11—Unjust Enrichment on behalf of the Illinois State Class; Count 12—Fraudulent Concealment on behalf of the Illinois State Class; Count 13—Violation of the Maryland Consumer Protection Act on behalf of the Maryland State Class; Count 14—Breach of Express Warranty on behalf of the Maryland State Class; Count 15—Unjust Enrichment on behalf of the Maryland State Class; Count 16—Breach of Express Warranty on behalf of the Massachusetts State Class; Count 17—Unjust Enrichment on behalf of the Massachusetts State Class; Count 18—Violation of the Michigan Consumer Protection Act on behalf of the Michigan State Class; Count 19—Breach of Implied Warranty of Merchantability on behalf of the Michigan State Class; Count 20—Violation of the Missouri Merchandising Practices Act on behalf of the Missouri State Class; Count

## II.

## STANDARD OF REVIEW

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the United States Supreme

Court disavowed the "no set of facts" language found in *Conley v. Gibson*, 355 U.S. 41 (1957),

which was long used to evaluate complaints subject to 12(b)(6) motions. 550 U.S. at 563.   In its

---

21—Breach of Express Warranty on behalf of the Missouri State Class; Count 22—Breach of Implied Warranty of Merchantability on behalf of the Missouri State Class; Count 23—Fraud by Concealment on behalf of the Missouri State Class; Count 24—Unjust Enrichment on behalf of the Missouri State Class; Count 25—Violation of the New York Consumer Protection from Deceptive Acts and Practices Act on behalf of the New York State Class; Count 26—Violation of the New York Consumer Protection from Deceptive Acts and Practices Act on behalf of the New York State Class; Count 27—Breach of Express Warranty on behalf of the New York State Class; Count 28—Breach of Implied Warranty of Merchantability on behalf of New York State Class; Count 29—Fraud by Concealment on behalf of the New York State Class; Count 30—Breach of Implied Warranty of Merchantability on behalf of the North Carolina State Class; Count 31—Violation of the North Carolina Unfair and Deceptive Trade Practices Act on behalf of the North Carolina State Class; Count 32—Fraud by Concealment on behalf of the North Carolina State Class; Count 33—Unjust Enrichment on behalf of the North Carolina State Class; Count 34—Violation of the Oklahoma Consumer Protection Act on behalf of the Oklahoma State Class; Count 35—Violation of the Oklahoma Deceptive Trade Practices Act on behalf of the Oklahoma State Class; Count 36—Breach of Express Warranty on behalf of the Oklahoma State Class; Count 37—Breach of Implied Warranty of Merchantability on behalf of the Oklahoma State Class; Count 38—Fraud by Concealment on behalf of the Oklahoma State Class; Count 39—Unjust Enrichment on behalf of the Oklahoma State Class; Count 40—Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law on behalf of the Pennsylvania State Class; Count 41—Breach of Express Warranty on behalf of the Pennsylvania State Class; Count 42—Breach of Implied Warranty of Merchantability on behalf of the Pennsylvania State Class; Count 43—Unjust Enrichment on behalf of the Pennsylvania State Class; Count 44—Breach of Implied Warranty of Merchantability on behalf of the South Carolina State Class; Count 45—Unjust Enrichment on behalf of the South Carolina Class; Count 46—Violation of the South Carolina Unfair Trade Practices Act on behalf of the South Carolina State Class; Count 47—Violation of the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act on behalf of the South Carolina State Class; Count 48—Breach of Implied Warranty of Merchantability on behalf of the Virginia State Class; Count 49—Fraud by Concealment on behalf of the Virginia State Class; Count 50—Violation of the Virginia Consumer Protection Act on behalf of the Virginia State Class; Count 51—Unjust Enrichment on behalf of the Virginia State Class; Count 52—Violation of the Wisconsin Deceptive Trade Practices Act on behalf of the Wisconsin State Class; Count 53—Breach of Express Warranty on behalf of the Wisconsin State Class; and Count 54—Unjust Enrichment on behalf of the Wisconsin State Class.

place, courts must now look for "plausibility" in the complaint.   This standard requires a plaintiff to set forth the "grounds" for an "entitle[ment] to relief" that is more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (internal quotation marks and citations omitted).   Accepting the factual allegations in the complaint as true (even when doubtful), the allegations "must be enough to raise a right to relief above the speculative level . . . ." *Id.* (citations omitted).   If the allegations in the complaint, assuming their truth, do "not raise a claim of entitlement to relief, this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Id.* at 558 (internal quotation marks and citations omitted).


   In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court explained the requirements of Rule 8 and the "plausibility standard" in more detail.   In *Iqbal*, the Supreme Court reiterated that Rule 8 does not demand "detailed factual allegations[.]" 556 U.S. at 678 (internal quotation marks and citations omitted).   However, a mere "unadorned, the-defendant-unlawfully-harmed-me accusation" is insufficient. *Id.*   "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).   Facial plausibility exists when a claim contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).   The Supreme Court continued by explaining that, although factual allegations in a complaint must be accepted as true for purposes of a motion to dismiss, this tenet does not apply to legal conclusions. *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory

statements, do not suffice." *Id*. (citation omitted).   Whether a plausible claim is stated in a complaint requires a court to conduct a context-specific analysis, drawing upon the court's own judicial experience and common sense. *Id*. at 679.   If the court finds from its analysis that "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" *Id*. (quoting, in part, Fed. R. Civ. P. 8(a)(2)).   The Supreme Court further articulated that "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.   While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*.

### III.
### DISCUSSION

### A.
### Failure to Adequately Allege a Defect

Ford first argues that the entire Complaint must be dismissed because Plaintiffs have failed to allege any specific design or manufacturing defect in the ETC system which makes its vehicles susceptible to sudden unintended acceleration events. Instead, Ford argues, these claims are made in a conclusory fashion and cannot survive scrutiny under Rule 12(b)(6).   For instance, Ford asserts Plaintiffs merely allege that a sudden unintended acceleration "may" be caused by electro-magnetic interference without identifying any specific defect.   Ford argues that Plaintiffs' failure to identify any specific design defect with the ETC system makes their claims insufficient under *Iqbal* and *Twombly*.   Upon review of the Complaint, the Court disagrees.

