IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

CHARLES JOHNSON, et al.,

TONY BURNETT, et al.,

and                             Case No.: 3:13-cv-06529
                                  Case No.: 3:13-cv-14207
CHARLES T. BURD, et al.,       Case No.: 3:13-cv-20976

        Plaintiffs,

v.

FORD MOTOR COMPANY,

        Defendant.

## MEMORANDUM OPINION and ORDER

Pending before the Court is Plaintiffs' Second Motion to Challenge Confidential Designation and to Compel. (ECF No. 377).[1] Defendant Ford Motor Company ("Ford") has filed a memorandum in opposition to the motion, (ECF No. 425), and Plaintiffs have replied, (ECF No. 435). Plaintiffs' motion relates to ten documents that Ford has claimed are shielded from discovery due to attorney-client privilege and attorney work-product immunity. (ECF No. 536-7 at 3-68). On August 18, 2015, the Court heard oral argument on the motion. (ECF No. at 591 at 5-27). For the reasons that follow, the Court **GRANTS,** in part, and **DENIES**, in part,

---

[1] The docket numbers referenced in this Order are taken from the lead case, *Johnson v. Ford Motor Company,* Case No.: 3:13-cv-06529. Corresponding motions to challenge and compel are found at ECF No. 301 in *Burnett v. Ford Motor Company,* Case No.: 3:13-cv-14207, and ECF No. 264 in *Burd v. Ford Motor Company,* Case No.: 3:13-cv-20976.

1

Plaintiffs' motion to challenge and compel production of documents. (ECF No. 377).[2]

## I. Relevant Facts

This putative class action involves alleged events of sudden unintended acceleration in certain Ford vehicles manufactured between 2002 and 2010. In particular, Plaintiffs claim that their vehicles were equipped with defective electronic throttle control ("ETC") systems, which were not fault tolerant, resulting in open throttle events during which the drivers of the vehicles lacked the ability to control the throttles. Plaintiffs assert that the mechanisms causing the throttles to open unexpectedly were numerous; they included electromagnetic interference, resistive shorts, and other voltage and resistance fluctuations; and these issues were known to Ford. Despite having knowledge of the potential for sudden unexpected acceleration, Ford allegedly failed to properly design the ETC system to correct the events when they occurred, and further neglected to install fail-safes, such as a Brake Over Accelerator system, which would allow the drivers to physically prevent or mitigate sudden acceleration.

On January 19, 2015, Ford served 608 documents on Plaintiffs in one production, including the ten documents currently at issue in Plaintiffs' motion to challenge and to compel. The documents had been collected by Ford's employees in 2014 and sent to Xerox, Ford's discovery vendor, for processing, maintenance, and subsequent production. Xerox made the 608 documents available on a computerized platform for pre-production review by Ford's national litigation counsel, Ms. Jody Schebel, who examined the documents for relevancy and privilege. Ms. Schebel,

---

[2] ECF No. 301 in *Burnett v. Ford Motor Company,* Case No.: 3:13-cv-14207, and ECF No. 264 in *Burd v. Ford Motor Company,* Case No.: 3:13-cv-20976.

believing the ten documents to be privileged attorney-client communications, designated them as "privileged" and "withheld" using Xerox's tagging system. Despite Ms. Schebel's designation, the ten documents were produced. In late February 2015, when Ms. Schebel discovered that the documents had been erroneously provided to Plaintiffs, she immediately issued a claw back letter and contacted Xerox to determine why the documents had been served despite their "privileged" and "withheld" tags. Ultimately, Xerox advised that a processing error on its part electronically stripped the tags from the documents, resulting in their inadvertent disclosure.

On March 23, 2015, Plaintiffs filed the instant motion, asking the Court to compel formal production of the ten documents now subject to Ford's claw back request. Plaintiffs assert that the documents should be produced for the following reasons: (1) the documents are not privileged; and (2) even if they are, Ford waived any privilege that might attach to the documents by failing to take reasonable steps to prevent their disclosure. In response, Ford argues that the documents are privileged as attorney-client communications, or protected from discovery as work product. Ford contends that it did not waive the privilege through inadvertent disclosure because Ford took reasonable steps to protect the documents and promptly attempted to claw them back when Ford's counsel learned of Xerox's error.

