**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**CHARLES JOHNSON, et al.,**

      **Plaintiffs,**

**v.**                                                    **Case No.:  3:13-cv-06529**


**FORD MOTOR COMPANY,**

      **Defendant.**


**<u>MEMORANDUM OPINION and ORDER</u>**

      Pending before the Court is Plaintiffs' second Motion to Compel Defendant Ford Motor Company to Produce Documents Listed in its Supplemental ASO (Automotive Safety Office) Privilege Log, (ECF No. 700), and Plaintiffs' Motion to Seal pertaining to Exhibit E attached to Plaintiffs' motion to compel, (ECF No. 698). Defendant Ford Motor Company ("Ford") has filed a memorandum in opposition to the motion, (ECF No. 703), and Plaintiffs have replied to that memorandum. (ECF No. 708).

      Plaintiffs' motion relates to 132 documents prepared by Ford's Automotive Safety Office ("ASO") in 2010, which Ford claims are shielded from discovery under attorney-client privilege and attorney work-product protection. Plaintiffs previously moved for an order compelling the production of these documents on June 9, 2015. (ECF No. 536). In ruling on that motion, the undersigned found Ford's privilege log to be insufficient and ordered Ford to supplement the log with more robust descriptions of the withheld ASO documents. However, the Court declined to compel production of the documents at that

1

time. (ECF No. 598 at 17).

After receiving the updated privilege log, Plaintiffs filed the instant motion to compel. On February 2, 2016, the parties provided oral argument on the motion. As a preliminary matter, the Court advised the parties that the supplemental privilege log was adequate under Federal Rule of Civil Procedure 26(b)(5)(A) and did comply with the Court's prior opinion and order. (ECF No. 714 a 9-10). Accordingly, the parties focused their arguments on whether the documents outlined on the privilege log were indeed entitled to protection from production. Having now fully considered the positions of the parties and the written materials, and for the reasons stated below, Plaintiffs' second Motion to Compel Ford to Produce Documents Listed in Ford's ASO Privilege Log, (ECF No. 700), is **DENIED**, and Plaintiffs' request for sanctions contained therein is also **DENIED**. Due to the highly confidential nature of the information contained in Exhibit E attached to Plaintiffs' motion to compel, the Court **GRANTS** Plaintiffs' Motion to Seal that exhibit, (ECF No. 698), and **ORDERS** that Exhibit E be sealed.[1]

## I.   <u>Relevant Factual and Procedural History</u>

These cases involve alleged events of sudden unintended acceleration in certain Ford vehicles manufactured between 2002 and 2010. In particular, Plaintiffs claim that their vehicles were equipped with defective electronic throttle control ("ETC") systems that were not fault tolerant, resulting in open throttle events during which the drivers of

---

[1] The Court is cognizant of the well-established Fourth Circuit precedent recognizing a presumption in favor of public access to judicial records. *Ashcraft v. Conoco, Inc.*, 218 F.3d 288 (4th Cir. 2000). As stated in *Ashcraft*, before sealing a document, the Court must follow a three step process: (1) provide public notice of the request to seal; (2) consider less drastic alternatives to sealing the document; and (3) provide specific reasons and factual findings supporting its decision to seal the documents and for rejecting alternatives. *Id.* at 302. The Court finds that this memorandum opinion and order serves as sufficient notice to the public. The Court has also considered less drastic alternatives to sealing Exhibit E and finds that none exist. Accordingly, the Court concludes that sealing Exhibit E is appropriate given its highly confidential nature.

the vehicles lacked the ability to control acceleration. Plaintiffs assert that the mechanisms causing the throttles to open unexpectedly were numerous, included electromagnetic interference, resistive shorts, and other voltage and resistance fluctuations, and that these issues were known to Ford. According to Plaintiffs, despite having knowledge of the potential for sudden unexpected acceleration, Ford nonetheless failed to properly design the ETC system to correct the events when they occurred, and further neglected to install fail-safes, such as a Brake Over Accelerator system, which would allow the drivers to physically prevent or mitigate sudden acceleration.

In the course of discovery, Plaintiffs requested that Ford produce documents, including studies, reports, analyses, and memoranda, related to alleged unintended acceleration in the class vehicles. (ECF No. 536-2 at 4, 28-29). Specifically at issue here, Plaintiffs requested that Ford produce the ASO reports and databases for any alleged unintended acceleration event in a Ford vehicle equipped with the ETC system. (*Id.* at 27-28). Plaintiffs also requested the production of documents related to any government correspondence or investigations concerning unintended accelerations in Ford vehicles equipped with the ETC system. (*Id.* at 33-34). On October 24, 2014, after producing non-privileged documents created as part of a 2010 ASO investigation into sudden unintended acceleration, Ford provided Plaintiffs with a privilege log listing additional documents from the 2010 ASO investigation that were withheld from discovery. (ECF No. 536-1 at 2-67; ECF No. 551 at 3). Ford explained that the ASO investigation into complaints of sudden unintended acceleration was undertaken after the Wall Street Journal published an article in 2010 concerning sudden unintended acceleration in Ford vehicles. (ECF No. 551 at 2-3). The article was based on findings from vehicle owner questionnaires ("VOQs") issued by the National Highway Transportation Safety Administration ("NHTSA"). (*Id.* at

2). At the time that the article was released, Ford asserts it was defending several lawsuits related to claims of unintended acceleration, including a case styled *Schanel v. Ford*, which was initiated in the District Court for El Paso County, Colorado in February 2010 and proceeded to trial in December 2010. (*Id.* at 2-3). Consequently, in connection with those lawsuits and the article, its Office of General Counsel ("OGC") began an investigation of the VOQs and Transportation Recall Enhancement, Accountability, and Documentation ("TREAD") Act submissions with the assistance of Ford's ASO. (*Id.* at 3). Ford subsequently produced the underlying data analyzed by the ASO, as well as any non-privileged information. However, Ford claims that the remaining documents were prepared exclusively for the use of Ford's OGC in order to render legal advice to Ford and were not shared or disclosed beyond Ford's employees involved in the project.

On March 25, 2015, the parties met and conferred about the sufficiency of Ford's ASO privilege log. (ECF No. 536 at 2). Plaintiffs' counsel informed Ford's counsel that the ASO privilege log failed to adequately describe each document withheld by Ford. (*Id.*) Plaintiffs' counsel also questioned whether the "vast majority" of documents were indeed shielded from disclosure given their descriptions as "spreadsheets" or "charts," which Plaintiffs interpreted to mean that those documents contained only "raw data or factual information." (*Id.*) In addition, Plaintiffs' counsel expressed their belief that the documents may not be privileged because they were not authored by an attorney or anyone at Ford's OGC, and the documents were sent to both attorneys and non-attorneys. (*Id.* at 2-3). The following day, Ford's counsel sent an e-mail confirming that Ford would review its privilege logs and determine whether additional information could be provided. (ECF No. 536-3 at 2). On April 6, 2015, Plaintiffs' counsel inquired about the status of Ford's counsel's privilege log review, and Ford's counsel replied the next day, verifying

4

that Ford would supplement its privilege logs. (ECF No. 536-4 at 2; ECF No. 536-5 at 2).

