**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**CHARLES JOHNSON, et al.,**

     **Plaintiffs,**

**v.**                             **Case No.: 3:13-cv-06529**

**FORD MOTOR COMPANY,**

       **Defendant.**

**MEMORANDUM OPINION and ORDER**

On December 27, 2017, this Court entered a Memorandum Opinion and Order sanctioning Defendant for making material misrepresentations during the discovery process, which significantly increased Plaintiffs' costs of litigation. (ECF No. 1111). In recompense, the Court awarded Plaintiffs attorneys' fees and costs and expert fees and costs attributable to Ford's discovery misconduct. The matter was referred to the undersigned United States Magistrate Judge to determine the appropriate amount of fees and costs to be awarded to Plaintiffs. (*Id.* at 20).

On December 29, 2017, the undersigned issued a briefing schedule. (ECF No. 1120). The parties have now completed their briefing, and the matter is ready for resolution. In their brief, Plaintiffs ask for fees and costs in the total amount of **$692,225.52**. (ECF No. 1166 at 15). Ford counters by arguing that once duplicative, excessive, vague, and unsupported amounts are deducted from Plaintiffs' request, they are entitled to an award of **$223,610.97**. (ECF No. 1152 at 20).

The undersigned notes that the law governing awards of attorneys' fees and costs

1

in this circuit is well established. Moreover, the issues in dispute are clear; therefore, oral argument would not assist the Court in resolving the matter. For the reasons that follow, the Court **ORDERS** Defendant, Ford Motor Company ("Ford"), to pay Plaintiffs the sum of **$488,028.31** in sanctions. Ford is further **ORDERED** to make this payment within **thirty (30) days** of the date of this Order.

## I.    Attorneys' Fees

The Court has concluded that Plaintiffs are entitled to reimbursement of attorneys' fees for time associated with preparing, negotiating, and arguing the source code protective order entered in this litigation, as well as pursuing Plaintiffs' motion for sanctions. In addition, Plaintiffs seek reimbursement of travel time to and from a secured room in Dearborn, Michigan where their counsel and experts were required to go in order to review source code produced by Ford. According to affidavits supplied by Plaintiffs, the total amount of attorneys' fees sought is **$351,256.63**. (ECF No. 1143 at 6-7).

In response, Ford concedes that Plaintiffs are entitled under the Court's order to attorneys' fees related to: (1) negotiating the source code protective order, (2) traveling to Dearborn, Michigan to use the secured source code room, and (3) drafting and arguing the motion for sanctions. (ECF No. 1152 at 2). However, Ford contends that Plaintiffs have not limited their fee application to those tasks. Furthermore, Ford argues that the number of attorney hours claimed by Plaintiffs is extreme, and the requested hourly rates substantially exceed reasonable, appropriate, and prevailing rates in this jurisdiction. (*Id.* at 2-3). After subtracting duplicative and excessive hours, and reducing the hourly rates to "reasonable" amounts, Ford asserts that Plaintiffs are entitled to attorneys' fees in the amount of **$77,824.25**. (ECF No. 1152 at 20).

The parties agree that when calculating an award of attorneys' fees in this circuit,

the court must follow a three-step process. *McAfee v. Bozcar,* 738 F.3d 81, 88 (4th Cir 2013) ("The proper calculation of an attorney's fee award involves a three-step process.") First, the court must "determine a lodestar figure by multiplying the number of reasonable hours expended times a reasonable rate." *Robinson v. Equifax Information Services, LLC,* 560 F.3d 235, 243 (4th Cir. 2009) (citing *Grissom v. The Mills Corp.*, 549 F.3d 313, 320 (4th Cir. 2008)). The burden of establishing a reasonable rate and demonstrating that a reasonable number of hours was expended rests with the party seeking attorneys' fees. *McGee v. Cole,* 115 F. Supp. 3d. 765, 771 (S.D.W. Va. 2015) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983)). The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") has enumerated twelve factors to consider when determining a lodestar figure, including the following:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Robinson,* 560 F.3d at 243-244 (citing *Johnson v. Ga. Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974)).

At the second step of the process, the court must subtract from the lodestar figure "fees for hours spent on unsuccessful claims unrelated to successful ones." *Grissom,* 549 F.3d at 321 (quoting *Johnson v. City of Aiken*, 278 F.3d 333, 337 (4th Cir. 2002)). Once this calculation is completed, the court proceeds to the third step, which consists of the court increasing the step-two figure by "some percentage of the remaining amount,

depending on the degree of success enjoyed by the [party seeking fees]." *Johnson,* 278 F.3d at 337. In this case, the Court need not formally proceed to the second and third steps, because the fees and expenses are being awarded as a discovery sanction, rather than as an award based upon a successful resolution of the case as a whole. In addition, Plaintiffs have already performed step two of the process by reducing the portion of their fee application related to the motion for sanctions by 50% to account for the fact that they only succeeded on one of two grounds asserted in the motion. Therefore, the Court focuses largely upon the lodestar figure.

### A. Reasonable Hourly Rate

"When calculating reasonable fees, establishing the hourly rate is generally the critical inquiry." *Wolfe v. Green,* No. 2:08–cv–01023, 2010 WL 3809857 *4, (S.D.W. Va. Sept. 24, 2010) (quoting *Westmoreland Coal Co. v. Cox,* 602 F.3d 276, 289 (4th Cir. 2010)). An hourly rate is considered reasonable when it is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson,* 465 U.S. 886, 890 n. 11 (1984). "[T]he community in which the court sits is the first place to look to in evaluating the prevailing market rate." *Rum Creek Coal Sales, Inc. v. Caperton,* 31 F.3d 169, 179 (4th Cir. 1994). Nevertheless, when an applicant seeks reimbursement of fees charged by an attorney who primarily practices law in another jurisdiction, the court may determine that using community rates, rather than the attorney's home rates, is inequitable; particularly, when there is an absence of comparable attorneys in the community. *National Wildlife Federation v. Hanson,* 859 F.2d 313, 317 (4th Cir. 1988) (holding that a fee award based on an extrajurisdictional rate is appropriate when the complexity and specialized nature of the case means that no attorney with the requisite skills is available locally). To

determine whether extrajurisdictional counsel are entitled to the prevailing hourly rates in their home jurisdiction, the court should consider the following questions: (1) did counsel provide services that were not available in the court's jurisdiction; and (2) did the client make a reasonable choice in hiring extrajurisdictional counsel, or did the client select an unreasonably expensive attorney? *Id.*

