# IN THE UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF WEST VIRGINIA

# HUNTINGTON DIVISION

CHARLES JOHNSON, et al.,

        Plaintiffs,

v.                          CIVIL ACTION NO. 3:13-6529

FORD MOTOR COMPANY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

On December 27, 2017, this Court entered a Memorandum Opinion and Order granting, in part, and denying, in part, Plaintiffs' Motion for Relief Related to Ford's Discovery Misconduct. *Johnson v. Ford,* Civ. Act. No. 3:13-6529, 2017 WL 6614101 (S.D. W. Va. Dec. 27, 2017). In that decision, the Court determined Ford misrepresented the level of safeguards it provided its source code, resulting in increased attorneys' fees and costs to Plaintiffs. *Id.* at *10. Therefore, the Court held Plaintiffs were entitled to reimbursement for those expenses.[1] Ford now moves the Court to reconsider that portion of the decision. ECF No. 1132. For the following reasons, the Court **DENIES** Ford's motion.

## I.
## STANDARD OF REVIEW

When, as here, a party moves for reconsideration of an interlocutory order pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the district court has discretion to revise such an order "at any time before the entry of a judgment adjudicating all the claims[.]" Fed. R.

---

[1] The Court denied the remainder of Plaintiffs' requests. *Id.*

Civ. P. 54(b). Although the Fourth Circuit has not set forth a precise standard for lower courts to follow under Rule 54(b), it has stated that "Rule 54(b)'s approach involves broader flexibility to revise *interlocutory* orders before final judgment as the litigation develops and new facts or arguments come to light." *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017) (italics original) (citing *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514–15 (4th Cir. 2003); *Cobell v. Jewell*, 802 F.3d 12, 25–26 (D.C. Cir. 2015)); *Howard v. W. Va. Div. of Corrs.,* No. 2:14-CV-13695, 2016 WL 958698, at *2 (S.D. W. Va. Mar. 14, 2016) ("The Fourth Circuit has not announced the appropriate standard of review for a motion for reconsideration under Rule 54(b) in this Circuit, but has stated that the power to amend interlocutory orders at any time before final judgment is 'committed to the discretion of the district court.'" (quoting *Am. Canoe*, 326 F.3d at 515; other citations omitted)). However, the court's discretion is not limitless and may be constrained when an interlocutory ruling becomes the law of the case and "govern[s] the same issues in subsequent stages in the same case." *Id.* (internal quotation marks and citations omitted).

Under the law of the case doctrine, the court may reconsider and modify its interlocutory ruling in limited circumstances. *Ross v. Klesius,* No. 16-2040, 2017 WL 4994785, at *2 (4th Cir. Oct. 25, 2017), cert. denied, No. 17-1032, 2018 WL 557429 (U.S. Feb. 26, 2018). Reconsideration may occur when there is: "(1) 'a subsequent trial produc[ing] substantially different evidence'; (2) a change in applicable law; or (3) clear error causing 'manifest injustice.'" *Id.* (quoting *Carlson*, 856 F.3d at 325; other citations omitted)). Nevertheless, relief is seldom appropriate "[w]hen the motion raises no new arguments, but merely requests the district court to reconsider a legal issue or to change its mind[.]" *Pritchard v. Wal-Mart Stores, Inc.*, 3 F. App'x

52, 53 (4th Cir. 2001) (citation and internal quotation marks omitted). Furthermore, although the law of the case doctrine is ubiquitous, it cannot categorically bar a court from reconsidering an earlier interlocutory order in light of the court's "ultimate responsibility . . . to reach the correct judgment under law.'" *Am. Canoe*, 326 F.3d at 515.[2]

## II.
## DISCUSSION

In its motion, Ford hinges its arguments for reconsideration on the "manifest injustice" prong. In support of its position, however, Ford merely recycles many of the same arguments it previously made and insists the Court must have misunderstood them, or it surely would have ruled in Ford's favor. The Court disagrees. The Court fully understood Ford's arguments when it wrote the original Memorandum Opinion and Order, discussed Ford's arguments at length, and soundly rejected them.