The Court finds Ford's argument misframes Plaintiffs' real claim of defect in this case.   It is true that Plaintiffs allege there may be a malfunction in the ETC system for a variety of reasons.   However, Plaintiffs' claim of defect is that, when there is a malfunction, the ETC system itself is defective because it only is designed to detect a single point of failure, depriving the operator of control over the throttle and allowing the throttle to remain open and result in a sudden unintended acceleration.   Plaintiffs assert the ETC system could and should have been designed in such a way to detect multiple faults at the same time, and Ford should have added failsafes, such as a BOA system, to give control of the throttle back to the driver if a sudden unintended acceleration occurs.   In other words, Plaintiffs' assertion is that the ETC system's ability to process malfunctions is the defect, irrespective of what caused the initial malfunctions.   Given this specific allegation, the Court finds Plaintiffs have met the plausibility standard of *Iqbal* and *Twombly*.

Ford also insists that Plaintiffs' claims fail because the BOA driver assistance feature is not designed to address any alleged defect with the ETC system.   Rather, the feature is designed to address mechanically entrapped gas pedals, such as when a car mat gets stuck on top of the gas pedal.   Ford argues Plaintiffs fail to allege how the addition of a BOA system, designed to address mechanical entrapments, would address an unwanted acceleration allegedly caused by some defect in the ETC system.   Ford argues it is not defective for the vehicles at issue not to be equipped with a BOA system because it was designed for a completely different purpose.

However, Plaintiffs claim that a BOA system is one of the failsafes Ford could have installed that would allow a driver to "cancel unwanted torque commands, regardless of the origin, and limit the amount of engine torque by depressing the brake pedal, thereby permitting the brakes to slow the vehicle." *Compl*. at ¶92, in part.   In other words, even though the BOA system was originally designed to help in instances of mechanical entrapment, Plaintiffs assert it also can help if there is a sudden unintended acceleration caused by the defect in the ETC system.   Plaintiffs allege Ford knew the ETC system was defective and should have installed a failsafe, such as a BOA system, which would allow a driver to retake control of the throttle. *Id*. at ¶177.   Thus, given these allegations, the Court rejects Ford's argument that the Complaint must be dismissed because the BOA system was not originally designed to mitigate an alleged defect with the ETC system.

Ford further argues the Complaint must be dismissed because it was not required to equip its vehicles with the most advanced safety features.   Ford asserts the fact a product can be made safer does not establish the product is automatically defective if that safety feature is not added.   Consumers are free to choose from a variety of models and safety features when they purchase an automobile.   As a general proposition, the Court agrees with Ford that it is not required to install the most advanced optional safety features on its vehicles. *See, e.g., Sexton By and Through Sexton v. Bell Helmets, Inc.*, 926 F.2d 331, 336 (4th Cir. 1991) (citing Kentucky law and stating "[a]s is often stated, manufacturers are not insurers against all injury involving their products"); *Marchant v. Mitchell Distrib. Co.,* 240 S.E.2d 511, 513 (S.C. 1977) ("Most any product can be made more safe . . . .   [A] bicycle is more safe if equipped with lights and a bell, but the fact that one is not so equipped does not create the inference that the bicycle is defective

and unreasonably dangerous.").   Nevertheless, Plaintiffs' argument is that the defect lies with the ETC system.   A BOA system is but one type of failsafe that could have been installed to mitigate a sudden unintended acceleration.   The Court finds the issue of whether the ETC system is defective is a matter better suited for summary judgment or for a jury determination after an adequate time for discovery.   Therefore, the Court finds a ruling on the issue is premature at this stage in the proceedings.   Accordingly, the Court **DENIES** Ford's motion to dismiss the Complaint for any of the foregoing reasons.

## B.
## Manifestation

Ford next argues that, even if the Court finds Plaintiffs have properly alleged an actionable defect, Plaintiffs have failed to properly allege an actionable injury.   Ford points out that only two of the twenty Plaintiffs named in the Complaint allege they actually experienced a sudden unintended acceleration, and neither of those Plaintiffs alleges they suffered any personal injuries or property damage as a result of those events.[3]   In fact, all Plaintiffs expressly exclude from their action any "wrongful death or personal injury claims, or any damages therefrom." *Compl.* at ¶1.   Instead, Plaintiffs allege they were deprived of the benefit of their bargain at the time of purchase because, had Ford disclosed the defect, they either would have paid less for the vehicle or not purchased the vehicle at all.   Thus, Plaintiffs seek damages to recover for diminished value at the time of purchase.

---

[3]The two Plaintiffs who experienced a sudden unintended acceleration in this action are Roofwerks, Inc. in North Carolina and the Pattons in Virginia.

Ford argues that the prevailing view of courts across the county is that plaintiffs may not recover for lost value if they have not experienced a manifestation of the defect which resulted in injury. On the other hand, Plaintiffs assert that, because the defect with the ETC system existed at the time the vehicles were manufactured, the defect already had manifested itself and, thus, they are entitled to collect for their economic loss for diminished value at the time of purchase.

In support of its argument, Ford first points to the Eighth Circuit Court of Appeals decision in *Briehl v. General Motors Corp.*, 172 F.3d 623 (8th Cir. 1999). In *Briehl*, the plaintiffs filed a class action lawsuit against General Motors (GM) and Kelsey Hayes, a component parts manufacturer, alleging that the anti-lock braking systems (ABS) in the GM vehicles owned by the plaintiffs are dangerously defective. 172 F.3d at 625-26. The Complaint disclaimed personal injury and property damages, and only sought damages for lost resale value and overpayment at the time of purchase under theories of, inter alia, breach of implied warranty, breach of express warranty, and fraudulent concealment. *Id.* The plaintiffs did not contend the ABS brakes failed to perform, but rather the brakes were defective because they acted counter-intuitively to how brakes normally respond, which may cause a driver to misapply the brakes during a hard stop. *Id.* at 626. The plaintiffs claimed that GM "knew that the brakes were defective, concealed this information from the public, and promoted the ABS as a highly effective safety device." *Id.* The district court dismissed the Complaint under Rule 12(b)(6) because the plaintiffs failed to allege a manifestation of the defect and failed to adequately allege damages. *Id.*

-10-

On appeal, the Eighth Circuit agreed with the district court and held: "Where, as in this case, a product performs satisfactory and never exhibits an alleged defect, no cause of action lies. Since the Plaintiffs have failed to allege any manifest defect and their vehicles perform in a satisfactory manner, the District Court was correct when it dismissed the Plaintiffs' Original Complaint." *Id.* at 628 (footnote omitted). The Eighth Circuit further held the plaintiffs' claim that they suffered a loss in resale value was too speculative and insufficient as a matter of law because they did not assert that any of them actually sold a vehicle for a reduced price, nor did they otherwise allege the amount of their damages. *Id.* at 628-29.