## II. Discussion

Having considered the arguments of the parties, and after closely reviewing the documents, the Court finds that only a portion of the ten documents consist of privileged attorney-client communications, and none of the documents are work product. Therefore, the Court **GRANTS** Plaintiffs' motion to de-designate and

compel the production of the non-privileged portions of the documents. With respect to the privileged portions, the Court **DENIES** Plaintiffs' motion and **GRANTS** Ford's request to claw back the documents.

### A. *Existence of Privilege*

The parties have divided the documents into three sets for purposes of discussion. Consequently, the Court will likewise refer to the documents by set number.

#### 1. Set One

Set One includes documents with Bates-stamped numbers of 3748 00000001942 through 3748 00000001947. Set One consists of an e-mail from Jim Engle, a design analysis engineer employed by Ford, to Jay Logel, an attorney with Ford's Office of the General Counsel, and attachments to the e-mail. In the e-mail, Mr. Engle seeks advice from Ford's counsel about a letter Mr. Engle intends to send to the Chicago Transit Authority, reporting on an investigation by Ford into the Chicago Transit Authority's claim of sudden unintended acceleration in Crown Victoria automobiles manufactured by Ford. The first attachment to the e-mail is the letter with Mr. Logel's edits. Also attached to the letter are two graphs with no edits.

Plaintiffs posit that all of Set One should be produced, because Mr. Engle did not specifically request *legal* advice, and the edits made by Mr. Logel were superficial or stylistic, and were not even remotely legal in nature. Plaintiffs further claim that the edits were incorporated in the final draft of the letter, which was produced in discovery without a privilege claim; therefore, the edits were intended for public disclosure. Ford disagrees, pointing to cases which purportedly hold that preliminary drafts of documents intended to be made public are nevertheless privileged;

4

particularly, when the drafts contain attorney's notes and comments.

The law is well-settled that "the attorney-client privilege applies to 'in-house' counsel just as it would to any other attorney." *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B,* 230 F.R.D. 398, 411 (D. Md. 2005) (citing *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 154, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975). Nonetheless, because a corporation's in-house counsel often wears more than one hat, courts look closely at claims of privilege asserted by corporate employees involving communications with in-house counsel. Only contacts sought and given for legal purposes will be privileged. *Id.* at 411 *(*quoting *Marten v. Yellow Freight System, Inc.,* 1998 WL 13244 *7 (D.Kan. Jan.6, 1998)). The proponent of the privilege "carries the burden of establishing the existence of the attorney-client relationship, the applicability of the privilege to the specific communication at issue, and the absence of waiver." *FTC v. Reckitt Benckiser Pharmaceuticals, Inc.,* No. 3:14mc5, 2015 WL 1062062, at *2 (E.D. Va. Mar. 10, 2015) (citing *In re Grand Jury Subpeona,* 341 F.3d 331, 335 (4th Cir. 2003)). "To determine whether communications were made primarily for the purpose of [seeking or] providing legal services, the court must consider the context in which they were made." *U.S. v. Cohn,* 303 F.Supp.2d 672, 684 (D.Md. 2003). Moreover, at least in this circuit,[3] when a client communicates information to counsel with the intention of having the information

---

[3] It is important to note that neither party has taken an explicit position on which jurisdiction's law governs with respect to questions concerning the existence of the attorney-client privilege. As previously indicated in this litigation, the Court could apply federal law, but there are also good arguments that either the law of Michigan or the law of West Virginia should be used. Since both parties cite extensively to federal law in their memoranda, the undersigned has applied federal law in this opinion. *See In re General Motors LLC Ignition Switch Litigation,* 2015 WL 221057, at *12, n. 3 (finding that the parties' reliance on federal law was implicit consent to apply federal law and was sufficient to establish choice of law on the subject); *see, also, Babych v. Psychiatric Solutions, Inc.,* 271 F.R.D. 603, 609 (N.D. Ill. 2010) (holding that when both federal and state law supplies the rule of decision, issues related to the attorney-client privilege should be governed by federal law).