On April 15, 2015, the Court conducted a regularly scheduled telephonic discovery

conference and addressed the privilege log issue. (ECF No. 536-6 at 3-4). Specifically, the

undersigned pointed out that Federal Rule of Civil Procedure 26 required a privilege log

to contain enough information that the receiving party could determine whether to

challenge assertion of the privilege. (*Id.* at 4).

On May 19, 2015, Ford produced a supplemental ASO privilege log to Plaintiffs.

(ECF No. 536-7 at 3-68). Distinguishing the supplemental privilege log from the original

privilege log was the addition of file names for the documents listed. (*Id.*) By way of

example, the first two rows of the privilege log appeared as such:

| Doc. # | Bates Range | Document Date | Author | Recipient | Document Type | Description | Basis for Claim | File Name |
|--------|-------------|---------------|--------|-----------|---------------|-------------|-----------------|-----------|
|        |             |               |        |           |               |             |                 |           |
| 1 | 00001P | 3/09/10 | Ken Lilly (Ford's Automotive Safety Office) | John Mellen (Attorney, Ford's OGC) ... | Spreadsheets and Charts | Confidential communication containing an analysis prepared by Ford employees of the ASO for and at the request of Ford's OGC to assist Ford's attorneys with pending and anticipated litigation. | Attorney-Client Privilege and Attorney Work-Product Immunity | DI_ExportFile _All_DI_1 8.XLS |

(*Id.* at 3). All 132 documents listed in the privilege log were described in one of two ways—

the first was the description in the table above, and the second stated that the document

was a "[c]onfidential communication containing an analysis prepared by authorized agent

consultant of Ford for and at the request of Ford's OGC to assist Ford's attorneys with pending and anticipated litigation." (*Id.* at 3-68).

On June 9, 2015, Plaintiffs filed a motion to compel production of the documents listed in the log and for sanctions. (ECF No. 536). On August 28, 2015, the Court issued a memorandum opinion and order finding that Ford's privilege log was insufficient under Federal Rule of Civil Procedure 26(b)(5)(A) because the log's document descriptions did not enable Plaintiffs "to make an intelligent determination about the validity of the assertion of the privilege." (ECF No. 598 at 14) (quoting *Auto. Club of N.Y., Inc. v. Port Auth. of N.Y. & N.J.*, No. 11 Civ. 6746, 2014 WL 2518959, at *5 (S.D.N.Y. June 4, 2014)). Accordingly, the Court ordered Ford to supplement the ASO privilege log with more detailed descriptions of the withheld documents. (*Id.* at 15). The Court declined to find that Ford had waived its privilege related to the withheld ASO investigation documents, but cautioned Ford that a finding of waiver would likely result if the supplemental log did not comply with Federal Rule of Civil Procedure 26(b)(5)(A) and the Court's opinion and order. (*Id.* at 15-16).

Ford supplemented its ASO privilege log on September 8, 2015. (ECF No. 700 at 5; ECF No. 700-6 at 2-67). The updated privilege log contains a "Supplemental Description" column. Some of the supplemental descriptions include: "VOQ data selected for ASO review in connection with 2010 ASO VOQ review project"; "Analysis of NHTSA VOQ Reports for Ford vehicles by category from 01/99 to 09/09 for all model years, including top 5 vehicle charts by VOQ Report Count"; "Analysis of NHTSA VOQ Reports for Toyota vehicles by category by incident date 01/99 to 10/09 for all model years, including top 5 vehicle charts by VOQ Report Count"; and "Analysis of Ford alleged SUA related fatalities from NHTSA VOQ Report count by model and year." (ECF No. 700-6 at

2-3, 6, 18). The remainder of the privilege log was identical to the privilege log produced on May 19, 2015 to Plaintiffs other than an addition to the "Description" column that states "See also attached Affidavit of Jay Logel in Schanel v. Ford in support of project description and basis of Ford's claim of privilege." (*Id.* at 2).

Mr. Logel's affidavit, which was sworn on November 18, 2010, and originally filed in the *Schanel* case, provides that he is an attorney who is employed with Ford's OGC and that he has reviewed Ford's ASO privilege log. (ECF No. 612 at 1, 3, 6). Mr. Logel asserts that Ford's OGC undertook a review and analysis of NHTSA VOQs and TREAD Act submissions after "the media opined that Ford had the second most claims of sudden unintended acceleration in its vehicles" based on the NHTSA questionnaires. (*Id.* at 4). Ford's OGC "engaged" the ASO to assist with this review and analysis. (*Id.* at 5). According to Mr. Logel, documents were created by the ASO in performing their duties assigned by the OGC, and those documents were "used solely by Ford's attorneys in rendering legal advice to Ford regarding pending and anticipated litigation involving claims of sudden unintended vehicle acceleration." (*Id.*) Mr. Logel indicates that the documents listed on Ford's ASO privilege log "would not have been created but for the request and direction of Ford's [OGC]." (*Id.*)

On December 21, 2015, Plaintiffs filed the instant Motion to Compel Ford to Produce Documents Listed in Ford's ASO Privilege Log. (ECF No. 700). In Plaintiffs' memorandum in support of their motion, they argue that the privilege log is still insufficient given the "perfunctory" nature of the supplemental document descriptions. (ECF No. 701 at 9). Accordingly, Plaintiffs assert that Ford has failed to "establish any element of privilege or work-product protection." (*Id.*) Plaintiffs request that the Court sanction Ford for failing to comply with the Court's August 28 opinion and order by again

providing an inadequate privilege log. (*Id.* at 20).

Additionally, Plaintiffs contend that the documents listed in the ASO privilege log are not privileged for several reasons. First, Plaintiffs insist that the documents were not created in anticipation of litigation or for the purpose of obtaining legal advice. (*Id.* at 10). Plaintiffs claim that Ford has not identified any pending or imminent litigation that caused it to prepare the withheld documents. (*Id.* at 12). Instead, Plaintiffs maintain that the documents were created in the ordinary course of Ford's business, and in support of this contention, Plaintiffs cite to the deposition testimony of Ford employees David Ott, Raymond Nevi, and Mark Tuneff. (*Id.* at 10-11). Second, Plaintiffs assert that Ford cannot demonstrate that Ford's employees in the ASO contemplated an attorney-client relationship when it communicated with Ford's OGC, because the communications were done in the ordinary course of Ford's business. (*Id.* at 13). Third, Plaintiffs argue that "there is no evidence that Ford approached the OGC to seek legal advice with respect to [sudden unintended acceleration]." (*Id.*) Rather, Plaintiffs insist that the evidence shows the 2010 ASO investigation was initiated at the request of Ford employees outside of the OGC. (*Id.* at 13-14). Fourth, Plaintiffs contend that Ford did not intend to preserve the confidentiality of the communications between the ASO and Ford's OGC. (*Id.* at 14). According to Plaintiffs, the ASO was not involved in litigation matters, "so its work is presumptively non-confidential." (*Id.*) Furthermore, Plaintiffs assert that many of the withheld documents were prepared for disclosure to the NHTSA, which defeats any claim of privilege. (*Id.* at 14-15).