Here, Plaintiffs seek reimbursement of fees charged by fourteen attorneys, with hourly rates ranging from $175 to $950, and by four paralegals billing between $115 and $275 per hour. Half of the attorneys and half of the paralegals have extrajurisdictional home bases. Plaintiffs argue that these practitioners are entitled to the prevailing hourly rates in their own communities, because they satisfy the two-part inquiry set forth in *Hanson.* (ECF No. 1166 at 6). According to Plaintiffs, the size and complexity of the instant action required them to hire a "coalition of law firms with experience in complex class action litigation," which could not be found exclusively in this jurisdiction. (*Id.* at 7). Ford counters this argument by pointing out that a local law firm, Spilman Thomas & Battle, PLLC, played a leadership role in the litigation and its billings account for 40% of the fees sought by Plaintiffs. (ECF No. 1152 at 7). Thus, the instant action is not so complex that no local lawyer is able to effectively prosecute it.

The undersigned agrees with Ford. Although the subject matter of this case is complex, both factually and legally, Plaintiffs have failed to demonstrate that this jurisdiction lacks experienced lawyers capable of successfully prosecuting Plaintiffs' claims. As Ford notes, one of Plaintiffs' leading law firms is located in Charleston, West Virginia, and as discussed below, Plaintiffs make no showing that Spilman Thomas & Battle is the only local firm qualified to handle complex class action litigation. Moreover, Plaintiffs seek reimbursement of substantial expert fees. Given that Plaintiffs relied

heavily on experts to navigate the technical aspects of the source code protective order and assist in locating evidentiary support for the motion for sanctions, the remaining tasks involved in negotiating the protective order and pursuing the award of sanctions could have been accomplished by a number of lawyers who regularly appear in this Court.

The undersigned acknowledges the Fourth Circuit cases cited by Plaintiffs in which fee awards were calculated using hourly rates from geographic markets outside the court's jurisdiction. (ECF No. 1166 at 6-7). However, in each of these cases, the court's decision was based on more than just the complexity of the case. In *Hanson*, *supra*, a case filed in eastern North Carolina, the party seeking attorneys' fees asked the court to apply Washington, D.C. rates. Unlike the plaintiffs in this case, however, the *Hanson* applicant did not rely solely on the complexity of the case to support its argument; instead the party produced *evidence* showing that: (1) its local counsel was unable to take the case; (2) the nearest counsel with experience in complex environmental litigation was located in Washington, D.C.; and (3) the applicant was unsuccessful in involving a local environmental defense fund. Accordingly, a sound basis existed for applying Washington, D.C. rates.

Similarly, in *Rum Creek Coal Sales, Inc.,* 31 F.3d at 178-79, the Fourth Circuit held that Richmond, Virginia rates were appropriate in a West Virginia case, in part due to the complex nature of the litigation. However, in addition, the court considered that (1) the Virginia lawyers were the applicant's regular counsel and were well-versed in the type of matters litigated; (2) outside counsel was necessary "since taking on the governor and the police of the state where the trial court is located, in the middle of a well-publicized coal miners' strike could be politically sensitive activity for a local West Virginia firm"; and (3) a substantial portion of the fees were incurred secondary to the party's appeal filed in

Richmond, Virginia. *Id.* at 179.

In *Friends of Earth, Inc. v. Gaston Copper Recycling Corp.*, the court applied Washington, D.C. rates in South Carolina where the fee applicant demonstrated that attorneys' services of like quality were not available in the forum and the selection of attorneys was reasonable under the circumstances. *Friends of Earth, Inc.,* No. 3:92-2574-MJP, 2007 WL 2363868, at *2 (D.S.C. Aug. 16, 2007). To establish its right to extrajurisdictional rates, the applicant supplied affidavits from local attorneys verifying an absence of available counsel in the jurisdiction capable of taking such a complex and expensive case on a contingent fee basis. Furthermore, the applicant used the affidavits to prove that the Washington, D.C. rates were comparable to South Carolina rates. Similar affidavits were submitted in *N.C. Alliance for Transp. Reform Inc. v. U.S. Dept. of Transp.*, 168 F. Supp. 2d 569, 580 (M.D.N.C. 2001) (relying on an affidavit from local counsel regarding the dearth of qualified lawyers in the jurisdiction and the unavailability of those lawyers that were sufficiently experienced).

In *ABT Bldg. Prods. Corp v. National Union Fire Ins. Co.*, the court based its decision to apply extrajurisdictional rates on the fact that the fee applicant used national counsel with vast institutional knowledge and prior experience in the same subject matter, noting that the efficiencies associated with national counsel counterbalanced their increased hourly rates. In addition, the party seeking reimbursement demonstrated that it had paid the fees requested without any expectation of their recovery. reasonable. *ABT Bldg. Prod. Corp.*, No. CIV. 501CV100-V, 2005 WL 6124839, at *2–3 (W.D.N.C. May 31, 2005), *aff'd sub nom. ABT Bldg. Prod. Corp. v. Nat'l Union Fire Ins. Co. Of Pittsburgh*, 472 F.3d 99 (4th Cir. 2006). Similar reasons for using New York rates in a North Carolina case were accepted by the court in *Aventis CropScience , N.V. v. Pioneer*

*Hi-bred Intern, Inc.,* No. 1:00CV463, 2010 WL 2306677, at *5 (M.D.N.C. Jun. 8, 2010) (concluding that applicant's national counsel provided a unique service to fee applicant that was not available locally).

In contrast to the fee applications in the above-cited cases, Plaintiffs offer no evidence or focused argument in this case. In fact, Plaintiffs provide no explanation for how they selected counsel; no evidence that they searched other local firms for comparable attorneys; and no corroboration that the extrajurisdictional attorneys in this case provided a unique service that could not be offered by less expensive and equally available counsel. Consequently, while the instant case certainly requires specialized skill, Plaintiffs have not adequately supported their request for extrajurisdictional rates.