On reconsideration, Ford insists that it did not intend to imply that it never allowed the source code to leave a Ford facility. Nevertheless, the record contradicts this assertion. On May 28, 2015, the Magistrate Judge held a hearing regarding production of the source code. *Tr. of Proceedings,* (May 28, 2015), ECF No. 531. In discussing whether the source code should be produced in "native" or "write access" format, counsel for Ford stated:

> The Ford ETC source code has never been produced, ever, never, ever been produced **in the format** that the plaintiffs are

---

[2]Plaintiffs argue that Ford ignores the interest of finality bestowed upon interlocutory decisions under the law of the case doctrine. As the underlying decision here found Plaintiffs are entitled to monetary sanctions, this decision has no impact on substantive issues addressed by the Court in subsequent proceedings. In other words, the Court's *Daubert* and summary judgment decisions do not rest upon the award of sanctions.

> requesting **to anyone. Not suppliers, not third-party suppliers, no one**.
>
> When there is an issue . . . people come into Ford and review it the same way that we have offered to provide it to the plaintiffs. They get to read it, they get to search it, and they get to look at it. That's how it's been proposed before, and that's how Ford has always done it. It's not unique. It's not new. It's not different.

*Id.* at 13 (emphasis added). Ford insists this statement is true because it never produced the source code in a format that was editable. However, as this Court detailed in its Memorandum Opinion and Order, "Ford's attempt to draw a distinction between native and flat file source code is nonsensical with respect to confidentiality concerns." *Johnson*, 2017 WL 6614101, at *5. The source code attached to the emails was "written in a plain ASCII text" and "[a]s such, [a] normal text editor such as Notepad can read, modify, and write any line of code in the bookshelf file. It is not in 'read only' format in any manner whatsoever." *Id.* (internal quotation marks and citation omitted). In this light, Ford's argument rings hollow.

Additionally, the Court finds disturbing Ford's argument that, because it never told "Plaintiffs or the Court [of] any instances in which it shared source code with its partners, subsidiaries, and contractors, . . . [it] did not intend to convey to the Court that it had never ever shared its ETC system source code with <u>anyone</u> outside of Ford under any circumstances." *Ford Motor Co.'s Mot. for Recons. of Dec. 27, 2017 Mem. Op. and Order Regarding Pls.' Mot. for Relief Related to Ford's Disc. Misconduct*, at 9 (Jan. 12, 2018), ECF No. 1132 (emphasis provided by Ford; footnote omitted)). This argument is in direct contravention to the statements quoted above at the hearing, when Ford's counsel expressly told the Magistrate Judge the source code was

not produced to "anyone," "no one." Similarly, Ford stated in the memorandum it submitted to the Magistrate Judge that:

> While Ford does not suggest that Plaintiffs or their consultants are untrustworthy, the mere act of removing Ford's proprietary source code from Ford's secure possession creates unnecessary risks of disclosure. Recent examples of industrial espionage . . . make clear that corporations must be vigilant and take all precautions to prevent the unauthorized disclosure of their proprietary material. . . . *A critical precaution Ford takes to avoid such catastrophes is to not allow its proprietary source code to leave its possession, ever, even for the benefit of Ford's own suppliers.*

*Ford Motor Co.'s Mem. Regarding Source Code Protective Order*, at 2 (May 22, 2015), ECF No. 502 (italics added). Ford further told the Magistrate Judge that "Ford's ETC system source code has not been provided to any non-Ford personnel, including a Ford supplier, for anything other than an 'eyes on' review on an as needed basis at a Ford facility on a Ford supplied computer with a Ford employee present and operating the computer." *Id*. at 9 (citation omitted). "Given its highly proprietary and sensitive nature, as well as its importance to vehicle operations, Ford [stated it] cannot permit its native ETC system source code to leave Ford's premises." *Id*. at 12. Yet, it is now undisputable that Ford sent source code outside of its computer network.