Following the Court's hearing on the pending motion, Plaintiffs submitted a supplemental pleading citing *In re Zurn Pex Plumbing Products Liability Litigation*, 644 F.3d 604 (8th Cir. 2011), for the position that the Eighth Circuit post-*Briehl* has held a warranty claim may arise by the mere fact there is a defect without resulting in any external damage. 644 F.3d at 617.[4] However, the Court finds this case did not change the holding in *Briehl*. In *In re Zurn*, homeowners brought a putative class action against the manufacturer of a plumbing system that the plaintiffs asserted was inherently defective. *Id.* at 608. The plaintiffs alleged that the brass fittings used in the system would begin to deteriorate as soon as they were installed and exposed to water, which ultimately would cause a leak. *Id.* at 609. Although not all the putative class members had experienced a leak, the court found the plaintiffs' warranty clam under Minnesota

---

[4]Ford moved to strike this supplemental pleading. ECF No. 83. The Court denies the motion by a separate order.

law survived because the manifestation occurred as soon as they were exposed to water.[5] *Id*. at 617.   Thus, *In re Zurn Pex* is distinguishable from both *Briehl* and the present case.


Taking a slightly different approach than *Briehl* and applying South Carolina law, the Fourth Circuit also addressed the issue of lost value in *Carlson v. General Motors Corp.*, 883 F.2d 287 (4th Cir. 1989).   In *Carlson*, the plaintiffs alleged GM made defective diesel engines. 883 F.2d at 289.   In describing the claims, the Fourth Circuit identified those plaintiffs "who did not allege that they encountered engine difficulties with their own cars," but claimed lost resale value under an implied warranty of merchantability theory because of "the poor reputation of the cars[, and] not from a manifest defect in any of the cars which have experienced no mechanical problems. *Id*. at 291.   In considering the issue, the Fourth Circuit recognized that South Carolina adopted Article 2 of the Uniform Commercial Code (UCC).   Section 314(2)(c) of Article 2 provides "'[g]oods to be merchantable must be at least such as . . . are fit for the ordinary purposes for which such goods are used.'" *Id*. at 297 (quoting §2-314(2)(c)).   Therefore, the Fourth Circuit stated that, "[s]ince cars are designed to provide transportation, the implied warranty of merchantability is simply a guarantee that they will operate in a 'safe condition' and 'substantially free of defects.'" *Id*. (citation omitted).   "So defined, 'merchantability' clearly does not encompass consumer expectations that a product will hold its value[.]" *Id*. at 297-98. Accordingly, the Court affirmed the district court's dismissal of those plaintiffs who alleged

---

[5]The Eight Circuit distinguished *In re Zurn* from *O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 503-04 (8th Cir. 2009), in which it recognized that the mere likelihood a crib may develop a dangerous defect is not sufficient to maintain a warranty claim. 644 F.3d at 616.

damages attributable only to 'lost resale value.'" *Id.* at 298.

Similarly, the district court for the Southern District of New York discussed an economic loss theory in *Weaver v. Chrysler Corp.*, 172 F.R.D. 96 (S.D. N.Y. 1997).   As here, the plaintiff in *Weaver* filed a putative class action alleging certain Chrysler model vehicles contained defective integrated child safety seats and, as a result, he paid more for his vehicle than he should have.   However, the plaintiff did not allege the seat in his vehicle ever malfunctioned. 172 F.R.D. at 98-99   The district court found the plaintiff "failed to state a claim for fraud, negligent misrepresentation, and breach of warranty because he has not sufficiently pleaded damages." *Id.* at 99.   The Court recognized "[i]t is well established that purchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own." *Id.* (citations and internal quotation marks omitted).   In other words, if "a product performs satisfactorily and never exhibits the alleged defect, no cause of action lies." *Id.* at 100. [6]   Thus, as the child seat never malfunctioned in the plaintiff's car, the district court found he had no cause of action. *Id.*; *see also Yost v. General Motors Corp.*, 651 F. Supp. 656, 657-58 (D. N.J. 1986) (The plaintiff alleged his engine is "likely" to leak, but he suffered no actual

---

[6]*See also Rule v. Fort Dodge Animal Health, Inc.*, 607 F.3d 250, 252-53 (1st Cir. 2010) ("Recovery generally is not available under the warranty of merchantability where the defect that made the product unfit caused no injury to the claimant, the threat is now gone and nothing now possessed by the claimant has been lessened in value."); *American Suzuki Motor Corp. v. The Superior Court of Los Angeles Cnty.*, 37 Cal. App.4th 1291, 1298-99 (Cal. Ct. App. Aug. 23, 1995) (finding the vast majority of vehicles at issue performed as they were intended and, thus, were "fit for their ordinary purpose"); *Yu v. International Bus. Machs. Corp.*, 732 N.E.2d 1173, 1177 (Ill. App. Ct. 2000) (finding the plaintiff's complaint only asserted a claim for potential harm and a "[f]ailure to state sufficient facts to constitute a legally cognizable present injury or damage mandates dismissal of the action" (citation omitted)).

damages.  The Court held that "[d]amage is a necessary element of both counts—breach of warranty and common law fraud.").

More recently, in *Wilson v. Style Crest Products, Inc.*, 627 S.E.2d 733 (S.C. 2006), the Supreme Court of South Carolina addressed a claim by plaintiffs that they failed to reap the benefit of their bargain when they purchased anchor tie down systems for their manufactured homes.   The plaintiffs claimed the systems were defective and would not hold their homes to the grounds in high winds. 627 S.E.2d at 735.   The plaintiffs sought "to recover the cost of the anchor systems, . . . the cost to upgrade the anchor system to one which is effective, or the cost of a permanent foundation.[.]" *Id*.   In affirming the lower court's grant of summary judgment in favor of the defendants under warranty and fraudulent concealment theories, the court noted that none of the plaintiffs suffered any injury or damage to their homes. *Id*. at 735-36.   The court recognized that "the no-injury approach to product litigation has been rejected in most decisions." *Id*. at 736 (citing, inter alia, *Briehl*, *Weaver*, and *Yost* (other citation omitted)).   In most of those cases, the courts found "the defective products the plaintiffs had purchased had performed satisfactory and, therefore, the courts found that the plaintiffs had reaped the benefit of their bargain and could not bring a warranty action." *Id*.   Likewise, the court found the plaintiffs in the case before it got exactly what they bargained for as their anchor systems had not failed in high winds. *Id*. Moreover, the Court stated that "without an injury or a defect, there has been no diminution in value to support the Homeowner's fraudulent concealment claim." *Id*. at 737.