5

published, no privilege attaches to the communication. *See In re Grand Jury Proceedings,* 727 F.2d 1352, 1358 (4th Cir. 1984). The key consideration in such circumstances is whether the client intended the information communicated to be kept confidential. *See In Re Grand Jury Subpoena,* 341 F.3d 331, 336 (4th Cir. 2003) (explaining that simply because a communication assists a client in providing a public statement or publishing a document does not result in a waiver of the privilege; "[a]dopting [that] … reasoning would lead to the untenable result that any attorney-client communications relating to the preparation of publicly filed legal documents—such as court pleadings—would be unprotected."); *see, also, In re General Motors LLC Ignition Switch Litigation,* -- F.Supp.3d --, 2015 WL 221057, at *6 (S.D.N.Y. Jan. 15, 2015) (holding that the public dissemination of information gathered during a confidential communication does not, by itself, lead to the factual inference that the communication was not intended to be confidential at the time it was made). "To determine whether confidentiality was intended, '[r]ather than look to the existence of the attorney-client relationship or to the existence or absence of a specific request for confidentiality, a court must look to the services which the attorney has been employed to provide, and determine if those services would reasonably be expected to entail the publication of the client's communications." *Reckitt Benckiser Pharmaceuticals, Inc., 2*015 WL 1062062, at *3 (quoting *United States v. (Under Seal),* 748 F.2d 871, 875 (4th Cir. 1984)).

Here, as indicated in the declarations submitted by Mr. Engle and Mr. Logel, Mr. Engle's purpose in communicating with Mr. Logel was to obtain legal advice about the wording of an investigation report Mr. Engle intended to supply to the Chicago Transit Authority. (ECF Nos. 425-1, 425-2). Mr. Engle did not provide data

6

to Mr. Logel for the purpose of drafting the investigation report; instead, he submitted the completed report to Mr. Logel to review with an eye toward "possible legal and/or litigation ramifications of the statements made in [the] draft report and as to the general wording of the document, including whether any information should be omitted or included to comply with legal requirements or principles." (ECF No. 425-2 at 2). In other words, Mr. Engle's communication with Mr. Logel was not a request for assistance in generating a public report; rather, it was a request to insure that the wording of a report that detailed a completed investigation did not expose the corporation to liability, or negatively affect its position in potential litigation. Being retained to provide legal guidance on how to reduce a client's risk of liability is different than being retained for the specific purpose of preparing a report intended for public dissemination. Certainly, Mr. Engle had reason to obtain legal advice on the wording of the report given his concern that the underlying incidents would lead to litigation. (ECF No. 425-2 at 2). Contrary to Plaintiffs' contention, there is nothing about this request for advice that suggests Mr. Engle's intention to have any of his communications with Mr. Logel published. *See In Re Grand Jury Subpoena,* 341 F.3d at 336. Accordingly, the Court finds that the e-mail exchange between Mr. Engle and Mr. Logel, and the draft showing the edits of Mr. Logel, Bates-stamped numbers 3748 00000001942-3748 00000001945, are privileged communications. While it is true that sections of the draft report contain factual statements that do not involve edits, the undersigned finds that Ford need not produce a redacted version given the extensiveness of the edits and the fact that Plaintiffs have a copy of the final draft report, which includes the same facts as those set forth in the draft. (ECF No. 425 at 6). With respect to the charts attached to the report, Bates-stamped numbers 3748

00000001946-3748 00000001947, they are not privileged. The charts contain no notations by Mr. Logel, and identical charts were attached to the final report sent to the Chicago Transit Authority and produced in this litigation.

Ford also argues that the documents in Set One are protected from discovery as attorney work product. That argument is unpersuasive. "Distinct from the attorney-client privilege, the work product doctrine belongs to the attorney and confers a qualified privilege on documents prepared by an attorney in anticipation of litigation." *Solis v. Food Employers Labor Relations Ass'n*, 644 F.3d 221, 231-32 (4th Cir. 2011) (citations omitted). However, "materials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes" are not "documents prepared in anticipation of litigation" protected by work product privilege. *Id.* at 232 (quoting *Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.,* 967 F.2d 980, 984 (4th Cir. 1992)). The Fourth Circuit explained the distinction as follows:

> We take notice of the fact that members of society tend to document transactions and occurrences to avoid the foibles of memory and to perpetuate evidence for the resolution of future disputes. And because litigation is an ever-present possibility in American life, it is more often the case than not that events are documented with the general possibility of litigation in mind. Yet, "[t]he mere fact that litigation does eventually ensue does not, by itself, cloak materials" with work product immunity. *Binks Mfg. Co. v. National Presto Indus., Inc.,* 709 F.2d 1109, 1118 (7th Cir.1983). *See also Janicker v. George Washington Univ.,* 94 F.R.D. 648, 650 (D.D.C.1982) ("The fact that a defendant anticipates the contingency of litigation resulting from an accident or an event does not automatically qualify an 'in house' report as work product."). The document must be prepared *because* of the prospect of litigation when the preparer faces an actual claim or a potential claim following an actual event or series of events that reasonably could result in litigation. Thus, we have held that materials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes are not documents prepared in anticipation of litigation within the meaning of Rule 26(b)(3). *See Goosman v. A. Duie*