Finally, to the extent that the Court declines to compel production of the withheld documents, Plaintiffs request that the Court order an *in camera* review of the documents to determine whether the crime-fraud exception applies; thereby, obviating the attorney-

8

client privilege and attorney work-product protection. (*Id.* at 15). Plaintiffs allege that the 2010 ASO investigation was conducted with the "fraudulent purpose of concealing from NHTSA and consumers Ford's knowledge of defects in its vehicles equipped with ETC systems." (*Id.* at 17). Plaintiffs assert that NHTSA conducted a series of meetings with Ford personnel regarding sudden unintended acceleration in early 2010 and that Ford provided documents and information concerning that issue to NHTSA, but Ford withheld an ASO review of thousands of reports related to sudden unintended acceleration contained in Ford's internal databases from NHTSA. (*Id.* at 18-20). Plaintiffs claim that Ford instead provided a separate, more limited analysis of sudden unintended acceleration data, which was meant to "create the false impression that Ford vehicles do not suffer from a high volume of [sudden unintended acceleration] incidents." (*Id.* at 18).

In response, Ford asserts that its most recently supplemented ASO privilege log is adequate and complies with the Court's August 28 opinion and order. (ECF No. 703 at 8). Ford argues that the additional document descriptions along with Mr. Logel's affidavit sufficiently provide the basis for Ford's claim of privilege over the documents listed in the ASO log. (*Id.*)

With respect to Plaintiffs' position that the documents were created in the ordinary course of business, Ford notes that it has produced to Plaintiffs the non-privileged documents created during the 2010 ASO investigation and only withheld those documents that were specifically prepared at the request and under the direction of Ford's counsel for the purpose of advising the corporation. (*Id.* at 11). Ford emphasizes Mr. Logel's statements in his affidavit that he and other attorneys in Ford's OGC commissioned the ASO to review the NHTSA questionnaires and Ford's TREAD Act submissions to aid Ford in defending pending and anticipated lawsuits related to claims

of sudden unintended acceleration. (*Id.* at 11). Ford indicates that the *Schanel* case, which was filed in February 2010, was pending at the time that the withheld documents were created. (*Id.*) Ford also cites Mr. Nevi's testimony that Ford's OGC requested a "different look" at the data reviewed by the ASO, which Ford believes supports its position that certain documents were created in the ordinary course of business during an initial look into the NHTSA VOQs and that other, privileged documents were generated at the OGC's request. (*Id.* at 12). Insofar as Plaintiffs rely on Ford employee deposition testimony to establish that the documents listed on the log were created in the ordinary course of Ford's business, Ford insists that the testimony demonstrates only that the process used by the ASO during its work for the OGC was the same process that the ASO routinely used. (*Id.* at 13).

Because the documents were created in anticipation of litigation, Ford contends that the withheld documents are protected from disclosure based on the attorney work-product doctrine. Ford argues that the withheld documents are opinion work product because they were created by the ASO at the request of Ford's OGC, and if produced, would divulge the substance of what Ford's counsel requested and directed Ford's employees to analyze. (*Id.* at 13). In addition, Ford asserts that the withheld documents are also protected from disclosure because they are fact work product. (*Id.* at 13 n.9). Ford maintians that attorney-client privilege bars Plaintiffs from discovering the logged documents because the documents were "created in furtherance of OGC's rendition of legal advice to Ford," and Ford intended for the information contained therein to remain confidential. (*Id.* at 15-16).

Finally, Ford argues that the crime-fraud exception is inapplicable in this case because "Ford has not claimed privilege over the 'communications' that Plaintiffs allege

Ford withheld from NHTSA." (*Id.* at 17). Indeed, Ford insists that Plaintiffs have received the purportedly withheld information that was not provided to NHTSA. (*Id.*) Moreover, Ford asserts that the crime-fraud exception does not apply since the data reviewed during the 2010 ASO investigation was in NHTSA's possession, either through the VOQs or TREAD Act and Early Warning Report submissions. (*Id.* at 18-19). Ultimately, Ford contends that Plaintiffs have failed to produce any evidence that Ford intended to "cover up a defect or to withhold data from NHTSA." (*Id.* at 18).

In reply, Plaintiffs insist that the latest version of the ASO privilege log "fails to provide additional information that would assist Plaintiffs in determining the validity of Ford's privilege claims." (ECF No. 708 at 3). Plaintiffs also argue that Mr. Logel's affidavit is insufficient to support Ford's claim of privilege over the listed documents because the affidavit conflicts with the testimony of Ford's employees that the withheld documents were created in the normal course of business. (*Id.* at 2, 8-11). On the subject of Ford's work-product argument, Plaintiffs reiterate their contention that the documents were not created in anticipation of litigation. (*Id.* at 11-12). As to Ford's invocation of attorney-client privilege, Plaintiffs claim that Ford has failed to supply the Court with sufficient information to determine whether the 2010 ASO investigation was related to the rendition of legal services by the OGC. (*Id.* at 12). Lastly, Plaintiffs assert that the crime-fraud exception applies because "Ford produced to NHTSA only the VOQ analysis it wanted NHTSA to see and invoked privilege over the 131 others it did not want NHTSA to see." (*Id.* at 13). Plaintiffs contend that Ford's "fraudulent scheme of withholding safety-critical analyses from NHTSA and the public" requires disclosure of the withheld documents. (*Id.*)

On February 2, 2016, the Court heard oral argument on the instant motion to compel. The Court informed the parties that it believed the supplemented log was adequate under Rule 26(b)(5)(A), and as such, the Court focused primarily on whether the withheld documents were protected from disclosure due to the work-product doctrine or attorney-client privilege. (ECF No. 714 at 9-10, 12-13). The Court indicated its concern that none of the Ford employees performing work for the ASO had unequivocally testified that the logged documents were created at the request of Mr. Logel or the OGC. (*Id.* at 16, 18-19, 24-30). The Court granted Ford leave to submit additional evidence on that issue. (*Id.* at 30-31). In addition, Plaintiffs were asked to a supply the Court with a representative, non-privileged document produced as part of the 2010 ASO investigation, and Ford was asked to provide for *in camera* review one or two of the privileged documents listed on the log. (*Id.* at 37-39).