Having determined that the prevailing market rates in the Southern District of West Virginia should be applied, the undersigned next considers the evidence submitted by Plaintiffs to establish the prevailing rates, as well as Ford's arguments in opposition. As indicated below, the parties are significantly at odds over the appropriate hourly rate to apply to each attorney included in the fee application:

| **Plaintiffs' requested hourly rates** | | **Ford's suggested hourly rates** | |
|---|---|---|---|
| Nathan Atkinson | $400 | Nathan Atkinson | $300 |
| Sandra Burch | $135 | Sandra Burch | $100 |
| Meg Coppley | $270 | Meg Coppley | $200 |
| Andrew Darcy | $185 | Andrew Darcy | $150 |
| Anthony DeWitt | $550 | Anthony DeWitt | $300 |
| Kelly Griffith | $260 | Kelly Griffith | $190 |
| Pamela Haynes | $115 | Pamela Haynes | $100 |
| Rebecca Hendrix | $175 | Rebecca Hendrix | $140 |
| Shawn Judge | $400 | Shawn Judge | $225 |
| Amy Keller | $675 | Amy Keller | $300 |
| Kathy Kuryak | $165 | Kathy Kuryak | $100 |

| Audrey Lebdjiri | $275 | Audrey Lebdjiri | $100 |
| Adam Levitt | $950 | Adam Levitt | $400 |
| Niall Paul | $500 | Niall Paul | $400 |
| Don Slavik | $700 | Don Slavik | $400 |
| John Tangren | $725 | John Tangren | $300 |
| Gregory Travalio | $495 | Gregory Travalio | $350 |
| Mark Troutman | $425 | Mark Troutman | $300 |

The prevailing market rate for attorneys' fees in a given jurisdiction may be established "by evidence of what attorneys earn from paying clients for similar services in similar circumstances." *Depaoli v. Vacation Sales Assocs, LLC,* 489 F.3d 615, 622 (4th Cir. 2007). Consequently, affidavits outlining hourly rates typically charged and received by local attorneys in the case are useful in determining home market rates. *Id.* Likewise, affidavits from other local lawyers, who are not involved in the case, but are familiar with the skill level of the involved attorneys and with the type of work performed, are also evidence of the range of reasonable hourly rates in the relevant district. *Robinson,* 560 F.3d at 245. In the absence of persuasive affidavits, the court may look to "previous awards in the relevant marketplace as a barometer for how much to award counsel in the immediate case." *Newport News Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219, 228 (4th Cir. 2009). When the fee applicant fails to provide sufficient outside evidence of prevailing rates in the community, the court may also rely on its own knowledge of such rates. *Rum Creek Coal Sales*, 31 F.3d at 174.

Plaintiffs support their requested hourly rates with affidavits from attorneys providing the legal services at issue, all of whom assert that the requested rates are reasonable. Many of the attorneys confirm that the hourly rates contained in their fee applications are the rates they typically charge to and receive from paying clients.

Plaintiffs additionally submit information outlining the qualifications, training, and experience of each attorney. Finally, Plaintiffs cite to several cases discussing fee awards; including a decision issued in a class action suit filed against Toyota Motor Corp., which involved claims of sudden acceleration in certain vehicle models, much like the instant action. Plaintiffs did not, however, provide affidavits from local counsel unrelated to the case, or supply other objective evidence verifying or corroborating the prevailing hourly rates charged in *this jurisdiction*.

Notwithstanding Plaintiffs' failure, the range of prevailing market rates for attorneys in this jurisdiction is discernible by examining the myriad of cases in this district considering the matter. For example, in October 2017, United States District Judge Robert C. Chambers awarded attorneys' fees in a Fair Labor Standards Act case, using an hourly rate of $350, which he found reasonable in light of counsel's experience in wage and hour law. *Federer v. Genesis Eldercare Rehab. Servs. LLC*, No. CV 3:17-0211, 2017 WL 5495809, at *2 (S.D.W. Va. Oct. 26, 2017). That same month, United States District Judge Thomas E. Johnston approved attorneys' fees ranging from $187 to $314.50 per hour and paralegal rates of $110.50 to $148.50 per hour. *Constellium Rolled Prod. Ravenswood, LLC v. Rogers*, No. 2:15-CV-13438, 2017 WL 4445977, at *2-*3 (S.D.W. Va. Oct. 5, 2017). In determining the reasonableness of these rates, Judge Johnston considered other fee awards in the district, the type of litigation at issue, and the skill and reputation of the law firm seeking fee reimbursement. (*Id.*). In July 2017, United States District Judge John T. Copenhaver, Jr., performed a "lodestar cross check" in a complex class action involving the contamination of the water supply in Charleston, West Virginia, using a blended hourly rate for attorneys of $360. *Good v. W. Virginia-Am. Water Co.*, No. CV 14-1374, 2017 WL 2884535, at *27 (S.D.W. Va. July 6, 2017). The

blended rate incorporated a range of hourly fees, with the highest billing rate being $575 per hour. In May 2017, United States District Judge Irene C. Berger approved hourly rates of $275-$550 for partners, $150-$400 for associates and senior attorneys, and $110 for paralegals in a case involving health benefits under ERISA. *Greenbrier Hotel Corp. v. Unite Here Health*, No. 5:13-CV-11644, 2017 WL 2058222, at *2–4 (S.D.W. Va. May 12, 2017), *vacated on other grounds,* No. 16-2116, 2018 WL 272012 (4th Cir. Jan. 3, 2018). Judge Berger's figures were based on evidence that these hourly rates were typically charged by the fee applicants; on supporting affidavits prepared by other experienced attorneys in the area stating that these hourly rates were competitive for the market; and on the Court's recent experience in awarding attorneys' fees. That same month, Judge Chambers awarded attorneys' fees in a Clean Water Act case, finding unchallenged hourly rates of $260-$450 to be reasonable. *Ohio Valley Envtl. Coal. v. Fola Coal Co., LLC*, No. CV 2:13-16044, 2017 WL 1712525, at *2 (S.D.W. Va. May 2, 2017).