Ford's lack of candor in disclosing the fact it sent source code outside of its network and the secured access area is one of the primary reasons it finds itself in this situation. If Ford was concerned about misleading the Magistrate Judge into believing something it did not intend, it easily could have disclosed that it emailed source code to its business associates. Instead, Ford withheld the fact "editable source code was emailed over unsecured networks by Ford employees to third parties on numerous occasions." *Johnson*, 2017 WL 6614191, at *5.

Although Ford candidly now admits that it did not disclose this information to the Magistrate Judge and Plaintiffs, Ford contends the omission was unintentional so the Court was wrong in awarding sanctions to Plaintiffs. *Id*. Again, the Court disagrees. Ford either knew, or should have known, this information was clearly relevant to the issues being debated, but it chose not to mention it and made statements that any reasonable person would believe were the exact opposite of what Ford now asserts. If Ford had disclosed this information, however, it likely would have undercut its argument the source code had to be "restricted to an ultra-secure Ford facility . . . because of its fear that an outside computer system could be hacked." *Id*. Using this argument, Ford successfully convinced the Magistrate Judge to impose the secured-facility restriction upon Plaintiffs and their experts. Had Ford been completely forthright, the Magistrate Judge may have identified other reasonable and less expensive measures to protect the code. It was the additional time and money Plaintiffs spent negotiating the protective order and conducting discovery at the secure facility in Michigan that the Court found compensable in its earlier decision. *Id.*, at *9-10 (holding Plaintiffs are entitled to "an award of attorneys' fees, expert fees, and costs . . . for any reasonable expense they can demonstrate was attributable to Ford's misrepresentations related to the level of security it used to protect its source code," as these misrepresentations "resulted in the Magistrate Judge unnecessarily requiring Plaintiffs to limit their review of the code to a secure facility in Michigan" (citation omitted)).[3]

---

[3] Plaintiffs also were entitled to their fees and costs associated with their motion for sanctions.

Similarly, Ford states it "never intended to convey to the Court (whether through an affirmative statement or inference) that entities such as [Visteon, Roush, Mazda, and Aston Martin] . . . have never been given access to Ford's source code." *Ford Motor Co.'s Mot. for Recons.*, at 10. Even at first blush, the Court finds it telling that Ford states that, even if it made *"an affirmative statement or inference"* that it never provided source code to these companies, it should not be held responsible for those representations because it lacked intent. *Id.* (italics added). Whether intentional or not, the fact remains that "Ford was not forthright with respect to the level of security it provided its source code, which resulted in the Magistrate Judge unnecessarily requiring Plaintiffs to limit their review of the code to a secure facility in Michigan." *Johnson*, 2017 WL 6614101, at *10.[4] Ford cannot avoid the consequences of its representations by essentially arguing the Magistrate Judge should have understood it really did not mean what it said.

Despite the mountain of evidence against Ford's position, it criticizes the Court for referring to four of the recipients of these emails, Visteon, Roush, Mazda, and Aston Martin, as "third parties," as Ford claims they really are "partners" and "subsidiaries." Ford maintains that it used the terms "third parties," "suppliers," and "competitors" in a very limited sense to reflect only those entities that were in competition with Ford.[5]

---

[4]This argument essentially is a reiteration of its earlier argument that those entities that received the emails were contractors who needed the code in order to do their jobs. *Johnson*, 2017 WL 6614101, at *5.

[5]In its motion, Ford does not even mention Melco Holdings, Inc. In one of the emails at issue, a Ford employee informed an individual with Mazda that Mazda could not share the attached code with Melco until there was a confidentiality agreement in place, clearly inferring Ford was

Initially, the Court recognizes there is nothing inherent about the terms "third parties" or "suppliers" to warrant such an interpretation, nor did Ford clearly convey its purported intent to the Magistrate Judge. Indeed, in looking at the language quoted above by counsel at the hearing and in Ford's Memorandum Regarding Source Code Protective Order, the Court can discern no such intent on the part of Ford. In fact, the language not "anyone . . . [n]ot suppliers, not third-party suppliers, no one,"[6] and the "code has not been provided to any non-Ford personnel, including a Ford supplier" outside of a Ford facility[7] leads the Court to the opposite result. Yet, despite this definitive and forceful language, it is now indisputable that Ford sent source code outside of Ford's computer network.