Plaintiffs, however, argue it is unnecessary for them to allege there was a sudden unintended acceleration in order for them to proceed on their theory that they did not receive the benefit of their bargain and paid too much for their vehicles.   In support, Plaintiffs rely upon *In re Bridgestone/Firestone, Inc.*, 155 F. Supp.2d 1069 (S.D. Ind. 2001).   In *Bridgestone*, the plaintiffs included purchasers and lessees of vehicles equipped with tires manufactured by Bridgestone. 155 F. Supp.2d at 1077.[7]   The tires had an abnormally high failure rate, but the plaintiffs had not experienced tire failure.   Instead, these plaintiffs sought damages "simply because they own(ed) or lease(d) . . . vehicles with defective tires." *Id.*

Turning to Michigan and Tennessee law,[8] the district court noted that both states had adopted the UCC provision §2-725(2), which provides that a breach of warranty occurs when delivery is made.[9] *Id.* at 1099.   Thus, the district court found the breach of warranty occurred at

---

[7]A second class of plaintiffs included purchasers and lessees of Ford Explorers, regardless of the tires.   Plaintiffs alleged Explorers had a "'significant handling and stability defect' which created 'a substantial risk of rollovers and other safety problems.'" *Id.* (citation omitted).

[8]The district court looked to the law of these two states because they were the principal place of business for Ford and Firestone, respectively.   *Id.* at 1077.

[9]This section specifically provides:

> A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.   A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

UCC §2-725(2) (codified at Mich. Comp. Laws § 440.2725(2) and Tenn. Code Ann. § 47-2-725(2)).

the time the plaintiffs purchased one or more of the tires at issue and the plaintiffs did not have to demonstrate a manifest injury. *Id.* The district court stated it was aware that "numerous courts have suggested otherwise." *Id.* (citing, inter alia, *Briehl*, *Yost*, and *Weaver*). However, the district court distinguished the case before it by finding the plaintiffs claimed the tires were not merchantable at the time of purchase and they experienced abnormal deterioration as soon as they were used. *Id.* at 1085-86 & 1099. Other cases to the contrary, the district court stated, mostly involved situations in which the products performed properly during their useful life and the plaintiffs received the benefit of their bargain. *Id.* at 1100. Therefore, the district court found it inappropriate to dismiss the warranty claim and stated the "[p]laintiffs need only allege and prove that the Tires . . . are *defective*." *Id.* (italics original).[10]

On interlocutory appeal on a choice of law question and a class certification issue, the Seventh Circuit reversed the district court. In doing so, the Seventh Circuit noted the class plaintiffs effectively consisted of only those consumers who did not experience tire failure or vehicle rollover. Instead, the "[p]laintiffs describe[d] the injury as financial rather than physical and seek to move the suit out of the tort domain and into that of contract (the vehicle was not the

---

[10]The district court noted that "the nature of injury required to maintain a cause of action differs depending upon the legal theory asserted[.]" *Id.* at 1086. With respect to the plaintiffs negligence/product liability claim, the district court granted dismissal to all but three of the plaintiffs because they failed to claim an injury to person or property. *Id.* 1086 & 1089 (citing, inter alia, *Weaver* and *Willet v. Baxter Int'l, Inc.*, 929 F.2d 1094, 1099-1100 (5th Cir. 1991) (stating "[w]hile we recognize that the fear of an unknowable, but potentially fatal, defect in a heart valve is perfectly rational, and almost certainly sincere, we have serious concerns about permitting recovery for such fear absent actual failure of the valve") (footnote omitted)). The district court also dismissed the plaintiffs' RICO action, finding allegations of overpayment or future cost of replacement tires that never manifested a defect are insufficient to state a claim under RICO.

flawless one described and thus is not merchantable, a warranty theory) and consumer fraud (on the theory that selling products with undisclosed attributes, and thus worth less than represented, is fraudulent.)." 288 F.3d at 1017.   The Seventh Circuit was not convinced that the plaintiffs actually moved their action from tort to contract law, and stated "[i]f tort law fully compensates those who are physically injured, then any recoveries by those whose products function properly mean excess compensation.   As a result, most states would not entertain the sort of theory that plaintiffs press." *Id.* (citing, inter alia, *Briehl & Carlson*; other citations and footnote omitted).[11]

Although the Seventh Circuit declined to actually decide whether Michigan and Tennessee law would allow the plaintiffs' claim for damages for lost resale value to proceed, its critique of the issue certainly raises doubts as to the sustainability of the plaintiffs' theory.   In addition, this Court is unconvinced that the district court's analysis in *Bridgestone* should apply here.   The Court finds unpersuasive the district court attempt to distinguish the weight of authority from other jurisdictions by stating that, "[w]hile couched in terms of whether manifest injury must be pled, the real ground for dismissing most of the cases . . . that are contrary to our conclusion on this point was that the defective products that the plaintiffs had purchased performed satisfactorily throughout their useful life[.]" 155 F. Supp.2d at 1100.   The district court then stated that because the plaintiffs in the case before it argued the tires "were not merchantable at the time of purchase," the plaintiffs are not required to allege a manifest injury to make a claim for breach of implied warranty. *Id.* at 1100-01.   However, the Seventh Circuit upon review found

---

[11]In note 1, the Seventh Circuit used an example to explain the economic theory behind the overcompensation by example.   The court described how compensating a buyer for a "risk of failure" over compensates the class of buyers and results in excess precautions. *Id.* at 1017 n.1.

the *Bridgestone* plaintiffs effectively are those "persons whose tires did *not* fail, whose vehicles did *not* role over." 288 F. 3d at 1016 (italics original).[12]   Thus, although the district court attempts to distinguish the facts before it from those in the other jurisdictions, this Court is not convinced of the soundness of that distinction and is not persuaded the district court's decision in *Bridgestone* should apply to this case.