> *Pyle, Inc.,* 320 F.2d 45, 52 (4th Cir.1963). Following any industrial accident, it can be expected that designated personnel will conduct investigations, not only out of a concern for future litigation, but also to prevent reoccurrences, to improve safety and efficiency in the facility, and to respond to regulatory obligations. Determining the driving force behind the preparation of each requested document is therefore required in resolving a work product immunity question.

*National Union Fire Ins. Co.* 967 F.2d at 984. "As in the case of attorney-client privilege, the party claiming the protection bears the burden of demonstrating the applicability of the work product doctrine." *Solis,* 644 F.3d at 232 (citing *In re Grand Jury,* 33 F.3d at 353). "The party seeking protection must make this showing with a specific demonstration of facts supporting the requested protection, preferably through affidavits from knowledgeable persons." *E.I. Du Pont de Nemours and Co. v. Kolon Indus., Inc.,* No. 3:09cv58, 2010 WL 1489966, at *3 (E.D.Va. Apr. 13, 2010) (internal quotations omitted).

Ford simply has not carried its burden to establish that the materials sent by Mr. Engle to Mr. Logel, or Mr. Logel's edits, were prepared *because of* the prospect of litigation.[4] Mere concern that a report or writing may have legal consequences in the future should litigation ensue is not the equivalent of preparing a report or writing for anticipated or pending litigation. Certainly, neither Mr. Engle nor Mr. Logel state that Mr. Engle's investigation was done for litigation purposes, rather than as a normal part of Ford's business. Likewise, they do not assert that the Chicago Transit Authority had lodged a claim against Ford or threated litigation, prompting Mr. Logel to request the investigation, or Mr. Engle to prepare the reports and materials he supplied to Mr. Logel for review. Finally, they do not

---

[4] To the extent Ford claims Set Two and Set Three contain documents protected as work product, the undersigned finds that Ford has similarly failed to meet its burden to establish that any of the documents were prepared in anticipation of litigation.

suggest that litigation related to the Chicago Transit Authority's concern was pending at the time the documents were created. Consequently, there is nothing in the record to support a finding that the documents in Set One constitute work product.

### 2. Set Two

Set Two consists of an e-mail chain regarding high idle conditions in some 2005 model Ford vehicles, having Bates-stamped numbers of 3748 00000001982 through 3748 00000001987. Since the filing of the motion to challenge and to compel, Ford has withdrawn its privilege claim to all of the documents in this set, with the exception of two e-mail exchanges found at page numbers 3748 00000001984 and 3748 00000001985. The undersigned finds that the e-mail from Kevin Layden to Jay Logel and others, dated Tuesday January 11, 2005 and timed 11:30 a.m. is a privileged communication given that Mr. Layden is specifically seeking legal direction based upon liability concerns. However, the subsequent e-mail in the chain, sent by Andy Sawers to Kevin Layden and Jay Logel on March 22, 2005 at 12:29 p.m., is not a privileged communication. While Mr. Sawers reports a recent incident and asks for follow-up, he does not seek *legal guidance*. Not every communication involving a lawyer will meet the definition of a privileged communication. *See In re Grand Jury Subpoena,* 727 F.2d at 1356. Moreover, a communication does not become privileged simply by including a lawyer in an e-mail chain and noting the communication as "a request for legal direction." *See In re Allen,* 106 F.3d 582, 604 (4th Cir. 1997). Indeed, it appears that Mr. Sawers put the header—indicating that the e-mail was a request for legal advice—in his March e-mail primarily because the header had appeared on the earlier e-mails discussing similar

subject matter. (ECF No. 425-4 at 2).

### 3. Set Three

The final set includes an e-mail exchange between Paul Szuszman, a technical specialist at Ford, and Jay Logel, having Bates-stamped numbers of 3748 00000035362 and 3748 00000035367. Also attached to the e-mails, at Bates-stamped numbers 3748 00000035368 through 3748 00000035375, are draft reports and investigative materials prepared by Ford employees that were forwarded to Jay Logel with a request for review. The drafts do not contain any notes or comments by Mr. Logel and were ultimately produced verbatim as final reports with supportive materials. Ford argues that all of the documents in Set Three are privileged communications, because they were sent to Mr. Logel for review. Plaintiffs argue that the documents are not privileged because they were created for the purpose of publication and contain facts rather than legal theories or conclusions.