The parties submitted their supplemental documentation related to the motion to compel within two weeks of the hearing, including a sample of already-produced, non-privileged documents related to the 2010 ASO investigation. Of particular note, on February 16, 2016, Ford submitted to the Court an affidavit from Keith Love, who has worked in Ford's ASO since March 2003 and was employed as an External Investigations Engineer within Ford's ASO in 2010.[2] In his affidavit, Mr. Love asserts that he has reviewed the ASO privilege log and is familiar with twenty-four of the documents listed therein. With respect to those twenty-four documents, Mr. Love confirms that he created those logged documents at Mr. Logel's request and for the OGC's use. Mr. Love explains that "[t]he review and analysis requested from Ford's ASO by Mr. Logel was different from

---

[2] The affidavit was never filed by Ford.

12

other VOQ analysis conducted by Ford's ASO during the same time period." In addition to Mr. Love's affidavit, on February 17, 2016, Ford submitted to the Court a withheld document for *in camera* review (Bates numbered 00120P).

## II.  **Discussion**

### A. The Adequacy of Ford's ASO Privilege Log as Supplemented on September 8, 2015

The Court's August 28, 2015 memorandum opinion and order described the proper standard for reviewing the adequacy of Ford's ASO privilege log, and the Court reiterates that standard herein.

Federal Rule of Civil Procedure 26(b)(1) provides that:

> Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter ... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

While the claims and defenses raised in the pleadings should be the focus of discovery, broader discovery is permitted when justified by the particular needs of the case. Fed. R. Civ. P. 26(b)(1), advisory committee notes (2000). In general, information is relevant, and thus discoverable, if it '"bears on, or ... reasonably could lead to other matter[s] that could bear on, any issue that is or may be in the case. Although 'the pleadings are the starting point from which relevancy and discovery are determined ... [r]elevancy is not limited by the exact issues identified in the pleadings, the merits of the case, or the admissibility of discovered information.'" *Kidwiler v. Progressive Paloverde Ins. Co.,* 192 F.R.D. 193, 199 (N.D.W.Va. 2000) (internal citations omitted). In many cases, "the general subject matter of the litigation governs the scope of relevant information for

discovery purposes." *Id.* The party resisting discovery, not the party seeking discovery, bears the burden of persuasion. *See Kinetic Concepts, Inc. v. ConvaTec Inc.,* 268 F.R.D. 226, 243-44 (M.D.N.C. 2010)(citing *Wagner v. St. Paul Fire & Marine Ins. Co.,* 238 F.R.D. 418, 424-25 (N.D.W.Va. 2006)).

In this case, Ford has withheld documents based on claims of attorney-client privilege and work-product protection. Procedurally, when a party withholds information from discovery on the basis of attorney-client privilege or the work-product protection, the party is required to: (1) "expressly make the claim"; and (2) "describe the nature of the documents, communications, or tangible things not produced or disclosed—and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim."[3] Fed. R. Civ. P. 26(b)(5)(A). "A party can sustain this burden through a properly prepared privilege log that identifies each document withheld, and contains information regarding the nature of the privilege/protection claimed, the name of the person making/receiving the communication, the date and place of the communication, and the document's general subject matter." *Sky Angel U.S., LLC v. Discovery Communications, LLC,* 28 F. Supp. 3d 465, 483 (D. Md. 2014). A party's conclusory assertion that a document is privileged is inadequate to meet the burden imposed by Rule 26(b)(5)(A). *See United Stationers Supply Co. v. King*, No. 5:11-CV-00728, 2013 WL 419346, at *2 (E.D.N.C. Feb. 1, 2013). Rather, the party's privilege log "must set forth specific facts which, taken as true, establish the elements of the privilege for each document for which privilege is claimed. A privilege log meets this standard, even if not detailed, if it identifies 'the nature of each document, the date of its transmission or

---

[3] Local Rule of Civil Procedure 37.1 requires "any claim of privilege or objection" to comply with Federal Rule of Civil Procedure 26(b)(5).

creation, the author and recipients, the subject, and the privilege asserted.'" *Clark v. Unum Life Ins. Co. of Am.*, 799 F. Supp. 2d 527, 536 (D. Md. 2011) (quoting *NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 502 (4th Cir. 2011)) (citation and footnote omitted); *see also Victor Stanley, Inc. v. Creative Pipe, Inc.*, 250 F.R.D. 251, 264 (D. Md. 2008) (noting that privilege logs typically require "information regarding the nature of the privilege/protection claimed, the name of the person making/receiving the communication, the date and place of the communication, and the document's general subject matter."); Paul W. Grimm, Charles S. Fax, & Paul Mark Sandler, *Discovery Problems and Their Solutions,* 62-64 (2005) ("To properly demonstrate that a privilege exists, the privilege log should contain a brief description or summary of the contents of the document, the date the document was prepared, the person or persons who prepared the document, the person to whom the document was directed, and for whom the document was prepared, the purpose in preparing the document, the privilege or privileges asserted with respect to the document, and how each element of the privilege is met for that document."). Regardless of how the privilege log is designed, its primary purpose is to "provide[] information about the nature of the withheld documents sufficient to enable the receiving party to make an intelligent determination about the validity of the assertion of the privilege." *Auto. Club of N.Y., Inc.*, 2014 WL 2518959, at *5. Ultimately, the creation of an adequate privilege log requires a delicate balancing act— on the one hand, the withholding party must not supply too little or indecipherable information, and on the other, the withholding party must not reveal too much detail for fear that the privileged information itself may seep into the log.

Undeniably, the sufficiency of a privilege log's document description may be context driven; nevertheless, "vague and uninformative document descriptions do not

satisfy" the standard for privilege log adequacy. *See In re McDonald*, No. 13-10661, 2014 WL 4365362, at *4 (Bankr. M.D.N.C. Sept. 3, 2014) (collecting cases). This is true for the simple reason that "when a party refuses to produce documents during discovery on the basis that they are privileged or protected, it has a duty to particularize that claim." *Victor Stanley, Inc.*, 250 F.R.D. at 254. "The focus is on the specific descriptive portion of the log, and not on conclusory invocations of the privilege or work-product rule, since the burden of the party withholding documents cannot be 'discharged by mere conclusory or ipse dixit assertions.'" *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B*, 230 F.R.D. 398, 406 n.14 (D. Md. 2005) (quoting *Golden Trade S.r.L. v. Lee Apparel Co.*, 1992 WL 367070 at *5 (S.D.N.Y. 1992)).