In October 2016, Judge Berger awarded attorneys' fees in a civil action alleging violations of the Fair Credit Reporting Act. *Daugherty v. Ocwen Loan Servicing, LLC*, No. 5:14-CV-24506, 2016 WL 6680033, at *2 (S.D.W. Va. Oct. 12, 2016). The fee applicant requested hourly rates of $300 and $400, which the applicant supported with affidavits from attorneys practicing in the Southern and Northern Districts of West Virginia. In the affidavits, local counsel confirmed that the requested rates coincided with prevailing market rates charged by local attorneys of similar skill and for similar work. (*Id.*). Relying on the affidavits, Judge Berger found the rates to be customary and reasonable for attorneys litigating similar cases. In August of the same year, Judge Chambers approved a request for attorneys' fees in a Clean Water Act case based on hourly rates of $240 to $450. *Ohio Valley Envtl. Coal., Inc. v. Fola Coal Co., LLC*, No. CV 2:13-5006, 2016 WL

8252928, at *2 (S.D.W. Va. Aug. 30, 2016). The hourly rates were accepted by the adverse party as being reasonable and, thus, were used without objection.

In a civil rights action pending in July 2015, Judge Chambers awarded fees based on hourly rates ranging from $225 to $500 for attorneys—depending upon each attorney's level of experience and specialization of services—and $100 for paralegals. *McGhee v. Cole*, 115 F. Supp.3d 765, 775 (S.D.W. Va. 2015). In determining the prevailing market rates, Judge Chambers relied upon his own experience in awarding fees, as well as hourly rates set by his colleagues in state and federal courts in the area. Judge Chambers explicitly rejected hourly rates of $771 and $789, which were requested by extrajurisdictional counsel and were based on the *Laffey* Matrix used in Washington, D.C. Judge Chambers concluded that the Matrix had "limited" applicability in this market and the requested rates exceeded prevailing market rates. (*Id.*). Although Judge Chambers acknowledged that counsel regularly charged more than the rates contained in the Matrix, he explained his obligation to apply local market rates in the absence of some special circumstance justifying rates from a different or larger market. (*Id.*).

In March 2014, Judge Copenhaver agreed that $250 per hour was generally accepted as a reasonable rate and awarded that amount in an action alleging unfair debt collection practices. *Finney v. MIG Capital Management Inc.,* Civil Action No. 2:13-02778, 2014 WL 1276159, at *15 (S.D.W. Va. Mar. 7, 2014). Finally, a year earlier in March 2013, Judge Johnston determined that hourly rates of $375, $175, and $160 were appropriate in a predatory lending case. *Koontz v. Wells Fargo N.A.*, No. 2:10-CV-00864, 2013 WL 1337260, at *18-19 (S.D.W. Va. Mar. 29, 2013). In making that determination, Judge Johnston considered affidavits from the attorneys seeking reimbursement of fees, as well as affidavits supplied by peer attorneys practicing in West Virginia. (*Id.* at *14).

Although Judge Johnston was critical of the affidavits, which he found deficient, he placed some weight on one of the affidavits and also relied on his own familiarity with the litigation and the local legal market in establishing reasonable market rates for each of the attorneys applying for fees.

Considering the affidavits supplied by Plaintiffs in this action and the cases cited above, the undersigned concludes that the prevailing rates for attorney services in this jurisdiction range from $150 to $550 per hour and between $100 and $145 per hour for paralegal services. Accordingly, the twelve *Johnson* factors must now be considered to arrive at a range of reasonable rates applicable to this matter. As Plaintiffs argue, the issues raised in this case have been relatively novel, such that when resolving concerns regarding the production and security of Ford's source code, the parties and the Court could find little guidance in existing case law. The case is complex, requiring more than average skill and experience to effectively prosecute and defend the claims. The discovery process was detailed and time-consuming, requiring the contributions of numerous attorneys and multiple experts. Accordingly, the second and third factors weigh heavily in Plaintiffs' favor when considering where in the prevailing market range the hourly rates in this case should fall. The customary rates charged and received by Plaintiffs' counsel, as set forth in their affidavits, further support rates at the higher end of the market range. All of the participating attorneys are associated with established law firms, have excellent reputations, have considerable experience, and consistently produce high quality work product, which are factors meriting hourly rates at the high end of the market range. In addition, Plaintiffs' attorneys have been forced to expend considerable resources to prosecute their case, making the case less desirable to the average litigator. In light of these factors, the Court finds that attorneys' fees ranging from $175 to $550 per hour and

paralegal rates ranging from $100 to $145 are reasonable.

With respect to the lawyers and paralegals working at Spilman Thomas and Battle, the Court finds that the hourly rates requested in the fee application fall within the prevailing market range and are appropriate when considering the level of experience, specialized skill, and professional investment of each individual. Therefore, the undersigned adopts the hourly rates proposed by Plaintiffs for Niall Paul, Nathan Atkinson, Sandra Burch, Meg Coppley, Andrew Darcy, Kelly Griffith, Rebecca Hendrix, and Pamela Haynes. As for the hourly rate proposed on behalf of Adam Levitt, one of the principal attorneys in the litigation, the rate is excessive for this market. Nonetheless, Mr. Levitt has practiced law for more than 25 years, specializing in class action litigation, with an emphasis on complex product liability cases. According to the affidavit supplied by his law partner, Mr. Levitt has been appointed to a leadership role in a number of automotive defect cases, giving him a level of experience not shared by many of the other attorneys. Consequently, a hourly rate of $550 for Mr. Levitt's services is reasonable. Similarly, Mr. Don Slavik, who has practiced law since 1981 and also specializes in complex product liability cases, including the multidistrict litigation involving unintended acceleration in Toyota vehicles, an hourly rate at the highest end of the market range is appropriate. Anthony DeWitt, a partner with the law firm of Bartimus, Frickleton, Robertson & Rader in Kansas, regularly manages class action litigation. He graduated from law school in 1993 and has received many recognitions, including an AV rating from Martindale Hubbell. Notwithstanding these accomplishments, his regular hourly rate of $550 is not supported by the record given his limited role. Accordingly, the undersigned finds that an hourly rate of $400 is reasonable for the time spent by Mr. DeWitt.