The inconsistency in Ford's argument is highlighted further by the Declaration by Eric Luehrsen, Ford's Controls Engineer, that Ford submitted for the Magistrate Judge's consideration. In his Declaration, Mr. Luehrsen reiterates the need to protect the highly proprietary nature of the source code and indicates "Ford has undertaken significant efforts to protect Ford's ETC system source code from disclosure," by limiting access to "Ford employees who are directly involved in the design and development of the ETC system, and placing even more stringent limitations on access to edit Ford's ETC system source code to a select group of design and software engineers." *Dec. of Eric Luehrsen*, at 4 (May 22, 2015), ECF No. 502-1. Mr. Luehrsen

---

willing to have the code shared with Melco under that condition. *See Ford-Bel-03301265*, ECF No. 999, at 7.

[6]*Tr. of Proceedings*, at 13.

[7]*Ford Motor Co.'s Mem. Regarding Source Code Protective Order*, at 9.

further states Ford has created "secure areas within Ford's premises" to protect the code, and "Ford employees are not permitted to remove Ford's ETC system source code from Ford secure systems *for any reason*." *Id*. at 4-5 (italics added). Additionally, Mr. Luehrsen avers "Ford's ETC system source code, in whole or in part, has not been provided to a non-Ford supplier third party *for any reason*." *Id*. at 5 (italics added). Mr. Luehrsen then states that "Ford's ETC system source code has not been provided to a Ford supplier for anything other than an 'eyes on' review on an as needed basis at a Ford facility on a Ford supplied computer with a Ford employee present and operating the computer." *Id*. Likewise, Mr. Luehrsen declares that "Ford has not provided *any supplier* with a paper *or electronic copy* of Ford's ETC system source code and Ford's suppliers have not been allowed to photograph or record Ford's ETC system source code." *Id*. (italics added).

In direct contradiction to Mr. Luehrsen's Declaration, however, it is established that Ford employees sent emails, with source code attached, to entities outside of Ford's computer network. Mr. Luehrsen stated Ford maintained "secure areas within Ford's premises," and Ford employees were not allowed to remove the "code from Ford secure systems *for any reason*." *Id*. at 4-5 (italics added). Nevertheless, Ford now claims it did not misrepresent anything because the code it sent out was to its business partners, subsidiaries, and contractors, not its adversaries. Hogwash. Irrespective of the label slapped on these other companies, the crux of Ford's argument was that, if it sent source code outside of Ford's facilities, it was vulnerable to a parade of horribles. As this Court previously held, these other companies could be hacked, and the source code compromised, despite the fact Ford may have had a confidentiality agreement with them. *Johnson*, 2017 WL 6614101, at *5. Obviously, "Ford engaged in a campaign of misrepresentations that

unequivocally influenced the Magistrate Judge's decision to require a level of security that, in reality, Ford did not employ itself." *Id.*[8]

Ford also asserts that, "[w]hile not always stated," it intended its statements and arguments to be interpreted in light of Plaintiffs' discovery requests, and the Court did not consider them within that context. *Ford Motor Co.'s Mot. for Recons.*, at 5-6. Ford insists the Court patently misunderstood Ford's statements against this backdrop and, as a result, reached a decision that is manifestly unjust. To the contrary, this Court was acutely aware of the backdrop of the discovery