Plaintiffs also point to *Lloyd v. General Motors Corp.*, 916 A.2d 257 (Md. 2007), for support.   In *Lloyd*, the plaintiffs owned vehicles manufactured by the defendants and alleged the seatbacks in those vehicles were defective and "have a tendency to collapse in rear-impact collisions, causing, in some cases, serious bodily injury or death to drivers and/or passengers in the class vehicles[.]" 916 A.2d at 262.   The plaintiffs sued for the cost of repair or replacement under tort, contract, and consumer protection theories. *Id.*   However, none of the plaintiffs had experienced an injury because of the seatbacks.   Nevertheless, the court found the plaintiffs could maintain their action under all three theories.

In reaching its conclusion, the court recognized a very limited exception in Maryland to the general rule that economic losses are not recoverable in tort actions.   The court quoted a 1994 decision in which it held: "'Even when a recovery, based on a defective product, is considered to be for purely economic loss, a plaintiff may still recover in tort if this defect creates a substantial and unreasonable risk of death or personal injury.'" *Id.* at 266 (quoting *U.S. Gypsum*

_____

[12]In fact, the Seventh Circuit pointed out that "[m]any class members face no future threat of failure either, because about 30 million tires were recalled and replaced, while other tires have been used up and discarded." *Id.*

-18-

*Co. v. Mayor & City Council of Baltimore*, 647 A.2d 405, 410 (Md. 1994)).   The court found that in those instances where the defective product "presents a substantial, clear and unreasonable risk of death or personal injury, it is inappropriate to draw a distinction" between economic loss and personal injury. *Id.*

Relying upon its previous decision in *Council of Co-Owners Atlantis Condominium, Inc. v. Whiting-Turner Contracting Co.*, 517 A.2d 336, 345 (Md. 1986), the court explained that whether a duty is imposed under a theory of tort is dependent upon the risk created by the negligence. *Id*. at 267 (quoting *Whiting-Turner*, 517 A.2d at 345).   When the risk is high, the cost to a defendant to correct the dangerous defect may be far less than the risk of compensating a plaintiff when a tragedy occurs, and a plaintiff should not have to wait until such an event occurs before seeking a remedy or repair of the defect. *Id*.   "'[I]t is the serious nature of the risk that persuades us to recognize the cause of action in the absence of actual risk.'" *Id*. (quoting *Whiting-Turner*, 517 A.2d at 345 n.5).   In other words, a "court must examine both the nature of the damage threatened and the probability of damage occurring to determine whether the two, viewed together, exhibit a clear, serious, and unreasonable risk of death or personal injury." *Id*. at 268 (citation and internal quotation marks omitted).   In balancing these two elements and determining the sufficiency of the complaint, "the critical test is not whether the plaintiff has alleged facts that meet an articulable threshold for both elements, but, rather, whether that plaintiff has met the threshold to satisfy *either* of the elements so long as, under the facts alleged, both elements are, at a minimum, present." *Id.* at 269 (citation omitted; italics original).

In applying these elements to the facts before it, the court found the plaintiffs sufficiently alleged extremely serious injuries had resulted from the defective seatbacks, "including paraplegia, quadriplegia and/or death" to allow for economic recovery. *Id*. at 270.   In addition, the court found the plaintiffs alleged sufficient facts that the probability of damage was serious, in that the plaintiffs "alleged that thousands of individuals have been injured or killed as a result of the collapse of the class vehicle seatbacks in rear-end collisions." *Id*.   The plaintiffs included specific records from the National Highway Traffic Safety Administration (NHTSA), reporting at least 38 injuries and 3 fatalities have resulted from collapsed seatbacks. *Id*. Therefore, the court found the plaintiffs could pursue negligence, strict liability, and negligent misrepresentation claims. *Id*. at 271-74.   The court also found the plaintiffs alleged sufficient facts to prevent dismissal of their fraudulent concealment, consumer protection, and civil conspiracy claims. *Id*. at 284-85.

Relying upon these same allegations, the court also found the plaintiffs could maintain a contract claim for a breach of implied warranty of merchantability.   The court specifically distinguished the facts of the case before it from *Briehl*, *Carlson*, and the other jurisdictions which do not allow economic loss in implied warranty cases absent an actual injury by noting that the majority of those cases found the alleged injuries were "merely speculative" and represented a "*potential* injury in the future or a purely speculative fear of such injury." *Id*. at 292 (italics original).   The *Lloyd* court found there was no discussion in those cases in which courts discussed "whether the plaintiffs submitted any objective facts that a significant number of others had been injured or harmed as a result of the product defect." *Id.*   In fact, the court in *Lloyd*

indicated it did not disagree with the holdings in those other cases and stated "without objective evidence of the likelihood of injuries, as measured by empirical or anecdotal evidence of actual injuries resulting from the defective seatbacks in this case, we would likely determine that the petitioners had not articulated a sufficient injury to withstand dismissal of their claims." *Id.*   Even looking to those cases involving allegations of defective automobiles, the *Lloyd* court found the case before it significantly different because the issue of "whether the harm alleged, in those cases, was sufficiently grave, or whether the likelihood of injury so great, to reach the threshold of the economic loss exception" was not addressed. *Id.* at 293 (discussing *Frank v. DaimlerChrysler Corp.*, 292 A.D.2d 118, 741 N.Y.S.2d 9 (N.Y. App. Div. 2002); *Weaver*; *American Suzuki Motor Corp. v. Superior Court*, 37 Cal. App.4th 1291, 44 Cal.Rptr.2d 526 (1995); and *Ford Motor Co. v. Rice*, 726 So.2d 626 (Ala. 1998)).   Therefore, the court determined the plaintiffs' breach of implied warranty claim and their other substantive claims were sufficient to survive a motion to dismiss. *Id.* at 294.

In comparing *Lloyd* to the present case, the Court finds Plaintiffs have not alleged the same objective evidence demonstrating "a substantial, clear and unreasonable risk of death or personal injury"[13] or a sufficient probability of damage.   Here, Plaintiffs only make general and conclusory statements that their vehicles are susceptible to sudden unintended accelerations and, therefore, are unsafe and inherently dangerous. They also generically allege sudden unintended accelerations have resulted in collisions, injuries, and deaths, but they do not identify the frequency of collisions, injuries, and deaths.   In fact, there are only two named Plaintiffs in this

---

[13]*Id.* at 266.

Complaint who state they actually have experienced sudden unintended accelerations, and there are no allegations that those events resulted in any accidents or injury.[14]  Plaintiffs do cite a report from the United States Department of Transportation's Office of Inspector General (OIG) in which it provides there were 3,018 reports of unintended accelerations in Ford vehicles between 2002 and 2009. *Compl.* at ¶¶ 182-83.   However, it does not identify whether the sudden unintended accelerations in the report were the result of the defect alleged in this case.   In addition, the report very likely includes Ford vehicles outside the proposed class period so that number does not reflect the number of vehicles within the proposed class that have experienced sudden unintended accelerations.[15]   Plaintiffs cite other complaints made to the NHTSA about certain Ford vehicles regarding acceleration issues and NHTSA's announcements they are launching or upgrading investigations with respect to those complaints.   However, again, those allegations do not address the probability of a sudden unintended acceleration caused by the defect alleged in this case, nor does it indicate the rate of accidents, injuries, or death caused by a sudden unintended acceleration.

---

[14]The Complaint provides that "[o]ne or more of Roofwerks, Inc.'s drivers has experienced unintended acceleration events in the F-250, specifically when using the cruise control or after pressing the accelerator to speed up.   Upon releasing the accelerator the truck would continue to accelerate once the pedal was released." *Compl.* at ¶52.   The other named Plaintiffs are the Pattons who assert that "[d]uring their ownership of this Lincoln Town Car, Plaintiffs Patton have experienced instances where the vehicle suddenly accelerated.   These incidents typically have occurred at fairly low speeds and when other vehicles were very close.   To prevent accidents, it has been necessary to press extremely hard on the brake pedal and in a couple of instances to also shift into neutral." *Id.* at ¶68.

[15]As the proposed class includes vehicles manufactured between 2002 and 2010 and the data collected for the report began in 2002, it is highly likely that vehicles manufactured prior to 2002 are included in the OIG's figures.

Upon review, the Court finds these allegations fall far short of the type of allegations the plaintiffs made in *Lloyd* in which they alleged the defective seatbacks caused very specific catastrophic injuries and death.   In addition, as to the probability of such damages occurring, the plaintiffs in *Lloyd* quoted the NHTSA figures reporting at least 38 injuries and 3 fatalities. *Lloyd*, 916 A.2d at 270.   The court in *Lloyd* even acknowledged that, but for the objective evidence, it "would likely determine that the petitioners had not articulated a sufficient injury to withstand dismissal of their claims." *Id.* at 292.   Here, there is no objective evidence of serious injury or death in the Complaint or the probability of damage occurring.   Therefore, the Court finds that Plaintiffs' allegations are insufficient under either element of the *Lloyd* test.

The Court also finds the decision in *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Product Liability Litigation*, 754 F. Supp.2d 1145 (C.D. Cal. 2010), distinguishable from the present case because the issue before the court in *In re Toyota* involved standing.   There, the court held "that experiencing an SUA defect is not required for standing.   Standing merely requires a redressable injury that is fairly traceable to Defendant's conduct.   Whether a plaintiff can recover for that injury under a particular theory of liability is a separate question." 754 F. Supp.2d at 1161.   Approximately six months later, the court issued another opinion in which it explained that not all states would permit some or all claims made by the plaintiffs to survive when there has not been a manifestation of a defect. *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Product Liability Litigation*, 785 F. Supp.2d 925, 932 (C.D. Cal. 2011).   To the extent, the court declined to dismiss the plaintiffs' claims before it when there was no manifestation, "it did so based on limited California case law

. . ., and because the factual record was largely undefined at the pleading stage." *Id.* (citation omitted).   The court further stated that applying "California law to a nationwide class, at least in some instances, would drastically expand the scope of relief available to Plaintiffs[.]" *Id.*

Thus, upon review of the preceding cases, the Court finds the cases cited by Plaintiffs are inapposite to the warranty claims of those Plaintiffs who have not experienced a sudden unintended acceleration.   Instead, these claims are much more closely aligned with those cases which have found no warranty claim exists under these circumstances.   Accordingly, as to those Plaintiffs who have not alleged that they have experienced a sudden unintended acceleration, the Court **GRANTS**   Ford's Motion to Dismiss their warranty claims as the Court has not found any comparable cases that have allowed such claims to survive.   Plaintiffs simply have failed to demonstrate a plausible claim that they paid more for their vehicles than their actual worth when they have used their vehicles without incident for many years.   However, as to the two Plaintiffs who have experienced a sudden unintended acceleration, the Court finds they have stated a plausible claim for relief as they allege they have experienced a manifestation of the purported defect.   Therefore, the Court **DENIES** Ford's Motion to Dismiss their warranty claims.

## C.
## Fraud

In their Complaint, Plaintiffs make a number of fraud-based claims and other claims which sound in fraud.   They also assert the statute of limitations on some of their claims should be extended because of fraudulent concealment.   However, Ford argues Plaintiffs have failed to allege any fraudulent conduct with the specificity required by Rule 9(b) of the Federal

Rules of Civil Procedure and, therefore, the fraud-based claims must be dismissed and the other fraud-related allegations must be ignored as insufficient.

Rule 9(b) provides, in part: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." *Fed. R. Civ. P.* 9(b), in part.   The Fourth Circuit has explained that this means a plaintiff must plead "the time, place, and contents of the false representations, as well as the identity of the person making the representation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (internal quotation marks and citations omitted).   The purpose of Rule 9(b) is:

> "First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . .   Second, Rule 9(b) exists to protect defendants from frivolous suits.   A third reason for the rule it to eliminate fraud actions in which all the facts are learned after discovery.   Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation."

*Id.* (quoting *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Georgia, Inc.*, 755 F. Supp. 1055, 1056-57 (S.D. Ga. 1990)).   The Court is mindful, however, that it should be hesitant to dismiss claims "under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.*   In light of these directions, the Court turns to the specific allegations in the Complaint to determine whether Plaintiffs have met the heightened pleading standard contained in Rule 9(b).

In the Complaint, each individual Plaintiff has a similar general allegation in support of their claims.   For instance, with respect to Plaintiff Belville, the Complaint provides:

> Plaintiff Belville saw advertisements for and representations about Lincoln vehicles on television, in magazines, on billboards, in brochures at the dealership, on window stickers, and on the Internet during the several years before he purchased his Town Car in or about January 2008.   Although Plaintiff Belville does not recall the specifics of the many Lincoln advertisements he saw before he purchased his Town Car, he does recall that safety and reliability were very frequent themes across the advertisements he saw. Those advertisements about safety and reliability influenced his decision to purchase his Town Car.   Had those advertisements and any other materials Plaintiff Belville saw disclosed that Ford Vehicles could accelerate suddenly and dangerously out of the driver's control, and lacked adequate fail-safe systems to prevent this, he would not have purchased this Town Car, or certainly would not have paid as much for it as he did.

*Compl.* at ¶16.[16] Similar to Plaintiff Belville, all Plaintiffs state they do "not recall the specifics of the many . . . advertisements," but "that safety and reliability were very frequent themes[.]" *See Compl.* at ¶¶ 19, 22, 25, 28, 31, 34, 37, 40, 43, 46, 50, 54, 57, 60, 63, 66, 70, & 73.   Later in the Complaint, Plaintiffs quote a number of annual reports, press releases, advertisements, and statements made by Ford attesting to a variety of safety characteristics in Ford vehicles.   The Court finds, however, two fundamental problems with Plaintiffs' claims.

First, although Plaintiffs identify in paragraphs 112-127 of the Complaint various reports, advertisements, and statements made by Ford, no Plaintiff states he or she actually saw,

---

[16]Details such as the year and model of the vehicle and when the vehicle was purchased or leased vary amongst each Plaintiff.

heard, or relied upon any of those specific reports, advertisements, or statements in deciding to buy a Ford vehicle.   Instead, they allege they were influenced by frequent *themes* of safety and reliability in advertisements over a period of several years.   Merely stating there were "themes" of safety and reliability over a period of years, however, does not meet the heightened pleading standard under Rule 9(b) to support a fraud claim.   Rule 9(b) very clearly requires Plaintiffs to state with particularity "the time, place, and contents of the false representations"[17] made by Ford, which Plaintiffs relied upon, which constitute the basis of their fraud claims.   Broad allegations that there were advertisements and other statements over several years—without identifying those advertisements and statements with particularity—is simply insufficient under the Rule. Therefore, the Court finds these allegations fail to comply with Rule 9(b).

Second, looking at the various reports, advertisements, and statements quoted by Plaintiff in paragraphs 112 through 127 of the Complaint, the Court finds most are mere puffery and cannot give rise to an actionable fraud claim—even if Plaintiffs would have alleged they recalled reading or hearing those specific quotes.   For instance, in paragraph 112, Plaintiffs allege "in its 2004 Annual Report, Ford stated: 'We conduct engineering, research and development primarily to improve the performance (including fuel efficiency), safety and customer satisfaction of our products, and to develop new products.'" *Compl.* at ¶112.   Similarly, in paragraph 113, Plaintiffs claim Ford stated in a 2004 press release that "it was 'underscoring its commitment to safety leadership.'" *Id.* at ¶113.   There is simply nothing in these statements, however, that can serve the basis for Plaintiffs' fraud claims.

---

[17] *Harrison*, 176 F.3d at 784.

-27-

In *In re General Motors Corp. Anti-Lock Brake Products Liability Litigation*, 966 F. Supp. 1525 (E.D. Mo. 1997), the district court was asked to review similar claims.   In that case, the plaintiffs "allege[d] that GM's advertisements and public promotions contained broad claims that the vehicles were safe from defects when, in fact, GM knew the ABS was defective." 966 F. Supp. at 1531.   As a result, the plaintiffs asserted, inter alia, the advertisements and other material constituted false misrepresentations and GM had superior knowledge of the defect and had a duty to disclose it. *Id*. at 1534.   The court disagreed and found the material issued by GM constituted mere puffery because a consumer could not have reasonably believed it. *Id.*[18]   In addition, the court found the claims of fraudulent misrepresentation failed because the plaintiffs not only did not pled them with specificity under Rule 9(b), but also did not allege facts supporting their claim of reliance with particularity. *Id*. at 1535.   The court found the complaint only contained conclusory allegations that the plaintiffs relied upon the statements, but none of the plaintiffs "state[d] which statements each of them relied on." *Id*.   The court held the "plaintiffs are required to allege facts supporting their claim of reliance, for where the complaint 'only states a

---

[18]The material quoted by the court were statements made by GM that it "estimated that crash-avoidance systems, such as anti-lock brakes, '[are] 99 percent more effective than protective systems' such as air bags, because protective systems are rarely used, while drivers frequently brake aggressively or make sudden road maneuvers to avoid hazards or collisions." *Id*. at 1531 (internal quotation marks and citation omitted).   Similarly, another statement by GM provided: "A driver is 100 times more likely to benefit from a vehicle's crash-avoidance capabilities (such as anti-lock brakes) than from its crash-survival capabilities (such as air bags)." *Id.* (internal quotation marks and citation omitted).   In addition, to finding these statements mere puffery, the court also held the plaintiffs failed to allege the statements were false and the basis of the bargain. *Id*.   Moreover, to the extent the plaintiffs' claims are based on failure to disclose the defect, the court held that the plaintiffs' breach of express warranty claims "cannot be premised on an omission." *Id*. (citation omitted).

conclusion that actual reliance existed' and is void of any allegations that anyone actually read any of the misleading statements or knew of their existence, such as an allegation 'fails the particularity requirement of Rule 9(b).'" *Id.* (quoting *Morse v. Abbot Labs.*, 756 F. Supp. 1108, 1112 (N.D. Ill. 1991)).

The present case contains the same problem.  Even if the Court were to assume, without deciding, that some of the statements extend beyond the realm of puffery and convey misrepresentations,[19] Plaintiff's do not allege they actually relied upon those specific statements, and reliance is a necessary element of fraud and must be pled with particularity.[20] *See Learning Works, Inc. v. The Learning Annex, Inc.*, 830 F.2d 541 (4th Cir. 1987) (finding dismissal proper because the plaintiff failed to allege reasonable reliance on a misrepresentation and stating "[r]easonable, detrimental reliance upon a misrepresentation is an essential element of a cause of action for fraud [under Maryland law] . . . and such reliance must be pleaded with particularity." 830 F.2d at 546 (citing Fed. R. Civ. P. 9(b)).   Thus, as no Plaintiff alleges reliance upon any of the

---

[19]*See Dunn v. Borta*, 369 F.3d 421, 430 (4th Cir. 2004) (quoting the Supreme Court as explaining "that 'when a proposed seller goes beyond [mere exaggeration of the qualities which an article has], assigns to the article qualities which it does not possess, does not simply magnify in opinion the advantages which it has but invents advantages and falsely asserts their existence, he transcends the limits of "puffing" and engages in false representations and pretenses.' *United States v. New S. Farm & Home Co.*, 241 U.S. 64, 71 (1916) (reversing dismissal of indictment for fraudulent sales of swamp land in Florida because misrepresentations did not constitute mere puffery") (other citation omitted)).

[20]The tort of fraudulent misrepresentation (deceit) is defined by the Restatement (Second) of Torts, § 525 as follows:   "One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."

specific material quoted in the Complaint, they are left with their assertion they were influenced by general themes of safety and reliability which, as this Court stated above, is insufficient under Rule 9(b).[21]   Therefore, the Court agrees with Ford that Plaintiffs have failed to allege their fraud claims with the specificity required under Rule 9(b).

### D.
### Fraudulent Concealment

Ford further argues that Plaintiffs have failed to plead fraudulent concealment with the specificity required under Rule 9(b).   The district court in *Weaver* was asked to address a similar issue where the plaintiff alleged that Chrysler's advertisements spoke as to the quality of its vehicles, but it did not inform the public of a defect in the integrated child seat.172 F.R.D. at 98. The plaintiff argued he was not able "to specify the time, place, and content of the fraudulent statements because he is alleging fraud by omission, and one cannot specify the time, place, and content of a failure to act." *Id*. at 101 (citation omitted).   However, the court rejected the plaintiff's argument and stated that the plaintiff was still required in an omission case to specifically identify "the representations, advertisements, and promotional materials that omitted the reference to the defective child seats, mislead him, and upon which he relied." *Id*. at 102. (citations omitted).   As Plaintiff had not done so, the court found that the plaintiff failed to meet the heightened pleading standard set forth in Rule 9(b). *Id*.; s*ee also In re General Motors Corporation Anti-Lock Brake Products Liability Litigation*, 966 F. Supp. at 1536 (finding the

---

[21]In addition, the Court notes that Plaintiffs' earliest specific example of a statement made by Ford was the 2004 Annual Report.   However, at least one Plaintiff, Charles Johnson, states he purchased his vehicle on or about November 15, 2003. *Compl.* at ¶34.   Thus, it is impossible for him to say he relied upon any of the quoted material because it was released *after* he purchased his vehicle.

plaintiffs "failed to plead their claims for fraudulent concealment with the specificity required of Rule 9(b)" because, inter alia, the plaintiffs "failed to allege if, when, where or how they read any of defendant GM's representations").

For the reasons stated above, Plaintiffs in the present case suffer the same fatal flaw.  Although Plaintiffs do quote various promotional material in paragraphs 112-127 of the Complaint, Plaintiffs do not say they ever saw, read, or heard these particular statements by Ford.  Therefore, the Court grants Ford's argument to dismiss any claims based upon fraudulent concealment.  In addition, the Court will not extend the statute of limitations on the basis of fraudulent concealment.[22]

---

[22]Specifically, Ford asserts the following counts are barred by the statute of limitations:

2. Breach of Express Warranty on behalf of the West Virginia State Class;

3. Breach of Implied Warranty of Merchantability on behalf of the West Virginia State Class;

10. Violation of Express Warranty on behalf of the Illinois State Class;

14. Breach of Express Warranty on behalf of the Maryland State Class;

41. Breach of Express Warranty on behalf of the Pennsylvania State Class;

42. Breach of Implied Warranty of Merchantability on behalf of the Pennsylvania State Class;

43. Unjust Enrichment on behalf of the Pennsylvania State Class;

**E.**
**Unjust Enrichment**

Ford next argues that Plaintiffs' claims for unjust enrichment should be dismissed for those individuals who bought their vehicles used because their purchase did not bestow any benefit on Ford.   As an initial matter, the Court finds that, for the same reasons stated with respect to Plaintiffs' warranty claims, those Plaintiffs who have never experienced a sudden unintended acceleration have failed to demonstrate a plausible claim that they paid more for their vehicles than their actual worth.   Thus, the Court finds in those situations Plaintiffs' claims for unjust enrichment also fail, and the Court **GRANTS** Ford's Motion to Dismiss those claims.

The only remaining unjust enrichment claim Ford argues should be dismissed, in which it is alleged there was sudden unintended acceleration, is the claim by the Pattons. According to the Complaint, the Pattons purchased a 2006 Lincoln Town Car on or about July 18, 2009, from Greenbrier Dodge, located in Chesapeake, Virginia. *Compl.* at ¶¶65-66.   The statute of limitations on a claim for unjust enrichment in Virginia, however, is three years. *See Ghiorzi v. B&B Builders & Remodelers, Inc.*, Civ. Act. No. 68466, 2012 WL 9321391, *1 (Va. Cir. Ct. June 15, 2012) (stating the statute of limitations for unjust enrichment is three years).   As stated above, the Pattons' claim is not tolled based upon Plaintiffs' allegations of fraudulent concealment, and they clearly filed outside that time frame.   Thus, the statute of limitations applies to this claim, and

---

51. Unjust Enrichment on behalf of the Virginia State Class; and

52. Violation of the Wisconsin Deceptive Trade Practices Act on behalf of the Wisconsin State Class.

whether or not the Pattons otherwise could state a claim for unjust enrichment is moot.

**F.**
**Request for Injunctive Relief**

Lastly, Ford argues this Court should dismiss Plaintiffs' request for injunctive relief pursuant to the primary jurisdiction doctrine.   Plaintiffs request an injunction be issued to prevent Ford "from continuing the unfair business practices alleged in this Complaint and requiring Defendant to institute a recall or free replacement program[.]" *Compl.* at ¶2 of Request for Relief.   Ford asserts that the NHTSA is much better equipped to investigate the alleged defect and assess the need for and oversee any vehicle recalls.   However, at this point in the proceedings, the Court finds no reason to defer to the NHTSA.   The claims currently before the Court are individual claims based upon breach of warranty and a variety of state-law causes of action, which this Court is well-equipped to handle.   Whether or not this Court should or will issue a nationwide recall or free replacement program is an issue better addressed at a later time.   Thus, the Court **DENIES WITHOUT PREJUDICE** Ford's motion in this regard.

**IV.**
**CONCLUSION**

Accordingly, for the foregoing reasons, the Court **GRANTS, in part,** and **DENIES, in part**, Ford's motion.   The Court will enter an Order with respect to further scheduling of the remaining matters in this case in the near future.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER:      March 31, 2014

ROBERT C. CHAMBERS, CHIEF JUDGE