For the reasons previously set forth, the undersigned finds that the request by Mr. Szuszman for legal input regarding the propriety of the reports, and Mr. Logel's response to Mr. Szuszman, are privileged communications (Bates-stamped numbers 3748 00000035362 and 3748 00000035367). Although Mr. Szuszman does not explicitly request an evaluation of the potential liability that may arise from the report, the declarations provided by Ford support the conclusion that Mr. Logel is the attorney in Ford's Office of the General Counsel who is regularly consulted when employees are concerned that a document they intend to publish or disclose will have unintended ramifications in litigation, or may otherwise expose the corporation to liability.

On the other hand, the attached reports and investigative materials are not privileged. As noted in one of the cases cited by Ford, the attorney-client privilege applies to information conveyed to an attorney "to the extent that such information is not contained in the document published and is not otherwise disclosed to third persons." *Schenet v. Anderson,* 678 F.Supp. 1280, 1283 (E.D. Mich. 1988) (quoting *U.S. v. Schlegel,* 313 F.Supp. 177, 179 (D. Neb. 1970)).[5] Similarly, while drafts of documents that contain the legal advice and opinions of attorneys may be privileged, the privilege is waived "as to those portions of the preliminary drafts ultimately revealed to third parties." *Id.* at 1284 (citations omitted). Given that the final reports and investigative materials produced by Ford are exactly the same as the attachments to the e-mails, the drafts are not properly withheld as privileged.

### B. *Waiver Through Inadvertent Disclosure*

Plaintiffs also take the position that even if some or all of the documents identified are privileged, as claimed by Ford, the privilege was waived by Ford's production of the documents. Plaintiffs argue that Ford should not be permitted to claw back the documents because it failed to take reasonable steps to protect them from disclosure.

According to Ford, the ten documents at issue here were inadvertently disclosed as a result of a technical error by Ford's document vendor, Xerox. Ford submitted an declaration from Mr. Kevin Buss, an account operations manager with Xerox, confirming that the ten documents had been designated as privileged by Ford,

---

[5] The *Schenet* Court expressly declined to follow the Fourth Circuit's opinion in *In re Grand Jury Subpeona,* 727 F.2d at 1356, suggesting that the Fourth Circuit's narrow interpretation of the attorney-client privilege would discourage clients from freely disclosing information to their attorneys. The undersigned need not address the perceived differences between the courts or otherwise reconcile the opinions, because even under the more liberal view espoused by the *Schenet* Court, the attachments are not privileged.

but had their privilege designation mistakenly removed electronically when Xerox moved the documents from one part of its platform to another to prepare for a document production. (ECF No. 425-6). The error was not discovered until after the documents were produced.

For the same reasons explained in this Court's prior claw back opinion, the undersigned finds that Ford took reasonable steps to protect the documents and, thus, should be permitted to claw back those pages that have been determined to be privileged. (*See* ECF No. 426). Having so found, the Court cautions Ford that now that it is aware of two technical glitches by Xerox, which resulted in the erroneous production of eleven documents marked as privileged, Ford should take additional steps to insure that no other improper productions are made by Xerox.

### III. Conclusion

Wherefore, for the foregoing reasons, the Court **ORDERS** that**:**

1. The following pages produced by Ford shall be de-designated as privileged:

   Bates-stamped numbers:   3748 00000001946
   3748 00000001947
   3748 00000001984—March 22, 2005 e-mail
   3748 00000035368
   3748 00000035369
   3748 00000035370
   3748 00000035371
   3748 00000035372
   3748 00000035373
   3748 00000035374
   3748 00000035375

2. The following pages produced by Ford shall be designated as privileged and may be clawed back by Ford:

   3748 00000001942
   3748 00000001943
   3748 00000001944

13

        3748 00000001945

        3748 00000001984-1985—only January 11, 2005 e-mail sent at 11:30 a.m. by Kevin Layden

        3748 00000035362
        3748 00000035367

    The Clerk is instructed to provide a copy of this Order to counsel of record and any unrepresented party.

        **ENTERED:** September 3, 2015

        _____
        Cheryl A. Eifert
        United States Magistrate Judge