In the August 28, 2015 opinion and order, the undersigned concluded that Ford's ASO privilege log, as it existed at that time, did not comply with Rule 26(b)(5)(A) because it failed to provide any concrete facts about the nature or subject matter of the withheld documents, which would allow an individual reviewing the log to assess the appropriateness of the privilege claim. Having now reviewed Ford's September 8, 2015 supplementation of the ASO privilege log, the Court finds that the log satisfies Rule 26(b)(5)(A) and the previous opinion and order. The supplemental document descriptions, along with the other information contained in the log, adequately permit Plaintiffs "to make an intelligent determination about the validity of the assertion of the privilege." *Auto. Club of N.Y., Inc.*, 2014 WL 2518959, at *5. Indeed, the supplemental document descriptions identify the specific type of data analyzed by the ASO in each withheld document, and the original document description column provides that these analyses were performed by the ASO at the request of Ford's OGC to assist Ford's attorneys with pending and anticipated litigation. With this information, Plaintiffs are

16

able to ascertain the basis for Ford's claim of privilege for each document and determine whether a challenge to Ford's non-disclosure would be reasonable. Thus, the Court **FINDS** that Ford's supplemental ASO privilege log is adequate. Accordingly, the Court turns to whether the logged documents are protected from disclosure for the reasons claimed by Ford.

### B. Work-Product Protection

As explained in detail above, Ford insists that the work-product doctrine prevents Plaintiffs from discovering the withheld documents. "[T]he work product doctrine belongs to the attorney and confers a qualified privilege on documents prepared by an attorney in anticipation of litigation." *Solis v. Food Emp'rs Labor Relations Ass'n*, 644 F.3d 221, 231 (4th Cir. 2011). "To determine whether a document was prepared in anticipation of litigation, 'the primary motivating purpose behind the creation of the document must have been to assist in pending or probable future litigation.'" *Mordesovitch v. Westfield Ins. Co.*, 244 F. Supp. 2d 636, 642 (S.D.W.Va. 2003) (quoting *State ex rel. United Hosp. Ctr., Inc. v. Bedell*, 484 S.E.2d 199, 213 (W. Va. 1997)). Federal Rule of Civil Procedure 26(b)(3), which codifies the work-product doctrine under federal law[4], states in part:

> (A) Documents and Tangible Things. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:

---

[4] Under Federal Rule of Evidence 501, a federal court in a diversity action answers questions of attorney-client privilege using state law. However, "[b]ecause the work product doctrine is not a privilege, but rather a qualified immunity from discovery," the applicability of the work product doctrine, even in diversity cases, is a matter of federal law. *See Cont'l Cas. Co. v. Under Armour, Inc.*, 537 F. Supp. 2d 761, 769-70 (D. Md. 2008) (collecting cases).

(i) they are otherwise discoverable under Rule 26(b)(1); and

(ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.

(B) Protection Against Disclosure. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

As can be deduced from the rule's language, work product is separated into two categories: (1) opinion work product, or in other words, "mental impressions, conclusions, opinions, or legal theories" of an attorney or other representative, which is "absolutely" immune from discovery; and (2) fact work product consisting of "documents prepared by an attorney that do not contain the attorney's mental impressions," which may be discovered "upon a showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship." *In re Grand Jury Proceedings #5 Empanelled January 28, 2004*, 401 F.3d 247, 250 (4th Cir. 2005); *see also Nat'l Union Fire Ins. Co. v. Murray Sheet Metal Co.*, 967 F.2d 980, 983-84 (4th Cir. 1992). The work-product doctrine protects not only those materials prepared by an attorney, but also those materials prepared by "agents for the attorney." *United States v. Nobles*, 422 U.S. 225, 238-39, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975). However, no matter who prepares them, "'materials prepared in the ordinary course of business or pursuant to regulatory requirements or for other non-litigation purposes' do not constitute 'documents prepared in anticipation of litigation' protected by work product privilege." *Solis*, 644 F.3d at 232 (quoting *Nat'l Union Fire Ins. Co.*, 967 F.2d at 984).

Here, the main thrust of Plaintiffs' argument against the applicability of work-product protection to the withheld ASO documents is that the documents were not created in anticipation of litigation. Instead, Plaintiffs insist that the documents were created in the ordinary course of Ford's business. In support of their argument, Plaintiffs cite to the deposition testimony of Mr. Ott, who was Ford's Manager of Government Investigations in 2010 and led the 2010 ASO Investigation. (ECF No. 701 at 2-3; ECF No. 703 at 4). Mr. Ott testified that the documents listed on the log contained "a compilation of the data reviews" that the ASO performed, but not "thoughts [or] conclusions" from the "data reviews," and he could not recall whether the documents contained recommendations to Ford's OGC related to the "data review." (ECF No. 700-1 at 23-24). Presumably, Plaintiffs cite this testimony to combat Ford's claim of opinion work-product protection. Plaintiffs also emphasize Mr. Ott's testimony that he believed he was enlisted from the Government Investigations Committee to perform the VOQ review because his "job typically involved review of reports, ... claims, allegations, and this team effort was constructed principally to do that, so it was ... an effort that we conducted as part of our normal course of business." (ECF No. 700-1 at 5).

In addition, Plaintiffs rely on the testimony of Mr. Nevi, who was also involved in the 2010 ASO investigation. At his deposition, Mr. Nevi stated that he approached Mr. Ott about the Wall Street Journal article and requested that Mr. Ott look at the VOQ data across major manufacturers. (ECF No. 700-3 at 5). When asked whether he gave Mr. Ott any specific instruction as to how to review the questionnaires or whether the task was "already defined in some existing standard operating procedure or Mr. Ott's job description," Mr. Nevi answered: "Well, not in the defined operating procedure per se, but just part of our everyday analysis." (*Id.* at 5-6). Mr. Nevi also testified that he did not

inform Mr. Ott of any "study design or specific objective" since the review "was part of the normal work we did on an ongoing basis." (*Id.* at 6). Plaintiffs also highlight Mr. Nevi's testimony that he did not commit to writing any format or protocol for data collection because "it was the ordinary course of business used in collecting all of the TREAD data." (*Id.* at 7).

Lastly, Plaintiffs assert that the deposition testimony of Mr. Tuneff, a Senior Research Engineer in Ford's ASO, supports their argument that the 2010 ASO investigation was performed in Ford's ordinary course of business. (ECF No. 701 at 4, 11). Plaintiffs rely on Mr. Tuneff's testimony that the "senior leadership" at Ford requested that the 2010 ASO investigation into the VOQs be performed. (ECF No. 700-2 at 13-14). Plaintiffs contend that Mr. Tuneff's statement signifies that an attorney did not initiate the 2010 ASO investigation. (ECF No. 701 at 11). Plaintiffs also point out that Mr. Tuneff testified the "level of reviews" of the analysis were "internal to the [ASO]," which Plaintiffs interpret to mean that the 2010 ASO investigation was not part of any broader litigation-related project. (ECF No. 700-2 at 15; ECF No. 701 at 11).

After reviewing all of the materials submitted by the parties, the Courts **FINDS** that the withheld documents listed on the 2010 ASO privilege log were created in anticipation of litigation. Mr. Logel's affidavit filed in the *Schanel* case establishes that Ford's OGC "undertook a review and analysis of NHTSA Vehicle Owner Questionnaires and TREAD Act submissions in order to assist Ford lawyers in defending lawsuits and non-litigated claims against Ford involving claims of sudden unintended acceleration, as well as anticipated lawsuits and claims ...." (ECF No. 612 at 4-5). Mr. Logel asserts that Ford's OGC enlisted Ford's ASO to assist in the review and analysis of NHTSA VOQs and TREAD Act submissions. (*Id.* at 5). Ford's ASO then created documents during its review

and analysis that were "used solely by Ford's attorneys in rendering legal advice to Ford regarding pending and anticipated litigation involving claims of sudden unintended vehicle acceleration." (*Id.*) Mr. Love's affidavit corroborates Mr. Logel's sworn statements. As a member of Ford's ASO in 2010, Mr. Love recalls creating documents at Ford's OGC's request after reviewing and analyzing NHTSA VOQs and TREAD Act submissions. Mr. Love also states that "[t]he review and analysis requested from Ford's ASO by Mr. Logel was different from other VOQ analysis conducted by Ford's ASO during th[e] same time period." Similarly, Mr. Nevi testified that Ford's OGC specifically requested a "different look" at the information reviewed by Ford's ASO during the 2010 investigation. (ECF No. 703-3 at 10).

Moreover, Ford's argument that the withheld documents were created in anticipation of litigation succeeds for at least three additional reasons. First, the withheld documents were created between February and July 2010, and the *Schanel* case, which concerned an allegation of sudden unintended acceleration, was pending from February 2010 through December 2010. (ECF No. 551 at 2-3; ECF No. 703-6 at 1-3, 5-6). As such, litigation related to the exact issue that Ford's OGC tasked the ASO with examining was ongoing at the time that the logged documents were created. Second, after reviewing Ford's *in camera* submission and comparing that submission to the representative documents provided by the parties, the Court concludes that the ASO conducted a separate analysis of the pertinent data from a different perspective for the benefit of the OGC. Third, and relatedly, the contents of Ford's *in camera* submission demonstrate that Ford was concerned with probable future litigation after the Wall Street Journal article was published.

The deposition testimony cited by Plaintiffs does not contradict Ford's substantiated claim that its OGC requested a separate analysis of the VOQs and TREAD Act submissions for use in defending pending or probable future litigation. Rather, the testimony relied on by Plaintiffs demonstrates that certain Ford employees were enlisted to perform the ASO investigation due to their familiarity with the typical analysis process used by Ford. Furthermore, the most reasonable resolution of any potential conflict between the parties' evidence is that a portion of the ASO documents were created at the behest of Ford's OGC, and a portion were not. Ford's counsel has represented that Plaintiffs have received those 2010 ASO investigation documents that were not prepared at Ford's OGC's request. (ECF No. 714 at 36-37).

Having determined that the withheld documents were created in anticipation of litigation, the Court turns to which type of work-product protection applies. The Court **FINDS** that the withheld documents constitute fact work-product as it does not appear from a review of the *in camera* submission and Ford's descriptions of the documents that the documents contain the "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B). Plaintiffs may only discover this fact work-product if they can show that they have "substantial need for the materials to prepare [their] case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii). Because the Court finds in the alternative below that attorney-client privilege also prevents disclosure of the withheld documents, a protracted discussion as to whether Plaintiffs can meet the standard for overcoming fact work-product protection is unnecessary. Nevertheless, the Court **FINDS** that Plaintiffs have not met the standard for discovering the fact work-product contained in the logged documents because

22

Plaintiffs have access to the underlying data that Ford's ASO analyzed in the withheld documents.

### C. Attorney-Client Privilege

Ford also contends that attorney-client privilege prevents Plaintiffs from discovering the withheld documents. The Court has previously noted the complex nature of choosing which forum's law to apply to claims of attorney-client privilege in this action under Federal Rule of Evidence 501. (ECF No. 426 at 6-7). In discussing the issue, the Court has noted that "the federal law of privilege and the laws of West Virginia and Michigan are compatible." (*Id.* at 7). In their submissions to the Court, neither party has taken an explicit position as to which jurisdiction's law should control. However, the parties primarily cite to federal law and West Virginia law in support of their attorney-client privilege positions. Accordingly, the Court summarizes and applies attorney-client privilege under both federal law and West Virginia state law.

Under West Virginia law, attorney-client privilege attaches to confidential communications made between a client and an attorney for the purpose of obtaining legal advice. *State ex rel. Montpelier U.S. Ins. Co. v. Bloom*, 757 S.E.2d 788, 794 (W. Va. 2014). "In order to assert an attorney-client privilege, three main elements must be present: (1) both parties must contemplate that the attorney-client relationship does or will exist; (2) the advice must be sought by the client from the attorney in his capacity as a legal advisor; (3) the communication between the attorney and client must be intended to be confidential." *Id.* (quoting *State v. Burton*, 254 S.E.2d 129, Syll. Pt. 2 (W. Va. 1979)). "[T]he burden of establishing the attorney-client privilege ... always rests upon the person asserting it." *State ex rel. U.S. Fid. & Guar. Co. v. Canady,* 460 S.E.2d 677, 684 (W. Va. 1995).

Similarly, under federal law, "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance are privileged." *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) (citing 8 Wigmore, *Evidence* § 2292 (McNaughton rev. ed. 1961)). The privilege "does not shield all information that a client divulges to an attorney, or vice versa, but rather is limited to instances where legal advice is sought or rendered." *Deseret Mgmt. Corp. v. United States,* 76 Fed.Cl. 88, 90 (2007) (quoting *Pac. Gas & Elec. Co. v. United States,* 69 Fed.Cl. 784, 810 (2006)). Particularly important here, "the attorney-client privilege applies to 'in-house' counsel just as it would to any other attorney." *Lola Brown Trust No. 1B*, 230 F.R.D. at 411 (*citing NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 154, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975)). The privilege also applies to "communications between an attorney and client during attorney-conducted investigations" for the purpose of fact finding where the attorney is acting in his or her capacity as an attorney. *In re Allen*, 106 F.3d 582, 602-03 (4th Cir. 1997); *see also Upjohn Co. v. United States*, 449 U.S. 383, 390-91, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (stating that "privilege exists to protect not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice," and recognizing "[t]he first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant."). Like West Virginia state law, under federal law, the party asserting the privilege bears the burden of establishing its applicability. *AAB Joint Venture v. United States,* 75 Fed.Cl. 448, 456 (2007). If a party can establish the privilege's applicability, then the communications between attorney and client are "absolute[ly] and complete[ly]" protected from disclosure. *In re Allen*, 106 F.3d at 600.

24

Under both West Virginia law and federal law, the withheld ASO documents are protected from disclosure under attorney-client privilege. First, Ford's OGC, specifically Mr. Logel, and Ford's ASO contemplated that an attorney-client relationship existed at the time that the OGC engaged the ASO to analyze the VOQs and TREAD Act data. Mr. Logel's affidavit, Mr. Love's affidavit, and Mr. Nevi's deposition testimony all support this conclusion. Second, as explained above, the ASO prepared and submitted the logged documents at the request of the OGC for the purpose of rendering legal advice to Ford.[5] Although Ford's OGC may have been the initiating party by requesting that the ASO conduct an analysis of the pertinent data, that fact alone does not render the attorney-client privilege inapplicable. As explained above, communications during fact-finding investigations conducted by an attorney in his or her legal capacity are protected. *In re Allen*, 106 F.3d at 602-03. Indeed, even with the understanding that the privilege should be construed narrowly, *Neuder v. Battelle Pacific Northwest Nat'l Lab.*, 194 F.R.D. 289, 293 (D.D.C. 2000), it would be an unreasonable interpretation of the privilege to hold that a proactive, fastidious in-house attorney who seeks information from his client for the purpose of rendering legal advice cannot claim privilege over the information that he receives in response to his request simply because he was the first to act. *See Cline v. Advanced Med. Optics, Inc.*, No. 2:08-CV-62, 2009 WL 585507, at *1-*3 (E.D. Tex. Mar. 6, 2009) (finding attorney-client privilege where in-house counsel initiated investigation into product manufactured by client); *First Chicago Int'l v. United Exchange Co. Ltd.*, 125 F.R.D. 55, 58 (S.D.N.Y. 1989) (applying attorney-client privilege to documents

---

[5] The Court rejects Plaintiffs' contention that Ford's removal of the word "analysis" from several document descriptions renders those documents unprivileged. (ECF No. 701 at 10 n.11). The privilege log indicates that the data contained in those documents was specifically selected for ASO review in connection with the ASO analysis that the Court finds was privileged.

created as a result of in-house counsel's initiation of investigation concerning client's business practice). Third, and finally, the communication of the information (i.e. the sending of the documents) from Ford's ASO to the OGC was intended to be confidential. As Mr. Logel's affidavit explains, "[t]he documents identified on Ford's ASO Privilege Log have not been disseminated beyond those Ford employees and consultants working directly with Ford's counsel in this regard." (ECF No. 612 at 6). There is no evidence that Mr. Logel's assertion is false or that it was "the intention or understanding of [Ford] that the communication [was] to be made known to others." *In re Grand Jury Proceedings*, 727 F.2d 1352, 1356 (4th Cir. 1984). Although Plaintiffs speculate that the description of a handful of the documents as "for presentation" means that the documents were not intended to be confidential, Plaintiffs' have provided no evidence that the presentations were made to a third-party, and their speculation cannot defeat Mr. Logel's clear statement that the documents were not disseminated in a manner that would destroy the privilege.[6] (ECF No. 701 at 14-15). For these reasons, the Court **FINDS** that documents listed on Ford's ASO privilege log are protected from disclosure by attorney-client privilege.

### D. Crime-Fraud Exception

Lastly, Plaintiffs argue that, even if the withheld documents are protected from disclosure based on work-product doctrine or attorney-client privilege, the Court should

---

[6] Plaintiffs' argument as to confidentiality also relies on testimony from ASO employees that they were not involved in litigation matters. (ECF No. 701 at 14). Even assuming that Plaintiffs' characterization of the testimony is correct, their argument is unconvincing. Certainly, an employee need not be employed by a company's litigation department for the attorney-client privilege to apply. Moreover, the fact that an employee may testify that he does not typically analyze "privileged information" *does not* mean that the employee did not create information subject to privilege by preparing an analysis at counsel's request. Most significantly, the Court has already found that sufficient evidence exists to support the conclusion that Ford's OGC enlisted the ASO to perform data review and analysis related to pending and anticipated litigation.

nevertheless compel disclosure under the crime-fraud exception. Ford responds that the crime-fraud exception is inapplicable to the withheld documents and that Plaintiffs' argument relies entirely on speculation. Because the parties generally cite federal law in support of their arguments on this point, the Court summarizes and applies the federal law related to the crime-fraud exception.[7]

The United States Court of Appeals for the Fourth Circuit has recognized that "[b]oth the attorney-client and work product privileges may be lost … when a client gives information to an attorney for the purpose of committing or furthering a crime or fraud." *In re Grand Jury Proceedings #5 Empanelled January 28, 2004*, 401 F.3d at 251. "The party asserting the crime-fraud exception … must make a prima facie showing that the privileged communications fall within the exception." *Id.* This prima facie standard does not require "proof either by a preponderance or beyond a reasonable doubt of the crime or fraud." *Id.* In elaborating on the requirements for establishing the crime-fraud exception, the Fourth Circuit has stated:

> [T]he party invoking the crime-fraud exception must make a prima facie showing that (1) the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme, and (2) the documents containing the privileged materials bear a close relationship to the client's existing or future scheme to commit a crime or fraud. Prong one of this test is satisfied by a prima facie showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed. Prong two may be satisfied with a showing of a close relationship between the attorney-client communications and the possible criminal or fraudulent activity.

---

[7] It seems that Federal Rule of Evidence 501 would apply to the crime-fraud exception analysis related to attorney-client privilege, yet, the rule may not apply to the crime-fraud exception concerning work-product protection. As mentioned above, because the parties primarily rely on federal law in their discussion of the crime-fraud exception, the Court determines that the most effective approach is to apply federal law in this area, rather than applying both state law and federal law. Notwithstanding, the Court notes that its ultimate conclusion is identical under both West Virginia law and federal law. *Cf. Cont'l Cas. Co. v. Am. Home Assurance Co.*, No. 2:00-0260, 2010 WL 692942, at *6 (S.D.W.Va. Feb. 23, 2010) (stating that "there is no material difference between the West Virginia and federal formulations of the [crime-fraud] exception.").

*Id.* (citations omitted). As this Court explained the exception, it "applies only when the client intended to perpetrate a crime or fraud, at the time of the communication or prospectively, and that the confidential discussions were had to further the nefarious act." *Cont'l Cas. Co. v. Am. Home Assurance Co.*, No. 2:00-0260, 2010 WL 692942, at *7 (S.D.W.Va. Feb. 23, 2010) (Copenhaver, J.).

Procedurally, in deciding the applicability of the crime-fraud exception, "the court may examine the assertedly privileged documents themselves in an *in camera* hearing, provided that the party invoking the exception ... first makes a threshold 'showing of a factual basis adequate to support a good faith belief by a reasonable person' that the hearing would reveal evidence of crime or fraud." *In re Grand Jury Subpoena #06-1*, 274 F. App'x 306, 310 (4th Cir. 2008) (quoting *United States v. Zolin*, 491 U.S. 554, 572, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989)). If the requisite showing is made by the invoking party, the court must decide whether to conduct an *in camera* review of the allegedly privileged and protected documents to determine if the exception applies. *Zolin*, 491 U.S. at 572. The decision to perform such a review rests within the sound discretion of the court, and "the court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through in camera review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply." *Id.*

In this case, Plaintiffs insist that the 2010 ASO investigation was conducted for a fraudulent purpose. (ECF No. 701 at 17). They contend that NHTSA was "actively investigating" claims of sudden unintended acceleration in Ford and other car

28

manufacturers' vehicles at the time of Ford's 2010 ASO investigation. (*Id.*) According to Plaintiffs, after NHTSA requested information from Ford about sudden unintended acceleration in Ford vehicles, Ford performed two analyses of report data related to unintended acceleration incidents. (*Id.* at 17-18). In conducting the first analysis, Ford drew data from "all of its internal sources," which were unavailable to NHTSA. (*Id.* at 18). Plaintiffs claim that the first analysis demonstrated that sudden unintended acceleration incidents at Ford "were much more common than NHTSA would have known," and therefore, Ford performed a second analysis "that involved reorganizing, slicing and dicing NHTSA's VOQ data relating to [sudden unintended acceleration] events in Ford vehicles to minimize the severity of the [sudden unintended acceleration] threat." (*Id.* at 18). Plaintiffs argue that the second analysis, which was submitted to NHTSA, was "incomplete and misleading," and Ford's submission of that second analysis perpetrated a fraud upon NHTSA and the public. (*Id.*; ECF No. 708 at 13).

In resolving the applicability of the crime-fraud exception, the Court sets forth some additional factual background. To start, Plaintiffs have supplied evidence that NHTSA's Office of Defect Investigation investigated Ford four times for reports of unintended acceleration between 2002 and 2010. (ECF No. 700-8 at 5-6). Ford maintains that these investigations did not concern ETC equipped Ford vehicles. (ECF No. 703 at 19). Moreover, Ford cites Mr. Tuneff's testimony that there was never a "formal investigation" by NHTSA into Ford's ETC systems, although Mr. Tuneff noted that NHTSA representatives had meetings with Ford in early 2010 concerning ETC systems and "potentially stuck throttles." (ECF No. 700-2 at 8-9; ECF No. 703-2 at 26-27). At one of those meetings, Ford's personnel explained the design of the ETC system and provided certain documents at NHTSA's request. (ECF No. 700-2 at 10). NHTSA representatives

also met with Ford in March 2010 to discuss Brake Over Accelerator technology. (ECF No. 700-3 at 10).

After that meeting occurred, on March 23, 2010, Ford voluntarily submitted an analysis of "certain VOQ information" to NHTSA. (ECF No. 700-4 at 2). With that analysis, Ford sent an explanation as to how Ford's personnel categorized the VOQ data in performing their analyses. (ECF No. 700-9 at 3). In addition to the analysis that Ford sent to NHTSA, Ford's ASO conducted a comparison analysis of the VOQ data with a larger pool of data related to sudden unintended acceleration. (ECF No. 700-2 at 4, 24). Mr. Tuneff testified that the data used for the comparison was taken from Ford's "internal data," including information from Ford's "MORS," "CQIS," "AWS," and lawsuit and claims databases. (*Id.* at 4, 12-13). This analysis and its results were not sent to NHTSA. (*Id.* at 18, 24). According to Mr. Tuneff, the analysis was not sent to NHTSA because the agency never requested the analysis and there was no formal investigation into Ford ongoing at that time. (*Id.* at 25). Moreover, Mr. Tuneff asserted that this broader analysis confirmed the results of the VOQ review results, which was another reason that the analysis was not provided to NHTSA. (*Id.* at 25). Similarly, Mr. Ott testified that he did not inform NHTSA about the comparison analysis because the agency did not inquire about it and Ford "principally" used NHTSA's data in performing the analysis. (ECF No. 700-1 at 19-20).

As for the results of the broader analysis, Mr. Ott testified that the ASO concluded there was not an unreasonable risk to the safety of Ford's customers due to sudden unintended acceleration in Ford's vehicles. (*Id.* at 11-12; ECF No. 703-1 at 8-11). Mr. Tuneff likewise testified that, after comparing the VOQ data to Ford's internal data, the ASO did not find any evidence of sudden unintended acceleration events. (ECF No. 703-

2 at 6-7). In addition, Mr. Nevi testified that Ford "saw no pattern of any condition in the vehicles leading to the [unintended acceleration] claims that were reported." (ECF No. 703-3 at 10).

Having considered Plaintiffs' arguments and the evidence cited in support of those arguments, the Court **FINDS** that Plaintiffs have failed to meet their burden of demonstrating "a factual basis adequate to support a good faith belief by a reasonable person" that *in camera* review of the withheld documents "would reveal evidence of crime or fraud." *In re Grand Jury Subpoena #06-1*, 274 F. App'x at 310 (quoting *Zolin*, 491 U.S. at 572). First, it is difficult to imagine how Ford could have perpetrated a fraud against NHTSA when the data that Ford analyzed was available for NHTSA to perform its own review. The VOQs were NHTSA's own data, and the information that Ford used in its broader analysis would have been available to NHTSA in the form of TREAD Act and Early Warning Report submissions. (ECF No. 700-2 at 20-22; ECF No. 703 at 3-4 n.2; 18 n.13; 19). Second, while Plaintiffs allege that Ford's production to NHTSA "reorganized" the VOQ data to minimize the number of sudden unintended acceleration incidents, Ford provided NHTSA with an explanation as to how it categorized various VOQs. Plaintiffs are hard-pressed to show that Ford intended to deceive NHTSA by disclosing the VOQ categorization utilized during Ford's analysis. (ECF No. 700-9 at 3). Third, Mr. Tuneff's testimony unequivocally demonstrates that Ford's conclusions were the same after both analyses. (ECF No. 700-2 at 25). Although submission of the broader analysis to NHTSA may have bolstered Ford's already-tendered analysis, there is nothing fraudulent about Ford's decision to refrain from sending a confirmatory analysis. Finally, at this juncture, Plaintiffs have presented no convincing evidence that Ford withheld ASO investigation documents from NTHSA showing a defect related to sudden unintended acceleration in

Ford vehicles. For these reasons, the Court **FINDS** that Plaintiffs have failed to meet their threshold burden for application of the crime-fraud exception and that *in camera* review of additional documents listed in the ASO privilege log is not warranted.

**III.    Conclusion**

For the aforementioned reasons, the Court **DENIES** Plaintiffs' Motion to Compel Ford to Produce Documents Listed in Ford's ASO Privilege Log, (ECF No. 700), and Plaintiffs' accompanying request for sanctions. The Court **GRANTS** Plaintiffs' Motion to Seal, (ECF No. 698), and **ORDERS** that Exhibit E attached to Plaintiffs' Motion to Compel, (ECF No. 700), be sealed.

The Clerk is directed to provide a copy of this Memorandum Opinion and Order to counsel of record and any unrepresented party.

**ENTERED:** March 28, 2016

Cheryl A. Eifert
United States Magistrate Judge