Amy Keller and John Tangren are law partners of Mr. Levitt, specializing in consumer class action litigation. While both attorneys have considerable experience, they did not play prominent roles in this litigation; therefore, hourly rates of $350 and $400, respectively, are supported by the record. Three attorneys from the firm of Isaac, Wiles, Burkholder & Teetor provided legal services; including Shawn Judge, who has twenty years of legal experience; Mark Troutman, a partner with 15 years of experience; and Gregory Travalio, who graduated from law school in 1975 and taught at the Moritz College of Law at the Ohio State University for decades. Bearing in mind each attorney's experience, training, specialization, customary hourly rates, and role in the instant action, the undersigned finds rates of $350, $400, and $475, respectively, to be reasonable. Lastly, two extrajurisdictional paralegals provided services—Kathy Kuryak and Audrey Lebdjiri. Ms. Kuryak conducted searches of the discovery to uncover source code communications, while Ms. Lebdjiri performed largely administrative functions. Consequently, the undersigned finds an hourly rate of $140 for Ms. Kuryak's time and $115 per hour for Ms. Lebdjiri's time to be reasonable.

In conclusion, the Court approves the following hourly rates as indicated below:

| | |
|---|---|
| Nathan Atkinson | $400 |
| Sandra Burch | $135 |
| Meg Coppley | $270 |
| Andrew Darcy | $185 |
| Anthony DeWitt | $350 |
| Kelly Griffith | $260 |
| Pamela Haynes | $115 |
| Rebecca Hendrix | $175 |
| Shawn Judge | $350 |
| Amy Keller | $350 |

| Kathy Kuryak | $115 |
| Audrey Lebdjiri | $140 |
| Adam Levitt | $550 |
| Niall Paul | $500 |
| Don Slavik | $550 |
| John Tangren | $400 |
| Greg Travalio | $475 |
| Mark Troutman | $400 |

Now that a range of  reasonable hourly rates has been determined, a review of the hours is necessary to ensure that the time billed is not duplicative, overlapping, or excessive.

### B.  Reasonable Number of Hours

"When reviewing a fee petition, the Court must exclude any hours that are excessive, redundant, or otherwise unnecessary." *Allen v. Monsanto Company,* 2007 WL 1859046 at *2 (S.D.W. Va. June 26, 2007) (citing *Hensley y v. Eckerhart,* 461 U.S. 424, 434 (1983)). "Counsel for a prevailing party has a duty to exercise 'billing judgment' to 'exclude from a fee request hours that are excessive, redundant or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission ...'" *Daly v. Hill,* 790 F.2d 1071, 1079 (4th Cir. 1986) (quoting *Hensley,* 461 U.S. at 434)). A fee application should contain, at a minimum, the dates on which the work was performed, a reasonably specific description of the work, and the amount of time spent on each task. *Central Cab Company, Inc., v. Cline,* 972 F. Supp. 370, 374 (S.D.W. Va. 1997). While the Court should look for evidence of excessive billing, such as duplication of effort and overuse of discovery, *Xiao-Yue Gu v. Hughes STX Corp.,* 127 F. Supp. 2d 751, 765 (D. Md. 2001), the Court "need not, and indeed should not, become [a] green-eyeshade accountant[]." *Fox v. Vice,* 563 U.S. 826, 838 (2011). "The essential goal" in awarding fees is "to do rough justice, not to achieve auditing perfection." *Id.* Thus, the

Court "may take into account [its] overall sense of [the] suit, and may use estimates in calculating and allocating an attorney's time." *Id.* "Even in the absence of novel questions, an expenditure of significant hours may be reasonable where 'the case certainly posed difficulties from an evidentiary standpoint and required a high degree of skill to win.'" *Xiao-Yue*, 127 F. Supp. 2d at 766 (quoting *Herold v. Hajoca Corp.,* 682 F.Supp. 297, 300 (W.D. Va. 1988)).

Ford complains that Plaintiffs' billing records show "substantial overlap and duplication of efforts." (ECF No. 1152 at 9). Ford argues that Plaintiffs had seven to ten partner-level attorneys working on the same protective order and sanctions motion, noting that multiple partners billed for supervisory work, while a horde of lawyers simultaneously drafted and reviewed the same court filings. Ford argues that the Court should reduce the requested fees by 50% to 67% in order to account for this "overstaffing." (*Id.* at 10-11). Furthermore, Ford challenges numerous billing entries on the basis that they are not reasonably specific, or they constitute block-billing, adding that courts routinely reduce fee awards when faced with these billing deficiencies.

In response to Ford's arguments, Plaintiffs contend that they have conservatively approached their fee application. (ECF No. 1166). Plaintiffs point out that they have already reduced their 2017 time by one half to account for their level of success on the motion for sanctions, and they have included only those billing entries directly related to the pertinent issues, excluding potentially compensable billings out of an abundance of caution. (ECF No. 1166-1 at 4; ECF No. 1166-2 at 7). With respect to Ford's concern about vague entries and block billing, Plaintiffs' counsel verify that each entry in their billing records was meticulously scrutinized so that only entries or portions of entries clearly related to the pertinent issues were included in their fee application. (*Id.*). Plaintiffs assert

that the source code protective order took more than five months to negotiate and draft and required contributions from many different attorneys. (ECF No. 1166 at 9). They provide examples of how Plaintiffs' lawyers used a "tag-team approach," indicating that a close review of the billing entries in chronological order demonstrates the absence of unnecessary staffing. Finally, Plaintiffs emphasize that all of this time and effort would have been avoided if Ford had not made material misrepresentations during discovery.

With these arguments and the *Johnson* factors in mind, the undersigned has reviewed the billing entries in chronological order and finds that Plaintiffs' counsel did bill a large number of hours on the source code protective order and the sanctions motion, and a portion of those hours were billed by members of the same or different firms performing duplicative tasks; including, reviewing, revising, researching, and examining the work of the other attorneys. To that extent, the approach used by Plaintiffs' counsel was "lawyers working by committee," which is not an appropriate approach in the context of calculating a fee award. *See McGee v. Cole,* 115 F. Supp. 3d 765, 776 (S.D.W. Va.2015). In addition, some of the billing entries were vague or inadequate in describing the tasks being performed. Unacceptable block billing likewise appears in Plaintiffs' billing entries. When faced with billing deficiencies in a fee application, the court "must exercise sound judgment based on knowledge of the case and litigation experience to reduce the number of hours by an appropriate percentage." *Route Triple Seven Ltd. P'ship v. Total Hockey, Inc.*, 127 F. Supp. 3d 607, 621–22 (E.D. Va. 2015). Courts have reduced fee requests by percentages ranging from 10% to 90%. *Id.*

Here, the undersigned accepts that some duplication in attorneys' services should be anticipated due to the nature of the case (a putative class action involving allegedly defective electronic throttle control systems in numerous vehicle models manufactured

over a nine-year period), the complexity of the issues surrounding the production of Ford's source code and related sanctions motion, and the perceived importance of the discovery to Plaintiffs' claims. The issues were hotly contested, requiring numerous court conferences and meet and confer sessions, an evidentiary hearing, and the involvement of an unbiased expert, Dr. William Sanders, to assist the Court with difficult and specialized technical matters. Therefore, the tasks associated with the protective order and sanctions motion required the contribution of highly skilled, trained, and experienced attorneys. For that reason, the prevalence of law firm partners—as opposed to associates—participating in these matters was reasonable and expected. Moreover, while there was duplication in attorney attendance at court conferences, the attorneys came from different law firms located in different states and were all participating in various aspects of the source code issues. Consequently, their direct involvement in the conferences allowed the Court to have the most knowledgeable attorneys present at all hearings and telephonic conferences, and likely resulted in increased efficiency in communication between the various firms. The undersigned also must consider that at the time Plaintiffs' counsel performed the work and incurred the expenses set forth in the fee application, they had no expectation of reimbursement. Accordingly, they did not intentionally overwork the issues to artificially inflate their billings. Instead, they invested the time and resources they felt were necessary to respond to a situation created by Ford.

Finally, Plaintiffs' counsel's staffing was likely no more excessive than lawyer staffing for the defense. The undersigned recalls that three or more defense attorneys appeared at or participated in most, if not all, court conferences. Undoubtedly, numerous defense attorneys worked on the same matters related to the source code protective order and Plaintiffs' motion for sanctions. In addition, as Plaintiffs' argue, the time billed by

their counsel for the source code protective order and the sanctions motion would not have been necessary at all if Ford had been accurate and forthright at the outset about its use, disclosure, and protection of the relevant source code. Ford's attempt to distinguish between issues at the evidentiary hearing related to source code protection and production is unavailing, because the entire process surrounding production of Ford's source code would have been shortened and streamlined if Ford had not repeatedly and vigorously misrepresented its history of source code disclosure. Ford should bear in mind that the award of fees and costs in this case does not arise ancillary to a routine Rule 37(a) discovery motion; rather, the award here is imposed as a *sanction* for Ford's discovery misconduct.

For the reasons stated above, the undersigned finds that the lodestar amounts for each attorney should be reduced by twenty-five percent to account for billing duplication, billing overlap, excessive billing, insufficient billing descriptions, and block billing. This percentage fairly addresses Ford's legitimate concerns, while accounting for the billing judgment already exercised by Plaintiffs' counsel. The only time excepted from the percentage reduction is time charged by Mr. Slavik for work in October 2015 through June 2017 and time charged by Ms. Kuryak, because these time entries are not duplicative, overlapping, or vague.

Having applied the approved hourly rates and deducting twenty-five percent from the lodestar amounts, Plaintiffs are entitled to an award of attorneys' fees totaling **$199,819.29,** which divided by law firm is as follows:

| | | |
|---|---|---|
| 1. | Grant & Eisenhoffer, P.A. | **$54,600.00** |
| 2. | DiCello Levitt & Casey, LLC | **$22,374.38** |
| 3. | Spilman Thomas & Battle, PLLC | **$75,569.91** |

| 4. | Slavik Law | **$44,961.25** |
| 5. | Bartimus Frickleton Robertson & Rader | **$1,732.50** |
| 6. | Isaac Wiles Burkholder & Teetor, LLC | **$581.25** |

## II.  <u>Attorneys' Expenses</u>

After subtracting an error in Mr. Slavik's itemization, Plaintiffs request an award of attorney-related expenses in the amount of **$12,756.97**, which includes expenses incurred by the three lead law firms representing Plaintiffs. In a series of affidavits, Plaintiffs' counsel verify that the expenses requested in the fee application are true, accurate, and directly related to Ford's discovery misconduct. (ECF Nos. 1166-1, 1166-2, 1166-3).

Ford objects to the claimed expenses, arguing that the itemizations provided by Plaintiffs' counsel are not well detailed or documented; thereby, preventing Ford from determining the reasonableness of the charges. The undersigned finds Ford's argument to be unpersuasive. Other than a couple of transcripts and secretarial overtime, the line items largely reflect travel-related expenditures for trips related to the source code protective order and the motion for sanctions. The amounts included by Plaintiffs' counsel appear to be reasonable on their face and to be limited to expenses incurred secondary to Ford's discovery misconduct. Moreover, as officers of the court, counsel have testified under oath that the list of expenses contained in the fee application are an accurate, if not understated, accounting of the expenses incurred by Plaintiffs' counsel as a result of Ford's misrepresentations. Accordingly, the undersigned finds that Plaintiffs are entitled to reimbursement of attorneys' expenses in the amount of  **$12,756.97**.

### III. <u>**Expert Fees and Expenses**</u>

Plaintiffs have requested payment of expert fees in the amount of **$261, 406.55** and expert expenses in the amount **$66,319.63**. The fees and expenses were charged to Plaintiffs by the Barr Group, Philip Koopman, Ph.D., and Edge Case Research. According to affidavits supplied by Plaintiffs, the time billed by the Barr Group reflects work performed in May 2015; October through December 2015; and January through October 2016. (ECF No. 1143-1 at 2, 10, 11). The May 2015 entries reflect work completed by Plaintiffs' expert, Nigel Jones, to prepare for an evidentiary hearing on the source code protective order. The remaining entries reflect the time spent by Barr Group experts traveling to and from the secured room in Dearborn, Michigan in order to review Ford's source code. (*Id.*). The Barr Group charged expert fees in the range of $325-$550 per hour. The total charged by the Barr Group for the above-described services is $145, 701.25. In addition, the Barr Group incurred expenses totaling $57, 537.70, including Mr. Jones's travel to Huntington, West Virginia for the evidentiary hearing, and the travel of other Barr Group experts to the secured room in Dearborn. (*Id.* at 3, 16).

Dr. Koopman, one of Plaintiff's expert witnesses, performed work in 2017, between February and November. Plaintiffs seek reimbursement of Dr. Koopman's fees for time spent traveling to Dearborn; for portions of his expert reports that "informed Plaintiffs' motion for sanctions"; and for direct support provided by Dr. Koopman during the briefing of the motion for sanctions. (*Id.* at 5, 49). Dr. Koopman's fees for those services total $65, 342.80. Dr. Koopman also incurred travel expenses in the amount of $5,619.99. (*Id.* at 6, 51).

Edge Case Research is an expert firm with expertise in embedded software and vehicle safety. (ECF No. 1143-1 at 3). Plaintiffs retained Edge Case Research, in relevant

part, to "review and analyze source code files attached to emails produced by Ford during discovery." (*Id.* at 4). The information uncovered by Edge Case Research formed the basis of Plaintiffs' sanctions motion. Plaintiffs seek reimbursement of fees incurred between April 19, 2017 and May 8, 2017 for Edge Case Research's analysis of the emailed source code. (*Id.* at 29-30). These fees total $50, 362.50. In addition, Plaintiffs paid Edge Case Research's expenses in the amount of $2,819.68, which constitute the cost of software licenses Edge Case Research was required to purchase in order to perform the source code review. (*Id.* at 4, 32).

### 1. Barr Group

Ford objects to the time billed by Mr. Jones for his attendance at the evidentiary hearing, arguing that the time should be reduced to one third, because the hearing involved issues other than the security of the source code. In addition, Ford objects to Mr. Jones's block billing. (ECF No. 1152 at 15). With respect to Barr expert, Steve Louden, Ford contends that Mr. Louden is requesting $550 per hour in fees when he only charged Plaintiffs $350-$375 per hour. Ford indicates that Mr. Louden's hourly rate should be decreased to reflect the actual rate charged to Plaintiffs. Finally, Ford objects to the expenses requested by the Barr Group on the ground that the expenses are not sufficiently detailed to allow Ford the opportunity to evaluate the reasonableness of the charges. Ford concedes that travel expense is an appropriate item for reimbursement, but argues that the lack of detailed travel charges justifies a 50% reduction of the Barr Group's expenses. (*Id.* at 19).

In a responsive affidavit, Andrew Girson, CEO of the Barr Group, verifies that the fees and expenses itemized by Plaintiffs in their fee application are accurate and are based upon contemporaneously prepared time and expense records of the Barr Group. (ECF No.

1166-6 at 2-3). Mr. Girson testifies that the time records submitted were prepared with great care to insure that only activities directly related to the protective order and travel to the source code room were included. He also asserts that Ford is mistaken about the hourly rate charged by the Barr Group to Plaintiffs for Mr. Louden's services, explaining that while Mr. Louden billed the Barr Group $350 to $375 per hour for his time, the Barr Group charged Plaintiffs $550 per hour for that time. Accordingly, the hourly fee sought by Plaintiffs for Mr. Louden's time is correct. (*Id.*).

In essence, Ford does not object to the categories of fees and expenses outlined by the Barr Group; instead, Ford contends that the individual entries are either excessive or not well supported. The undersigned disagrees. The Barr Group has provided sufficient information to discern the task that led to the charge and the expense that accompanied the task. The undersigned likewise finds Ford's argument regarding Mr. Jones's appearance at the evidentiary hearing to be unpersuasive. If not for the difficulty associated with negotiating the source code protective order, an evidentiary hearing likely would not have been necessary. Therefore, Mr. Jones's appearance at the hearing can be directly attributed to Ford's discovery misconduct. While the travel time and expenses claimed by the Barr Group are substantial, the amounts are verified by the affidavit of Mr. Girson. There is nothing facially outrageous about the time and expenses claimed, and the hourly rates charged by the Barr Group are within the range typically charged by experts.

Nevertheless, there are some entries included on the Barr Group's expense itemization that either lack a corresponding time record, or are undated and thus prevent the Court from determining if a corresponding time record exists. Although the Barr Group may have legitimately charged these amounts, the Court is not tasked with parsing

through the record and interpreting entries in an effort to match activities with expenses. To the contrary, the burden rests with the Plaintiffs to adequately demonstrate that their fee application is complete and accurate. Entries that are unclear or inconsistent with other records will be rejected as lacking substantiation. For that reason, the following expense entries have been disallowed:

| | | |
|---|---|---|
| 11/04/2015 | Louden trip to Detroit (10/6-10/8) | $881.93 |
| 11/04/2015 | Louden trip to Detroit (10/6-10/8) | $420.00 |
| 12/09/2015 | Louden trip to Detroit (11/8-11/21) | $810.00 |
| 12/09/2015 | Louden trip to Detroit (11/8-11/21) | $4,974.20 |
| 2/08/2016 | Barr trip to Detroit (1/12-1/13) | $683.27 |
| 2/08/2016 | Barr trip to Detroit (1/12-1/13) | $198.18 |
| 2/08/2016 | Barr trip to Detroit (1/12-1/13) | $81.25 |
| 11/11/2016 | Louden per diem | $33.50 |
| 11/11/2016 | Louden transportation (10/16 & 10/23) | $1,084.96 |
| 11/11/2016 | Smith transportation | $63.00 |
| 11/11/2016 | Smith rental car | $247.20 |
| 11/11/2016 | Smith meal per diem | $195.00 |
| 11/11/2016 | Louden meal per diem | $390.00 |
| 2/07/2017 | Louden meal per diem | $325.00 |
| 3/07/2017 | Louden transportation (2/11 & 2/18) | $1,101.08 |
| 3/07/2017 | Louden meal per diem | $780.00 |
| 4/06/2017 | Louden meal per diem | $65.00 |

In addition, two time records are disallowed as they reflect administrative, rather than expert witness time: 5/26/2015 Nigel Jones Prep for travel, totaling $262.50, and

11/27/2015 Michael Wilk travel arrangements, totaling $325.00.

After making these deductions, the undersigned concludes that Plaintiffs are entitled to reimbursement of the fees and expenses charged by the Barr Group in the total amount of **$190,317.88**.

### 2. Philip Koopman, Ph.D

Ford opposes Dr. Koopman's fees and expenses on two grounds. First, Ford asserts that Plaintiffs are attempting to recoup time spent by Dr. Koopman traveling to the secured source code room even though Dr. Koopman never charged this time to Plaintiffs. (ECF No. 1152 at 15-16). Ford argues that it should not have to pay fees that were never passed on to Plaintiffs. Second, Ford objects to Plaintiffs' request for reimbursement of 10% of Dr. Koopman's time spent preparing his expert reports and giving deposition testimony. Ford contends that the percentage selected by Plaintiffs is "wholly made up" in that it is not tied to any concrete measurement. (*Id.* at 16).

Plaintiffs counter Ford's objections by supplying an affidavit from Dr. Koopman. (ECF No. 1166-7 at 2-6). Dr. Koopman explains that he did bill Plaintiffs for his travel time, directing the parties to the entries in his invoices that represent his charges for travel. (*Id.* at 4). Dr. Koopman acknowledges that he did not identify travel time as a separate line item in his bills to Plaintiffs, but did make a conservative estimate to assist Plaintiffs in supporting their motion for sanctions. Dr. Koopman testifies that the time allowed for his travel "understates the actual amount of time" he spent commuting to the secured source code room. (*Id.*). In regard to the 10% charged for time spent on security issues in his expert reports and deposition, Dr. Koopman supplies a rationale for the 10% figure used by Plaintiffs.

The undersigned finds Ford's opposition to Dr. Koopman's travel time to be without merit. As Plaintiffs have stressed on more than one occasion, they suggested other methods for reviewing the source code that would not have required extensive travel by their expert witnesses. Ford strenuously opposed each one of Plaintiffs' suggestions on the ground that Ford's source code had been strictly safeguarded in the past and was entitled to heightened protection that could only be accomplished by a secured source code room. As it turned out, Ford's representations were grossly inaccurate, making travel to the source code room an avoidable extravagance. Consequently, Ford must pay the travel time and expenses of Dr. Koopman.

On the other hand, Plaintiffs have failed to carry their burden of demonstrating how Ford's misrepresentations increased the time Dr. Koopman spent writing his expert reports and giving a deposition. While it is possible that these tasks are connected to the discovery misconduct, the information before the Court does not adequately explain the relationship. For that reason, the time attributed to preparing the expert reports and preparing for deposition testimony will be deducted. Plaintiffs are entitled to reimbursement, however, for the time Dr. Koopman spent assisting with with the motion for sanctions.

After subtracting the time described above, the undersigned finds that Plaintiffs are entitled to **$31,951.99** for Dr. Koopman's fees and expenses.

### 3. Edge Case Research

Ford argues that all of the fees and expenses billed by Edge Case Research should be disallowed, because its task descriptions are "incomplete and vague." (ECF No. 1152 at 15). Ford suggests that Edge Case Research's work had nothing to do with the protective order or the motion for sanctions. Instead, according to Ford, Plaintiffs are attempting to

shift the costs of their case in chief to Ford. (*Id.*). Ford also objects to paying the expenses claimed by Edge Case Research, arguing that Edge Case Research seeks reimbursement of software licenses that were needed to analyze the source code in general, not specifically the code discussed in the motion for sanctions.

In his affidavit, Dr. Koopman responds to Ford's assertions by explaining that he is a co-founder of Edge Case Research, a firm that provides expert analysis in litigation. (ECF No. 1166-7 at 2). In regard to Ford's discovery misconduct, Edge Case Research was retained to examine and analyze the source code files attached to emails produced by Ford during discovery. Plaintiffs confirm that the source code files attached to emails were not examined to advance Plaintiffs' theories of recovery, but were instead examined to determine the extent of Ford's misrepresentations. (ECF No. 1152 at 15). Dr. Koopman also verifies that the time included in the fee application described by Edge Case Research as source code analysis relates directly to the emailed source code attachments and not to source code analysis performed as part of Plaintiffs' case in chief. (ECF No. 1166-7). In addition, Dr. Koopman confirms that the software licenses purchased by Edge Case Research were essential to an analysis of the emailed source code. (*Id.* at 3).

In light of Dr. Koopman's affidavit, the undersigned finds that the services charged by Edge Case Research were directly related to Ford's discovery misconduct. Furthermore, the software license purchased by Edge Case Research were necessary to allow employees of Edge Case Research to access the source code files that were attached to emails produced by Ford in discovery. By opening and reviewing these attachments, Edge Case Research determined that Ford misrepresented the level of protection given to the source code ordered to be disclosed in this case. Ford has not produced any evidence to refute the credibility of Dr. Koopman's affidavit. Therefore, Plaintiffs are entitled to

reimbursement of the fees and expenses charged by Edge Case Research in the amount of **$53,182.18.**

**IV.**     **Conclusion**

Wherefore, for the reasons set forth above, the Court **ORDERS** Ford to pay Plaintiffs the total sum of **$488,028.31** as sanctions for Ford's discovery misconduct. The payment shall be made within **thirty days** of the date of this Order.

The Clerk is instructed to provide a copy of this Order to counsel of record and any unrepresented party.

**ENTERED:**  March 22, 2018

Cheryl A. Eifert
United States Magistrate Judge