---

[8]The parties disagree in their briefing about how the Court should characterize these other companies. In the Declaration of Philip Koopman, Ph.D., that Plaintiffs attached to their Motion for Relief Related to Ford's Discovery Misconduct, Dr. Koopman examined the emails and opined, *inter alia*, that Ford had emailed code "among numerous Ford employees, as well as third parties on unsecure networks." *Dec. of Philip Koopman, Ph.D.*, at 2 (June 16, 2017), ECF No. 998. In addition, Dr. Koopman found there were "several instances the source code had been sent off-site to employees at manufacturers such as Mazda and Aston Martin, and emailed to be shared with suppliers such as Roush and Melco." *Id*. Although Ford insists these companies are its subsidiaries, partners, and contractors, no reasonable person considering Ford's arguments and statements would believe that Roush and Visteon were not included amongst the "suppliers" that Ford referenced, irrespective of a contractual relationship between the companies. Merely because two entities have "partnered" or "contracted" together, does not mean that one of those entities cannot also be a "supplier." Additionally, although Aston Martin was wholly owned by Ford when the emails were sent, and Ford owned an interest in Mazda, both were separate companies with separate computer networks.

In the original decision, the Court used the phrase "third parties" to represent all these companies. Ford complains that it subsidiaries, partners, and contactors are not legally "third parties." Although Ford's point may be legally accurate, Ford's statements and arguments were not confined to conveying that it never allowed the source code to be sent to those who had the legal status of "third parties." The language Ford used cast a much larger net than Ford wants to admit. Moreover, regardless, the emails were sent outside of the Ford's secure-access area and computer network, which Ford told the Magistrate Judge was not done. The problem for the Court is not that Ford shared its source code with other companies for business purposes. The problem is that it told the Magistrate Judge it did not happen.

requests made by Plaintiffs, and it fully considered those requests when it issued its prior decision. In fact, in considering the issues related to sanctions, the Court received the assistance of the Court's independent technical advisor, William H. Sanders, Ph.D., M.S.E., B.S.E. Dr. Sanders was exceptionally well versed with the issues raised in the sanction motion because he also served as the technical advisor to the Magistrate Judge on the type, extent, and manner in which the source code was to be provided. The Court reached its decision after fully considering all the issues raised by the parties, and the fact Ford misrepresented the level of security by which it handled its own code. Ford clearly is unhappy with the result, but it is a result the Court was fully justified in reaching in equity to Plaintiffs and, importantly, to protect "the integrity of the [judicial] process[.]" *United States v. Shaffer Equip. Co.*, 11 F.3d 450, 462 (4th Cir. 1993). Therefore, the Court **DENIES** Ford's Motion for Reconsideration.

In the event the Court denies its motion, Ford further asks that the Court to clarify that its decision on sanctions is limited to this case and shall have no preclusive effect on future litigation. To be clear, the Court's decision today is based upon the facts of this case. The Court will not speculate, however, as to the impact this decision may have on future litigation. Ford certainly is free to argue, as the Court is sure it will, that this case is distinguishable from other situations it may confront.

In their Response, Plaintiffs also renew their request for the additional relief they sought in their original motion. The Court finds no basis to broaden the scope of relief. However, the Court **GRANTS** Plaintiffs additional attorneys' fees and costs associated with responding to

Ford's Motion for Reconsideration and **DIRECTS** Ford to pay all invoices submitted by Dr. Sanders in assisting the Court in resolving all the issues related to sanctions.

### III.
### CONCLUSION

For the foregoing reasons, the Court **DENIES** Ford Motor Company's Motion for Reconsideration of December 27, 2017 Memorandum Opinion and Order Regarding Plaintiffs' Motion for Relief Related to Ford's Discovery Misconduct (ECF No. 1132), and **GRANTS** Plaintiffs attorneys' fees and costs associated with responding to the motion. The Court shall apply the same criteria the Magistrate Judge applied in her Memorandum Opinion and Order entered on March 22, 2018 (ECF No. 1173), to determine the amount Plaintiffs are due. The Court **DIRECTS** Plaintiffs to file an affidavit itemizing the claimed fees, costs, and expenses **on or before April 9, 2018**. Plaintiffs also may file a memorandum in support of the requested award. If Ford objects to Plaintiffs' claim, the Court **DIRECTS** Ford to respond **on or before April 19, 2018**. Plaintiff shall have until **on or before April 26, 2018,** in which to reply.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented parties.

ENTER: March 26, 2018

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE